# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THE PLAZA AT 835 WEST HAMILTON STREET LP** | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | **NO. 15-6616** |
| | : | |
| **ALLENTOWN NEIGHBORHOOD IMPROVEMENT ZONE DEVELOPMENT AUTHORITY, et al.** | : | |

## M E M O R A N D U M

**STENGEL, C. J.**                                          **September  12, 2017**

In 2009, the Pennsylvania General Assembly passed the Neighborhood Improvement Zone Act ("NIZ Act"), which subsidizes development projects in downtown Allentown.  Because of the subsidies, new developments are able to offer cheaper rent to their tenants than preexisting, unsubsidized buildings.  The plaintiff owns an office building in Allentown that is ineligible for NIZ subsidies.  The plaintiff projects that its building will be unable to keep or acquire tenants and therefore expects to default on its mortgage and face foreclosure.  The plaintiff challenges the NIZ Act and its implementation under the Pennsylvania Constitution and the Equal Protection Clause, the Takings Clause, and the Contracts Clause of the United States Constitution through 28 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

Motions to dismiss for failure to state a claim have been filed by the City of Allentown and Mayor Pawlowski, as well as by Pennsylvania Revenue Secretary Eileen

McNulty.  Defendant ANIZDA filed a motion for judgment on the pleadings.  )[1]  For the

following reasons, I will grant the motions and dismiss the claims with leave to amend to

the extent the plaintiff can state a claim consistent with this memorandum.

## I.    BACKGROUND

The heart of the plaintiff's complaint is that the defendants did not interpret the

NIZ Act's provision of funds for "improvement and development" to apply to preexisting

buildings and their tenants, thereby denying the plaintiff access to the NIZ funds to which

its competitors had access.

### A.  The Plaza

In November 2006, the plaintiff acquired PPL Plaza ("The Plaza") for $92 million.

(Compl. ¶¶ 27–31.)  The plaintiff paid over $13 million in cash at closing and financed

the remainder with two loans, one for $75 million and one for $7 million.  Id. ¶ 33.  The

plaintiff's loans were to be repaid in monthly installments, with a final balloon payment

of all amounts outstanding on December 1, 2016.  Id. ¶ 34.[2]  The plaintiff has spent

$334,000 on improvements to the property.  Id. ¶ 37.

---

[1] The plaintiff also initially sued Pennsylvania Treasurer Timothy Reese, Auditor General
Eugene DePasquale, and Governor Thomas Wolf, but the court approved the parties' stipulations
dismissing them as defendants.  (Doc. Nos. 30, 33 & 47).
[2] The plaintiff filed its complaint on December 15, 2015.  The plaintiff alleges that, as of
October 2015, it had paid almost $12 million in principal and over $41 million in interest on the
loans.  Id. ¶ 36.  On August 21, 2017, the plaintiff filed a memorandum with the court explaining
that the lender had initiated a foreclosure action in state court.  (Pl.'s Supp. Mem. in Opp. to
Defs.' Mot. to Dismiss, Document #64).

As of the filing of the complaint, the Plaza's sole tenant (besides one small retail tenant on the ground floor) was a company called Talen Energy Corp.  Id. ¶ 44.[3]  Talen's lease, which was created in 2003, sets its rent at $27.20 per square foot.  Id. ¶ 40, 42.  The lease expires on April 30, 2018.  Id. ¶ 40.

## B. NIZ Act

In an effort to stimulate the economy in Pennsylvania's cities, the Pennsylvania General Assembly passed the NIZ Act on October 9, 2009.  Id. ¶ 52.[4]  The Act allowed the city to create a municipal authority that would designate a "Neighborhood Improvement Zone" ("NIZ") of no more than 130 acres in which the city would enable the construction of a sports facility and other developments.  72 Pa. Cons. Stat. §§ 8902-B–8904-B.  (Compl. ¶ 53.)

The City of Allentown designated a NIZ of 128 acres in downtown Allentown along the western side of the Lehigh River on August 28, 2011, and this designation took effect on September 6, 2012.  Id. ¶ 56.  The zone, which contains the Plaza, "is the only zone designated or eligible for designation under the Act."  Id. ¶ 55.

The Act permits state taxes paid by businesses operating in the NIZ to go into a fund, which can then pay debt service on bonds or loans issued to finance development, improvement, and construction in the NIZ.  72 Pa. Cons. Stat. §§ 8903-B–8907-B; §§ 8904-B(b)–(d), 8902-B.  Id. ¶ 60.  The Pennsylvania Department of Revenue ("DOR")

---

[3] Talen's predecessor, PPL Energy Plus, LLC, a subsidiary of Pennsylvania Power and Light (PPL), was the Plaza's primary tenant from 2003 until 2015.  Talen acquired PPL's rights and obligations under its lease.  (Compl. ¶ 18.)

[4] The NIZ Act was amended on July 9, 2013, and is now part of the Tax Reform Code of 1971, Article XIX-B, codified at 72 Pa. Cons. Stat. §§ 8901-B–8908-B.

certifies the amount of state and local taxes paid by businesses in the NIZ, which are put

into the fund and administered by a municipal authority, the Allentown Neighborhood

Improvement Zone Development Authority ("ANIZDA"). 72 Pa. Cons. Stat. § 8904-

B(d). (Compl. ¶¶ 11, 76.) According to the Act, the money in the fund can be used to

finance "the construction of all or part of a facility or facility complex" or "the

improvement and development of all or any part of the neighborhood improvement

zone." 72 Pa. Cons. Stat. § 8904-B(e)(1).[5]

---

[5] In full, the Act provides:

(1) The money may only be utilized as follows:

    (i) For payment of debt service, directly or indirectly through a multi-tiered ownership structure or other structure authorized by a contracting authority to facilitate financing mechanisms, on bonds or on refinancing loans used to repay bonds issued to finance or refinance:

        (A) the improvement and development of all or any part of the neighborhood improvement zone,

        (B) the construction of all or part of a facility or facility complex.

    (ii) For payment of debt service on bonds issued to refund those bonds.

    (iii) For replenishment of amounts required in any debt service reserve funds established to pay debt service on bonds.

(1.1) The term of a bond to be refunded shall not exceed the maximum term permitted for the original bond issued for the improvement or development of the neighborhood improvement zone and the construction of a facility or facility complex.

(2) The money may not be utilized for purposes of renovating or repairing a facility or facility complex, except for capital maintenance and improvement projects.

Id. § 8904-B(e).

## C. **The Guidelines**

ANIZDA promulgated guidelines regarding the use of the NIZ funds.  (Compl. ¶

80; Reese Mot. to Dismiss Ex. 1 (ANIZDA Guidelines for Obtaining Financing for

Projects in the City of Allentown's NIZ ("the Guidelines"), as amended Mar. 4, 2015)

(Doc. No. 15-2).)[6]  The Guidelines are "intended for informational purposes only" and

"shall not be construed to limit in any way the discretion of the Authority."  (Guidelines ¶

1.3.)  According to the plaintiff, the Authority interpreted the Act's language providing

funds for "the improvement and development of all or any part of the [NIZ]" to apply to

construction of a facility or complex, renovations, or capital improvements to the existing

building, but not to upkeep of preexisting buildings.  (Compl. ¶¶ 86, 108).  Although the

Guidelines do not explicitly state that a project must involve one of these three categories

to be eligible, they generally refer to projects as though they are construction projects.

(See, e.g., Guidelines #5 (describing preferences given to certain "certified subcontractors

in the construction of the Project"); #8 ("Applicant should provide a timeline of major

milestones and construction activities."); #13 ("The Authority shall have the right to

review construction inspection reports being prepared for the Applicant's financial

institution . . . .").)  The plaintiff alleges that ANIZDA also restricted NIZ funds to "new

businesses starting up or moving into the NIZ."  (Compl. ¶ 82).[7]

---

[6] In ruling on a motion to dismiss, a district court may rely on matters of public record
and documents integral to or relied upon in the complaint.  Sands v. McCormick, 502 F. 3d 263,
268 (3d Cir. 2007); Pryor v. NCAA, 288 F.3d 548, 560 (3d Cir. 2002). The Complaint repeatedly
references the Guidelines, which are also a matter of public record.
[7] The plaintiff also points out that Guidelines further deem ineligible "any project
proposing to relocate tenants, occupants, or business existing in the NIZ to another location

As the plaintiff was not planning construction, renovations, or capital improvements, it was ineligible for those subsidies.  Id. ¶ 108.  And its tenant, Talen, was already operating within the NIZ and therefore was not eligible for NIZ funds given to new businesses moving into the NIZ.  Id. ¶ 84.  As a result, "the NIZ affords benefits to every new building inside its boundaries except for PPL Plaza."  Id. ¶ 60 (emphasis omitted).

The plaintiff met with city and state officials, ANIZDA officials, and developers, but was unable to obtain a modification of the Guidelines or other accommodations to give it access to NIZ funds.  Id. ¶¶ 102–08.

The NIZ Act has spurred development in the NIZ.  Since 2009, two office and residential complexes have begun construction:  the City Center Lehigh Valley, which consists of four office buildings with 650,000 square feet of rentable office space, a full-service hotel, 170 luxury apartments, and 100,000 square feet of upscale retail and restaurant space (id. ¶ 64), and the Waterfront Development,[8] which includes six office buildings, 124 residences, and restaurant and retail space.  Id. ¶ 65.  The developers of these complexes anticipate receiving NIZ subsidies of more than $40 million.  Id. ¶¶ 67, 69.  Because of these subsidies, they are able to charge tenants prices significantly below pre-NIZ market rates.  Id. ¶¶ 68, 70–71.

within the NIZ"; "working capital," "rolling stock," and "inventory/receivable financing," "relocation costs for a business or its employees moving into the NIZ," and "molds and dies." Id. ¶ 84.  The plaintiff does not explain, however, how these restrictions affected it.
    [8] The plaintiff argues that the Waterfront Development is outside the walkable downtown center of Allentown and therefore subsidizing it is diverting resources from the downtown, contrary to the NIZ Act's purpose.  Id. ¶¶ 66–67.

The value of PPL Plaza has plummeted since the designation of the NIZ.[9]  Under the lease, the plaintiff charges Talen $27.20 per square foot.  Id. ¶ 42.  In January 2015, after the NIZ Act and Guidelines were promulgated, Talen's parent company asked to renegotiate its lease at a base rent of $8.00 per square foot.  Id. ¶ 90.  It also offered to purchase PPL Plaza for $41 million—a loss to the plaintiff of over $51 million.  Id. ¶ 90.  In October 2015, Talen explained that, although it would be "ideal" for Talen to stay in the Plaza, it had received lower rent offers from the new, NIZ-financed buildings, and it was "close on a final lease solution for a new building" in the Waterfront Development.  Id. ¶ 94.  It is therefore "evident that Talen will vacate the Plaza when the Lease expires in April 2018."  Id. ¶ 97.  The plaintiff explains that the loss of Talen, and the plaintiff's likely inability to find a replacement tenant willing to pay a high enough rate of rent, will likely result in the plaintiff's default on its loans and a foreclosure sale of the Plaza.  Id. ¶ 101.

On August 21, 2017, the plaintiff filed a supplemental memorandum explaining that the owner of its debt had initiated a foreclosure action against it in the Pennsylvania Court of Common Pleas for Lehigh County.  (Pl.'s Supp. Mem. in Opp. to Defs.' Mot. to Dismiss ¶ 2 (Document # 64)).

### D. **The Resolutions**

The plaintiff contends that, in addition to incentivizing Talen to leave the Plaza by making cheaper rent rates available in the new buildings, ANIZDA made a special deal

---

[9] The defendants point out that the plaintiff purchased the Plaza in 2006, at the height of the real estate bubble, and argue that its loss in value is largely due to a nationwide collapse in the real estate market.  (ANIZDA Reply Br. 5 (Document #55)).

for Talen with two resolutions.  (Compl. ¶¶ 109–113.)  The first addressed the fact that

Talen's relocation would have cost Talen money for which it was ineligible for NIZ

subsidies, as the Guidelines deemed ineligible "any project proposing to relocate tenants,

occupants, or business existing in the NIZ to another location within the NIZ."  Id. ¶ 84.

Thus, Talen would have to bear the cost of moving to the Waterfront Development.  The

plaintiff alleges that, to prevent Talen from bearing this cost, ANIZDA passed Resolution

#73, which directed tax revenues to be returned to businesses that relocate from another

place within the NIZ to the Waterfront Development.  (Id. ¶¶ 117, 118; ANIZDA's Mot.

for Leave to File a Mot. for J. on the Pleadings in Excess of the Ct.'s P. Limit, Ex. D

(Resolution 2015-73) (Documents #37-8)).

Second, ANIZDA gave Talen a special tax break.  Resolution #74 allows Talen to

"recoup all state and local taxes above the amount paid by its predecessor, PPL, in 2014."

(Compl. ¶ 19; see also ANIZDA's Mot. for Leave to File a Mot. for J. on the Pleadings in

Excess of the Ct.'s P. Limit, Ex. E (Resolution 2015-74) (Doc. No. 37-9).)  The plaintiff

argues that these resolutions "reveal how the Act has been arbitrarily and irrationally

manipulated to provide benefits to favored entities, while at the same time denying the

same benefits to Plaintiff."  Id. ¶ 123.[10]

---

[10] The plaintiff alleges that the president of PPL Electric Utilities—the company that owned Talen's predecessor, PPL Energy Plus, LLC, (id. ¶ 18)—is on ANIZDA's board of eight or nine directors.  Id. ¶ 75.  The plaintiff does not, however, allege that PPL's Electric Utilities' president has any continued interest in Talen or reaped any benefit from any of ANIZDA's decisions with respect to Talen.

### E.  Procedural History

The plaintiff brought claims for violation of its rights under the United States Constitution pursuant to 18 U.S.C. § 1983 and the Declaratory Judgment Act and its rights under the Pennsylvania Constitution against ANIZDA, the City of Allentown, Mayor of Allentown Ed Pawlowski, Pennsylvania Governor Thomas Wolf, Pennsylvania Secretary of Revenue Eileen McNulty, Pennsylvania Treasurer Timothy Reese, and Pennsylvania Auditor General Eugene DePasquale.  I approved the parties' stipulations to dismiss the claims against Defendants Treasurer Reese (Document #31), Auditor General DePasquale (Document #33), and Governor Wolf (Document #47).

ANIZDA filed an answer (Document #36) and then a motion for judgment on the pleadings (Document #46).  Defendant City of Allentown and Ed Pawlowski filed a motion to dismiss (Documents #38 & 39).  Defendant Secretary McNulty filed a motion to dismiss.  (Document #44.)[11]  The plaintiff responded in opposition to these motions, and the defendants replied.  The plaintiff filed a sur-reply in opposition to ANIZDA's reply.  Lastly, the plaintiff filed a supplemental memorandum in support of its opposition to the defendants' motions, updating the court on recent changes to its financial situation. (Document #64).

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Typically, "a

---

[11] Secretary McNulty filed this motion with then-defendant Governor Wolf, who was subsequently dismissed from the case by stipulation.  (Document #47).

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted). A well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. at 556. However, a complaint must provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. Id. at 556. In reviewing a complaint on a motion to dismiss, "the factual and legal elements of a claim should be separated," and while all well-pleaded facts should be accepted as true, the court "may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## III.  DISCUSSION

The plaintiff's allegations show that a paradoxical consequence of the NIZ Act's implementation is that new buildings are being built while the plaintiff's existing building is the subject of a foreclosure action. But, paradoxical as this may be, it does not state a claim for violation of the plaintiff's constitutional rights.

## A.    Standing

ANIZDA argues that the plaintiff does not have standing to bring its claims because it has not alleged an injury-in-fact, causation, or redressability.  I agree.

To have standing to bring a federal action under Article III of the United States Constitution, the plaintiff must show that it meets three requirements:

> First, the plaintiff must have suffered an 'injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks, alterations, and citations omitted).

The allegations in the plaintiff's complaint are insufficient to show standing.  The plaintiff does not show how the NIZ Act and its implementation caused the plaintiff's inability to pay its debt.  According to the complaint, the plaintiff entered into its lease with Talen before the NIZ Act was passed, and that lease extends until April 2018 at a fixed rate of rent.  (Compl. ¶¶ 40-45.)  The plaintiff's repayment of its loans was due December 2016.  Id. ¶ 33.  Thus, it is not apparent from the complaint why a decrease in the market rate for rent in the NIZ affected the plaintiff's ability to pay its mortgage in light of its continued lease agreement with Talen.

The plaintiff also argues that the decreased value of the Plaza constitutes an injury. (Pl.'s Br. in Opp. to Defs. Mots. to Dismiss 24.)  But the plaintiff does not show how it has realized this loss, especially in light of its likelihood of facing foreclosure.  The plaintiff has not shown how it, rather than the party that owns its debt, is harmed by the diminished value of the Plaza.

Even if the plaintiff is able to file an amended complaint sufficient to satisfy Article III's standing requirements, there are other reasons that the plaintiff's complaint does not state a claim that I will address here.

### B.      Pennsylvania Constitutional Claims

There is no private cause of action under the Pennsylvania Constitution.  Gary v. Braddock Cemetery, 517 F.3d 195, 207 n.4 (3d Cir.2008) ("The prevailing view is that Pennsylvania does not recognize a private right of action for damages in a suit alleging violation of the Pennsylvania Constitution.").  I will therefore dismiss the plaintiff's claims brought under Article I of the Pennsylvania Constitution with prejudice.

### C.      McNulty's Immunity under the Eleventh Amendment

Secretary McNulty argues that the claims against her are barred by the Eleventh Amendment and should be dismissed with prejudice.  I agree that the plaintiff cannot sue Secretary McNulty for damages, but hold that the plaintiff's claims against her for prospective injunctive relief are not barred.

To the extent the plaintiff seeks damages from Secretary McNulty, this relief is barred under the Eleventh Amendment.  Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267–70 (1997).  (Compl. ¶¶ 14–15).  The Eleventh Amendment prohibits suits in

federal court by citizens against states for damages. Id. "[A] suit against a state official in his or her official capacity . . . is a suit against the official's office," Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989), and therefore triggers Eleventh Amendment immunity.

A suit for prospective injunctive relief against state officers is also barred by Eleventh Amendment immunity when the state is "the real, substantial party in interest." Coeur D'Alene Tribe, 521 U.S. at 277. A state is the real party in interest when "the essential nature and effect of the proceeding" is not against the officer but against the state. Id. This is true when "the relief sought . . . has an impact directly on the State itself." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117 (1984). However, an exception to this immunity allows suits against state officials where, first, "the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," Verizon Md., Inc. v. PSC, 535 U.S. 635, 645 (2002) (quoting Coeur d'Alene Tribe, 521 U.S. at 296), and, second, the state officer has a sufficient connection to the unconstitutional conduct. NCAA v. Governor of N.J., 799 F.3d 259, 263 n.3 (3d Cir. 2015). Here, the plaintiff is both seeking prospective injunctive relief and has alleged a sufficiently close connection between Secretary McNulty's duties and the allegedly unconstitutional conduct.

### 1. Prospective Injunctive Relief

The exception allowing suits for prospective injunctive relief against state officers for ongoing violation of federal law originated in Ex parte Young, 209 U.S. 123, 159 (1908). The Supreme Court held that state officials could be enjoined from enforcing a

railroad commission's order requiring a reduction in rates.  Id. at 129.  Because the act

was alleged to be unconstitutional, "the use of the name of the State to enforce an

unconstitutional act to the injury of complainants is a proceeding without the authority of

and one which does not affect the State in its sovereign or governmental capacity."  Id. at

159.  Thus, the proceeding against the state officer was not barred by the Eleventh

Amendment.  Id.

Applying the principal in Ex parte Young, the Court in Verizon Maryland v. PSC

held that the petitioner's request for injunctive and declaratory relief against a state

commission "clearly satisfied" the Ex parte Young exception.  535 U.S. at 645.  In that

case, the Maryland Public Service Commission had approved an agreement between the

petitioner and respondent phone companies respecting an agreement relating to the use of

phone lines.  Id. at 639.  The FCC then issued a ruling relevant to the parties'

implementation of the agreement.  Id. at 640.  They brought their disagreement before the

Commission, which issued an order in the respondent's favor.  Id.  The petitioner then

brought claims in federal court, seeking a declaration that the commission's order was

unlawful and an injunction to prevent its enforcement.  Id. at 642.  The Supreme Court

held that this was a "straightforward" application of Ex parte Young, because the

complaint alleged an ongoing violation of federal law and sought prospective injunctive

relief.  Id. at 645.

Here, the plaintiff is seeking prospective injunctive relief against Secretary

McNulty for a violation of the federal Constitution.  Therefore, the plaintiffs' claims fall

within the exception described in Ex parte Young and Secretary McNulty is not immune on this basis.

### 2. Sufficient Connection

In order to obtain an injunction against a state officer, a plaintiff must also allege that officer is actually involved in the unconstitutional conduct. NCAA, 799 F.3d at 263 n.3 (explaining that plaintiffs cannot "name officials who bear no connection whatsoever to the [challenged] Law" and citing Ex parte Young for the proposition that "plaintiffs cannot name just any state official, such as a 'state superintendent of schools' simply 'to test the constitutionality' of a law"). In other words, the plaintiff must allege a "sufficient connection between the state official and the offending conduct in question." Doe v. Wolf, No. 16-6039, 2017 U.S. Dist. LEXIS 134853, at *28 (E.D. Pa. Aug. 23, 2017).

A sufficient connection between the defendant and the offending conduct exists where the defendant has a duty to enforce the offending regulation, not merely a general power to review and approve regulations. Rode v. Dellarciprete, 845 F.2d 1195, 1208 (3d Cir. 1980); 1st Westco Corp. v. School Dist. of Phila., 6 F.3d 108, 112–116 (3d Cir. 1993). In order to bring such a claim against a state official, there must be a "realistic potential" that the defendant's power would have been applied to the conduct at issue. Rode, 845 F.3d at 1208. In Rode, the Court of Appeals determined that neither the governor nor the attorney general, both of whom were named as defendants, were charged with the "duty to enforce" an allegedly offending regulation regarding the Pennsylvania State Police simply because they had the "power to review and approve a departmental regulation for form and legality." Id. at 1208. The court in Rode did,

however, hold that "[the plaintiff] was able to challenge the constitutionality of the regulation by naming the [Police] administrators." Id. at 1209.

Similarly, in 1st Westco Corp. v. School District of Philadelphia, the Court of Appeals again dismissed the governor and attorney general as defendants, explaining that "neither of the Commonwealth officials possesse[d] a statutory duty to enforce" the Code provision. 6 F.3d at 113. But the court allowed the suit to proceed against other officials charged with enforcing the allegedly offending section of the Pennsylvania School Code. Id.[12]

Here, the plaintiff's claims against McNulty are not barred by the Eleventh Amendment because the plaintiff seeks an injunction against the DOR's allegedly unconstitutional implementation of the NIZ Act. Specifically, the plaintiff alleges the DOR, of which McNulty is Secretary, was directly involved in ANIZDA Resolution 74. (Pl.'s Mem. in Opp. to Def. McNulty's Mot. to Dismiss 41 (Doc. No. 50).) Resolution 74 states that the DOR is a party to the agreement that forms the basis of the resolution (Resolution 2015-74 at ¶ 1), and it requires the DOR, "through its Office of the Budget . . . to accelerate transfer of funds from the Excess NIZ Revenue account to the DOR and the method of reporting and allocation of taxes paid by Talen." Id. at 1. Defendant McNulty, as DOR Secretary, is therefore sufficiently involved in the resolution's enforcement to be a defendant in this case.

---

[12] The Pennsylvania Code is a compendium of Pennsylvania's administrative law. It is distinct from the Pennsylvania Consolidated Statutes or Pennsylvania Annotated Statutes, which are codified legislation.

Defendant McNulty argues the plaintiff has not alleged a sufficiently close connection between her conduct and the allegedly unconstitutional activity, citing <u>Rode</u> and <u>1st Westco Corp.</u> In another recent case, <u>Doe v. Wolf</u>, the Commonwealth of Pennsylvania put forth the same argument and cited the same two cases. 2017 U.S. Dist. LEXIS 134853, at *28. In that case, the court held that Defendant Pennsylvania State Police Commissioner was a proper defendant because he had the power to enforce the allegedly offending statute. <u>Id.</u> at *32. Defendant Police Commissioner in <u>Doe v. Wolf</u> was in a position similar to the one McNulty is in here—both state officers are charged with enforcing the allegedly unlawful state policy. Therefore, the plaintiff alleges a sufficiently close connection between McNulty and Resolution 74. The plaintiff's pursuit of a prospective injunctive relief against Secretary McNulty is therefore not barred by the Eleventh Amendment and I will not dismiss all claims against her with prejudice. For the reasons described below, however, I find that the plaintiff has not stated a claim against her and will dismiss the plaintiff's complaint with leave to amend.

### D.    **Equal Protection**

In Count II, the plaintiff alleges "the NIZ Act, by its very terms arbitrarily and capriciously treats Plaintiff and its property, PPL Plaza, differently from all other Class A office buildings in the zone." (Compl. ¶ 131.) "In addition, in implementing the Act and passing the Resolutions, Defendants' singular, discriminatory treatment of the Plaza puts Plaintiff in a class-of-one" (<u>id.</u> ¶ 132), and "unreasonably and arbitrarily has created substantial economic hardship for PPL Plaza." <u>Id.</u> ¶ 133. But while the plaintiff shows, taking as true the facts described in its complaint and interpreting them in the light most

favorable to the plaintiff, that the NIZ Act and its implementation may have been unwise, the plaintiff does not show that they had no rational basis.

"[T]o state a claim for 'class of one' equal protection, a plaintiff must at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment." Phillips v. Cty. of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008). The rational basis standard is met where "a plausible policy reason explains the classification and the relationship of the classification to its policy goal is not so weak as to suggest that the distinction is arbitrary or irrational." United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007) (citing Fitzgerald v. Racing Ass'n of Cent. Iowa, 539 U.S. 103, 107 (2003)).

> [T]he rational basis test is a very deferential standard. Under rational basis review, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it . . . . In this context, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. The threshold for upholding distinctions in a statute under rational basis review is extremely low, and it is not within the purview of the courts to conduct anything but a limited review of the reasons that legislation subject to rational-basis review classifies among similarly situated persons. Even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous, where there are plausible reasons for the legislature's action, our inquiry is at an end.

Doe v. Pa. Bd. of Prob. & Parole, 513 F.3d 95, 115–16 (3d Cir. 2008) (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)) (quotations, citations, and internal alterations omitted).

Similarly, showing that an authority violated a plaintiff's constitutional rights to equal protection in its implementation of a law on a "class of one" theory, the plaintiff must show that its selective treatment "was based on an unjustifiable standard," such as an "arbitrary factor," and that it was taken with "discriminatory purpose." Jewish Home v. Ctrs. for Medicare & Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2011) (citing Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886)). "Hence, to maintain an equal protection claim of this sort, [a plaintiff] must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect. [It] must show that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." Id. (citing Wayte v. United States, 470 U.S. 598, 610 (1985)).

The reason for this deference to the legislature is that

> [t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 133 (3d Cir. 2002) (citation omitted).

Here, the plaintiff has not shown that the NIZ Act, the implementing Guidelines, or the Resolutions are so unrelated to the achievement of any legitimate purpose as to be irrational, or that they were implemented with discriminatory purpose. The NIZ Act subsidizes development in designated urban zones in Pennsylvania. One conceivable

(and, indeed, stated) reason for this Act is to further the legitimate goal of economic revitalization. Similarly, ANIZDA seeks to implement the aims of the Act; thus, one plausible reason for ANIZDA's decision not to award the plaintiff NIZ funds might be that subsidizing the plaintiff's building does not foster development because the building has already been developed. This is the basis provided in the complaint and attached exhibits.

Finally, the complaint does not show that the resolutions are based on an unjustifiable standard. In fact, the plaintiff itself supplies a rational reason for the ANIZDA resolutions. (Pl.'s Br. in Opp. to Defs.' Mots. to Dismiss 33 (Document #50)). The plaintiff states that the defendants "concluded that PPL Plaza could not retain Talen as a tenant. In their view, this greatly increased the risk that Talen would leave Allentown completely." Id. From this, the plaintiff concludes that "[t]he regulatory process was therefore tainted by Defendants' objective of keeping Talen as a downtown Allentown employer." Id. But the plaintiff is mistaken that alleging that an authority helped one particular business is sufficient to show that the authority acted arbitrarily, unjustifiably, or otherwise with discriminatory purpose against the plaintiff. On the contrary, the reason the plaintiff describes is a justifiable policy reason to pass the Resolutions. The same goes for the plaintiff's argument that the defendants facilitated Talen's move to the Waterfront Development because of a desire to "effectuate their vision of a new civic landscape in the [waterfront] region." Id. at 34. This is also a legitimate policy reason for the resolution. Thus, while the plaintiff shows that ANIZDA's implementation in the Guidelines and the Resolutions has rendered the

plaintiff unable to continue leasing its building, it does not show discriminatory purpose—that ANIZDA or any other defendant interpreted the NIZ Act to exclude the plaintiff's building in part because of, not merely in spite of, its likelihood to cause the plaintiff to default on its debt.[13]

The plaintiff appears to focus its argument with respect to its Equal Protection claim not on the unjustifiability of the NIZ Act or the standards used in its implementation, nor on any discriminatory purpose, but instead on whether ANIZDA's interpretation of the NIZ Act is permissible as a matter of statutory interpretation. (See, e.g., Pl.'s Br. in Opp. to Defs.' Mots. To Dismiss 34–35 ("Defendants' promotion of new construction at the expense of existing buildings may or may not constitute ineffective urban planning, but it is undoubtedly a material issue of fact as to whether such conduct can be said to be rational under the NIZ Act.")). But even if ANIZDA employed an unsupported interpretation of the NIZ Act, that does not on its own make out an Equal Protection claim. The plaintiff must go further and show that the implementation was arbitrary, unjustifiable, and taken in part because of the adverse effect it would have on the plaintiff. The plaintiff has not done so.

---

[13] Although the plaintiff argues the Guidelines are arbitrary and irrational in that they deem ineligible "any project proposing to relocate tenants, occupants or business existing in the NIZ to another location within the NIZ;" "working capital," "rolling stock," and "inventory/receivable financing," "relocation costs for a business or its employees moving into the NIZ," and "molds and dies," (id. ¶ 84), it is unclear how this disadvantaged the plaintiff in particular.

### E.    Takings Clause

In Count V, the plaintiff argues that the NIZ Act and its implementation constitute an unconstitutional taking under the Fifth Amendment, which provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. Am. V.  The plaintiff alleges that what occurred here is not a classic taking—the government's physical intrusion onto a person's land—but rather a regulatory taking.  Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005).  A regulatory taking occurs when "government regulation of private property [is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster . . . ."  Id.  The plaintiff alleges the NIZ Act "forcibly and substantially reduces prevailing or market rates for rent of office space in Allentown without addressing the impact of such actions on PPL Plaza," "substantially reduces the value of PPL Plaza" (id. ¶ 149), and will "lead to foreclosure and total loss of Plaintiff's property."  Id. ¶ 150.  Thus, it alleges the NIZ Act "interferes with the Plaintiff's reasonable investment-backed expectations," (id. ¶ 151) and "has rendered [the plaintiff's] ownership of PPL Plaza essentially valueless."  Id. ¶ 150.

The defendants argue—and I agree—that the plaintiff's takings claim fails for two reasons:  first, because the plaintiff did not exhaust its opportunity for compensation from the state before bringing this claim, and second, because the NIZ Act and its implementation are not "tantamount to a direct appropriation or ouster," as necessary to constitute a regulatory taking.

### 1. Exhaustion

A Fifth Amendment takings claim is not ripe unless the plaintiff first sought and was denied just compensation for the taken property from the government. Cowell v. Palmer Township, 263 F.3d 286, 290 (3d Cir. 2001); Cty. Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 164 (3d Cir. 2006) (explaining that the plaintiff must show that it "has unsuccessfully exhausted the state's procedures for seeking 'just compensation'") (quoting Williamson Cty Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 186 (1985)). This requirement, known as the "exhaustion requirement," applies to both facial and as-applied constitutional challenges. Id. at 168.[14] As long as "a reasonable, certain, and adequate provision for obtaining compensation exists at the time of the taking," the plaintiff must avail itself of that provision before bringing a claim. Williamson Cty., 473 U.S. at 194.

Pennsylvania's Eminent Domain Code, 26 Pa. Cons. Stat. § 102 et seq., is such a provision. Cowell, 263 F.3d at 290. "Pennsylvania's Eminent Domain Code provides inverse condemnation procedures through which a landowner may seek just compensation for the taking of property." Cowell, 263 F.3d at 290. Section 102(a) of the Eminent Domain Code states that it is the "complete and exclusive procedure and law to

---

[14] For as-applied constitutional challenges, which the plaintiff also brings, a plaintiff must also show that "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue' (the 'finality rule')." Cty. Concrete Corp., 442 F.3d at 164. Unlike the finality rule, the exhaustion requirement applies to both as-applied and facial challenges. Id. at 168 ("[T]he fact that [the plaintiffs] allege a facial Just Compensation Takings claim against the Ordinance may save them from the finality rule, [but] it does not relieve them from the duty to seek just compensation from the state before claiming that their right to just compensation under the Fifth Amendment has been violated.").

govern all condemnations of property for public purposes and the assessment of damages." 26 Pa. Cons. Stat. §102(a). Any "owner of a property interest taken, injured or destroyed," 26 Pa. Cons. Stat. Ann. § 103, "may file a petition requesting the appointment of viewers . . . to ascertain just compensation." 26 Pa. Cons. Stat. Ann. § 502(a).

Numerous courts have required plaintiffs to seek compensation through Pennsylvania's Eminent Domain Code before bringing federal takings claims. See, e.g., Cowell, 263 F.3d at 290–91 (holding that the plaintiffs' claims that two municipal liens on their property were regulatory takings were unripe for failure to use the Eminent Domain Code's procedures); Prop. Mgmt. Grp., Ltd. v. City of Phila., No. 17-1260, 2017 U.S. Dist. LEXIS 77924, at *19-25 (E.D. Pa. May 23, 2017) (holding that parking lot owners' challenge to an ordinance requiring vehicles be ticketed before being towed, and therefore prohibiting lot owners from towing them immediately, was subject to the Eminent Domain Code's process requirements); Gould v. Council of Bristol Borough, 2014 U.S. Dist. LEXIS 9995 at *19 (E.D. Pa. Jan. 27, 2014) (explaining that the plaintiff had to first seek compensation under the Eminent Domain Code before bringing his claim that the Borough misapplied its zoning law to prevent him from developing his property).

The plaintiff alleges it is the owner of a property interest that was injured by legislation and the legislation's implementation. The plaintiff's claim therefore falls within the purview of the Eminent Domain Code. The plaintiff does not allege it has

availed itself of the procedure in the Eminent Domain Code. Thus, the plaintiff's Fifth Amendment takings claim is not ripe for adjudication.[15]

## 2. Takings Claim

In addition to failing to show ripeness, the plaintiff's Takings Clause claim suffers from substantive deficiencies.

The Fifth Amendment's Takings Clause is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle, 544 U.S. at 537. However, in certain circumstances, burdensome regulation may "be so onerous that its effect is tantamount to a direct appropriation or ouster" so as to be compensable under the Fifth Amendment. Id. "The rub, of course, has been—and remains—how to discern how far is 'too far.' In answering that question, we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good,' and

---

[15] The plaintiff argues the exhaustion requirement is excused here because there is no adequate remedy and exhaustion would be futile. Trauma Serv. Grp. v. Keating, 907 F. Supp. 110, 113 (E. D. Pa. 1995). First, the plaintiff argues there is an absence of an adequate statutory remedy because "nothing in the [Eminent Domain Code] provides a procedure for a property owner to challenge administratively the constitutionality of the NIZ or the availability of NIZ benefits." (Pl.'s Br. in Opp. to Defs.' Mots. To Dismiss 29.) But the existence of the Eminent Domain Code is determinative of the ripeness of the plaintiff's claim because just compensation through its procedures would render the alleged taking constitutional, and therefore would obviate the need to challenge the constitutionality of the NIZ and its benefits.

Second, the plaintiff argues that exhaustion would be futile because the plaintiff already met with ANIZDA officials and was twice turned away. (Pl.'s Br. in Opp. to Defs.' Mots. To Dismiss 29.) This does not, however, show that seeking compensation through the Eminent Domain Code's procedures would be futile—an effort the plaintiff does not contend it has made.

that 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.'" Id. at 538 (quoting Andrus v. Allard, 444 U.S. 51, 65 (1979), and Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922)).

Court precedent has established two narrow categories of "per se" takings: permanent physical invasion of an owner's property and regulations that "completely deprive an owner of *all* economically beneficial use of her property." Id. (emphasis in original). Beyond these two categories of per se taking, the law is murkier. Id.

> Outside these two relatively narrow categories . . . regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978). The Court in Penn Central acknowledged that it had hitherto been "unable to develop any 'set formula'" for evaluating regulatory takings claims, but identified "several factors that have particular significance." Id. at 124. Primary among those factors are 'the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Ibid. In addition, the "character of the governmental action"—for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"— may be relevant in discerning whether a taking has occurred.

Lingle, 544 U.S. at 537–39.

Thus, "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty . . . . [T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by

the government, rather than remain disproportionately concentrated on a few persons."
Penn Cent. Transp. Co., 438 U.S. at 123–24.

Although the economic impact of a regulation is a "primary" factor, Lingle, 544
U.S. at 539, it is not dispositive. "That a regulation will put a particular plaintiff out of
business cannot be proof that a taking has occurred. Instead, the size of the deprivation
inflicted by a law must be evaluated in the context of the other relevant facts." Unity
Real Estate Co. v. Hudson, 178 F.3d 649, 677 (3d Cir. 1999) (rejecting the plaintiffs'
argument that an act of legislation was a taking in part because it would force the
plaintiffs into bankruptcy). The Court of Appeals has explained that it is "unaware of any
principle of takings law under which an imposition of liability is deemed a per se taking
as to any party that cannot pay it." Id. at 675.

With respect to interference with reasonable investment-backed expectations,
courts have considered this significant when the plaintiff shows it has a specific plan or
investment that was thwarted by government action. Keystone Bituminous Coal Ass'n v.
Duncan, 771 F.2d 707, 716 (3d Cir. 1985). A statute may "frustrate distinct investment-
backed expectations" when it has "nearly the same effect as the complete destruction of
rights [a party] had reserved from the owners of the surface land." Penn Central, 438
U.S. at 127. Penn Central derives this factor from Pennsylvania Coal Co. v. Mahon, 260
U.S. at 413 (1922). See Keystone, 771 F.2d at 716. "[T]he coal owners in Mahon had
expressly contracted with individual surface owners for the waiver of any claim for
damages due to subsidence." Id. Mining regulations were found to be a taking that
required just compensation to the coal owners in part because "[i]t was reasonable for

them to have distinct expectations, grounded upon those waivers, to be free to mine coal without liability for damage caused to the surface owners' estates." <u>Id.</u>  This exception is not a broad one; rather, the Supreme Court has made clear that the "government may execute laws or programs that adversely affect recognized economic values," and has thus "dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes." <u>Penn Cent. Transp. Co.</u> 438 U.S. at 124–25.

Lastly, and particularly significant here, is the character of the governmental action.  Certain government actions are of a character more akin to a taking.  The Court of Appeals has held that, "[t]o succeed on a [regulatory] takings claim, [the plaintiff] must show that the State's action affected a 'legally cognizable property interest.'" <u>Am. Exp. Travel Related Servs. v. Sidamon-Eristoff</u>, 669 F.3d 359, 371 (3d Cir. 2012).  "Even a regulation that prohibits the most beneficial use of property, or prevents an individual from operating an otherwise lawful business, does not necessarily violate the Takings Clause." <u>Id.</u>  For example, a taking can be shown where the government removes a specific property right or interest.  <u>See, e.g.</u>, <u>Kaiser Aetna v. United States</u>, 444 U.S. 164 (1979) (holding that it was a taking for the government to require owners of a pond to allow public access); <u>Loretto v. Teleprompter Manhattan Catv Corp.</u>, 458 U.S. 419 (holding that a permanent physical installation on the land was a taking); <u>Hodel v. Irving</u>, 481 U.S. 704 (1987) (holding that a law effectively abolishing the power of testamentary disposition of certain property was a taking).  Certain types of regulations, however are

less likely, by their character, to constitute takings.  For example, "[t]he Supreme Court has repeatedly rejected the argument that a tax—even a tax on a small set of businesses—may . . .  constitute a taking simply because it may force some of the regulated entities out of business."  Unity Real Estate Co., 178 F.3d at 675.  Similarly, it is rare for a court to find zoning laws to constitute a regulatory taking.  Pace Res., Inc. v. Shrewsbury Twp., 808 F.2d 1023, 1031 (3d Cir. 1987) ("[C]ourts will invoke the taking clause of the Fifth Amendment only when zoning regulation interferes drastically with a property's possible uses."); but see Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926) (holding that a regulatory taking had occurred when a zoning change caused a 75% diminution in the value of a developer's land); see also Midnight Sessions, Ltd. v. Philadelphia, 945 F.2d 667, 677 (3d Cir. 1991) (holding that denial of a license for a dance hall was not a taking).

Here, the plaintiff's allegations do not show, under the Penn Central factors, that the NIZ Act or its implementation constituted a taking.  Although the plaintiff has shown a serious economic impact by alleging that the NIZ Act and the Guidelines caused the plaintiff to face foreclosure proceedings, the other factors weigh against a finding of a taking.  First, the plaintiff has not alleged an investment-backed interest in any particular use or right to the Plaza; rather, it alleges a general interest in maintaining the building's value and rentability.  This is not sufficient to show an "investment-backed interest" under Penn Central because every property owner has invested in its property to the extent that it owns it.  Second, the character of the government's actions here—subsidizing urban development—is not of a similar character to those that constitute

takings.  The NIZ Act is less an intrusion into property rights than either zoning laws—which restrict property from certain uses—or tax laws, which take proceeds from property owners.  Rather, the NIZ Act and its implementing regulations merely offer construction subsidies through tax breaks for new developers.  To the extent they have decreased the value of the Plaza, they have done so indirectly, not through the removal of a specific property right or interest, nor through the imposition of regulatory burdens, but through subsidizing new competitors.  Weighing the <u>Penn Central</u> factors, I hold that the complaint does not show that the NIZ Act and its implementation enacted a taking for which the plaintiff is entitled to compensation under the Fifth Amendment.

**F.**     **Contract Clause**

In Count VII, the plaintiff alleges the NIZ has "directly interfered with and substantially impaired [the plaintiff's] contractual relationship with its tenant under the Lease" by making "it impossible for [the plaintiff] to renew or extend the Lease on terms that satisfy [the plaintiff's] capital needs."  (Compl. ¶ 98; <u>see also</u> <u>id.</u> ¶ 161.)  The plaintiff argues this violated its rights under the Contract Clause of the United States Constitution.

Article I, Section 10 of the United States Constitution prohibits any state law "impairing the Obligation of Contracts."  A law impairs the "Obligation of Contracts" if there was an already-existing contractual relationship, a change in law impaired that contractual relationship, and the impairment was substantial.  <u>Gen. Motors Corp. v. Romein</u>, 503 U.S. 181, 186 (1992).  "Thus, under the Contract Clause, the contract in

question must preexist the passage of the state law." <u>Mabey Bridge & Shore, Inc. v.</u> <u>Schoch</u>, 666 F.3d 862, 874 (3d Cir. 2012).

The plaintiff does not argue or allege that the NIZ Act impaired its contractual relationship with Talen under the current lease, which extends until April 2018. Rather, the plaintiff argues that the NIZ Act impaired its likelihood of being able to renew this lease—i.e., to create a new contract. This does not state a claim under the Contract Clause because the future lease does not preexist the passage of the state law. I will therefore dismiss this claim with leave to amend to the extent the plaintiff can allege facts sufficient to state a claim under the Contract Clause.

## IV. <u>CONCLUSION</u>

The plaintiff has not stated a claim under the United States Constitution. For the reasons described above, including the plaintiff's failure to allege facts showing that it has standing, I will dismiss the plaintiff's federal Constitutional claims with leave to amend. I will also dismiss the plaintiff's claims under the Pennsylvania Constitution with prejudice.

Because the plaintiff has not stated a claim under any provision of the United States Constitution, I will also dismiss its separately stated claims under 28 U.S.C. § 1983 and the Declaratory Judgment Acts with leave to amend.

An appropriate Order follows.