## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------x
THE PLAZA AT 835 WEST HAMILTON          :
STREET LP,                              :
                                        :
                    Plaintiff,          :
                                        :
            v.                          :        Civil Action No. 2015- 06616
                                        :
ALLENTOWN NEIGHBORHOOD                   :        JURY TRIAL DEMANDED
IMPROVEMENT ZONE DEVELOPMENT             :
AUTHORITY, CITY OF ALLENTOWN,           :
ED PAWLOWSKI, in his official capacity as :
Mayor of Allentown, and C. DANIEL HASSELL, :
Secretary of Revenue of the Commonwealth, in his :
official capacity,                       :
                                        :
                    Defendants.          :
-------------------------------------------------------------x
```

## AMENDED COMPLAINT FOR
## DECLARATORY, INJUNCTIVE AND MONETARY RELIEF

Plaintiff The Plaza at 835 West Hamilton Street LP ("Plaza LP" or "Plaintiff"), by and through its undersigned attorneys, brings this Amended Complaint for Declaratory, Injunctive and Monetary Relief against the above-named defendants regarding the constitutionality of the legislation establishing the neighborhood improvement zone in Allentown, Pennsylvania. In support of its amended complaint, Plaintiff avers as follows:

### NATURE OF THE ACTION

1.      This is a civil action for declaratory, injunctive and monetary relief arising under various provisions of the United States Constitution.

2.      Plaintiff is the sole owner of the prominent Class A office complex located at the corner of Ninth and Hamilton Streets in Allentown, commonly referred to as "PPL Plaza" or the "Plaza." PPL Plaza is located within Allentown's neighborhood improvement zone ("NIZ"), a

designated area of approximately 128 acres in downtown Allentown and along the western side of the Lehigh River.

3.     This case concerns the constitutionality of the legislation establishing the NIZ, which allows certain tax revenues generated in the NIZ to be applied to offset property owners' and landlords' development and improvement costs, as well as its irrational and discriminatory implementation in the City of Allentown.

4.     By its terms and as applied by city and state authorities, the legislation has substantially interfered with Plaintiff's lease with its tenant, Talen Energy Corp., as the lease, which was contemplated to run through 2038, will instead be ending in April 2018.  The loss of the lease, in turn, will lead to Plaintiff's loss of the property itself, which is now the subject of a mortgage foreclosure proceeding.

5.     Further, as a direct result of the guidelines promulgated by the NIZ developmental authority, NIZ benefits are available to every Class A commercial property owner and landlord in the NIZ *except Plaintiff.*   Such implementation of the legislation is arbitrary, discriminatory, and devoid of any rational basis.  By purposefully excluding PPL Plaza from NIZ benefits, defendants have discriminated against Plaintiff and placed Plaintiff into a class-of-one.

6.     The NIZ legislation, both by its terms and through its implementation by city and state officials, has injured Plaintiff and violated Plaintiff's federal constitutional rights.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this case presents federal questions involving the deprivation of Plaintiff's civil rights under the U.S. Constitution.

8.     Venue is proper under 28 U.S.C. § 1391(b)(1), because all defendants are government officials, agencies or entities which operate in this judicial district. Furthermore, the conduct complained of occurred in and/or resulted in injury to Plaintiff in this judicial district.

## PARTIES

9.     Plaintiff Plaza LP is a Pennsylvania limited partnership whose address is c/o Phoenix Asset Management, LLC, 6851 Jericho Turnpike, Syosset, New York 11791. Plaza LP is the sole owner of PPL Plaza.

10.     Defendant Allentown Neighborhood Improvement Zone Development Authority ("ANIZDA") is a local municipal authority with its principal place of business at 435 Hamilton Street, Allentown, PA 18101. ANIZDA was established pursuant to the law governing neighborhood improvement zones and has the authority to administer all activities related to the NIZ, including but not limited to the distribution of NIZ funds. ANIZDA is governed by a nine-member board of directors.

11.     Defendant City of Allentown (the "City") is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania.

12.     Defendant Ed Pawlowski ("Pawlowski") is the Mayor of Allentown and is sued in his official capacity. The Mayor is directed to take care to enforce the law in the City.

13.     Defendant C. Daniel Hassell ("Hassell," and collectively with ANIZDA, the City, and Pawlowski, "Defendants") is sued in his official capacity as Secretary of Revenue of the Commonwealth of Pennsylvania.[1] Under the Act, the Secretary and the Department of Revenue of the Commonwealth of Pennsylvania (the "DOR") are directed to annually review and certify

---

[1]     Mr. Hassell has replaced Eileen McNulty as Secretary of Revenue, and thus has been substituted for Ms. McNulty as a named defendant in this action.

certain tax revenues.   *See* 72 Pa. C.S.A. § 8904-B.   Mr. Hassell and the DOR are also empowered to transfer tax revenues into the NIZ Fund, as defined below. *Id.*

## RELEVANT THIRD PARTIES

14.     Pennsylvania Power & Light ("PPL") is an energy company headquartered in Allentown.  PPL, through its subsidiary entity, PPL Energy Plus, LLC, was PPL Plaza's primary tenant from 2003 until June 2015, when PPL spun off the business lines of PPL Energy Plus, LLC to Talen Energy Corp. ("Talen"), and Talen acquired PPL's rights and obligations under the lease.  PPL's President, Mr. Gregory N. Dudkin, sits on the board of directors of ANIZDA.

15.     Talen is the current primary tenant of PPL Plaza.  As set forth in greater detail below, Talen has publicly announced that it will not be continuing its lease at PPL Plaza and will instead be relocating to Tower 6, a new, to-be-built office building in the NIZ whose owner and landlord is afforded full NIZ benefits, including the ability to pass on to Talen substantially discounted rent.

## RELEVANT FACTS

**A.     PPL Plaza**

16.     PPL Plaza was a build-to-suit complex constructed for PPL in 2003 on the premise that it would be the long-term home for PPL, as well as a centerpiece of downtown Allentown and its business district.

17.     Designed by Robert A.M. Stern Architects, the complex consists of an environmentally sustainable, 245,000 square foot Class A office tower and a generous south-facing landscaped courtyard.  Photographs depicting PPL Plaza are attached hereto as Exhibit A.

18.     The site, at the corner of North Ninth Street and Hamilton Street, was home to the former Hess Brothers Department Store, a mainstay shopping destination for the Allentown community until its closing in 1995.

-4-

19.     At the time it was built, PPL Plaza was the largest office building in Allentown. It was the most prestigious Class A office building in all of Allentown.

20.     PPL Plaza is a critical part of the City's infrastructure.  It generates $1.5 million in real estate taxes annually for the City, Allentown School District and Lehigh County.  It was LEED®-certified Gold in March 2004, a first place winner in the Northeast Sustainable Energy Award's large building category, and a 2004 Top Ten award winner of the national American Institute of Architects' Committee on the Environment.

21.     PPL Plaza continues to be a prominent city landmark today.

**B.     <u>Plaintiff's Acquisition of and Investment in PPL Plaza</u>**

22.     Plaintiff acquired PPL Plaza and an adjoining parking garage from Liberty Property Development Corporation ("Liberty") in November 2006.

23.     Specifically, on or about October 17, 2006, Liberty, as seller, and Lingwood Partners, LP ("Lingwood"), as purchaser, entered into an agreement for the sale and purchase of PPL Plaza and the parking garage.

24.     Lingwood assigned its rights as purchaser to Plaza LP on November 22, 2006.

25.     Closing occurred two days later, on November 24, 2006.

26.     At closing, Plaza LP acquired fee simple title to PPL Plaza and the garage for the purchase price of $92 million.

27.     Plaza LP also assumed Liberty's rights and obligations under several pre-existing leases between Liberty and PPL Energy Plus, a division of PPL, for 198,000 square feet of the 245,000 rentable square feet of space in PPL Plaza and the entire parking garage.  Aside from retail tenants on the ground floor, PPL was the only tenant at the time of the acquisition.

28.     Plaintiff paid $13,042,218 in cash at closing, and financed the remainder of the purchase via: (a) a loan in the amount of $75 million from CIBC, Inc. ("CIBC") (the "First Loan"), evidenced by a promissory note with a maturity date of December 1, 2016; and (b) a mezzanine loan in the amount of $7 million from CIBC (the "Mezzanine Loan"), evidenced by a promissory note with a maturity date of December 1, 2016.  The First Loan and Mezzanine Loan are collectively referred to herein as the "Loans."

29.     The Loans provide that they are to be repaid in monthly payments, with one final balloon payment of all amounts remaining outstanding on the maturity date of December 1, 2016.

30.     Between the time of its acquisition of PPL Plaza in November 2006 and the present, Plaintiff has made significant investments in PPL Plaza.

31.     On the First Loan, Plaintiff has paid approximately $8,007,588.11 in principal and $42,267,454.25 in interest.  On the Mezzanine Loan, Plaintiff has repaid the principal balance of $7,000,000 in full, as well as $3,181,920.72 in interest.  In total, including interest, Plaintiff has paid over $60,456,963.01 on the Loans.

32.     Plaintiff has also made more than $334,000 in improvements to the property.

33.     Plaintiff remains deeply committed to the future of PPL Plaza as a center for business and commerce in Allentown.

**C.     Lease with PPL**

34.     As stated above, Plaintiff acquired PPL Plaza subject to several preexisting leases between Liberty and PPL.

35.     The primary lease is for 198,000 square feet of rentable Class A office space and approximately 1,100 parking spaces in the adjoining garage (the "Lease").  A true and correct copy of the Lease is attached hereto as Exhibit B.

36.     The Lease provides that annual rent and operating expenses are payable for both the office space and the garage space.

37.     The current monthly net base rent for the office space is $449,304.86 per month, which is approximately $27.20 per square foot annually.  Including additional rent for the garage and common area maintenance charges ("CAM"), rent for PPL Plaza totals $671,630.25 per month, or $39.88 per square foot annually.

38.     Rent for the garage space in all Lease Years is calculated by multiplying an annual "per space" fee by the number of leased parking spaces.  Garage rent is owed in addition to rent for the office space.

39.     In June 2015, after PPL spun off certain business lines to Talen, Talen acquired PPL's rights and obligations under the Lease.  Today, other than two small retail tenants on the ground floor, Talen remains the Plaza's sole tenant.[2]

40.     The Lease's current term commenced on April 30, 2003, and runs through April 30, 2018 (the "Current Term").  *See* Ex. B, Lease § 4(a).

41.     The Lease grants Talen the right to unilaterally "extend the [Current] Term" for "two (2) additional periods of ten (10) years each" (the "Extension Terms").  Ex. B, Lease § 4(b).

42.     The total length of the Lease, including the Current Term and the Extension Terms, is 35 years, and runs through 2038.

---

[2]     A branch of National Penn Bank rents approximately 6,500 square feet of retail space on the ground floor of PPL Plaza, and another retail tenant operates a small newsstand/deli.

43.    Section 4(b) of the Lease provides that "[a]ll of the terms, provisions and conditions of this Lease in effect immediately prior to the commencement of each Extension Term shall equally pertain to, and be in full force and effect during, such Extension Term, except that the Minimum Annual Rent for the Premises during such Extension Term shall be the Market Value."

44.    "Market value" is defined as the "then current base rental rates being offered and accepted for both new leases and renewals of Class A corporate headquarter facilities of comparable size . . . with comparable amenities." Ex. B, Lease § 4(d).

45.    Section 4(d) of the Lease sets forth the steps that the parties must follow in determining market value.  If the parties are unable to reach agreement, they may engage a Qualified Appraiser, who "may consider such comparable properties as may be located in any of Lehigh, Northampton, Bucks, Chester, Delaware and Montgomery Counties of Pennsylvania or the Mercer, Somerset and Hunterdon Counties of New Jersey," and may "tak[e] into account (and mak[e] appropriate adjustments for) the size of the space being leased, the length of the term of each lease, the condition of the respective premises demised thereunder, the actual location of the respective premises and the other provisions of this Lease." *Id.*

**D.    The NIZ Act**

46.    Spearheaded by Senator Patrick Browne, legislation establishing neighborhood improvement zones was initially enacted by the Pennsylvania General Assembly on October 9, 2009 and found in Article XVI-B of the Pennsylvania Fiscal Code.  The legislation was amended on July 9, 2013, and is now part of the Tax Reform Code of 1971 as Article XIX-B, codified at 72 Pa. C.S.A. §§ 8901-B–8908-B (the "NIZ Act" or "Act").

-8-

47.    The Act provides for the designation of a neighborhood improvement zone of not greater than 130 acres in which a sports arena or facility may be constructed "for the purpose of improvement and development within the neighborhood improvement zone."  72 Pa. C.S.A. § 8903-B.

48.    The statute defines "neighborhood improvement zone" as a "zone designated by the contracting authority for the purposes of neighborhood improvement and development within a city."  *Id.* § 8902-B.

49.    The Act does not specify Allentown by name, but the City's NIZ is the only zone designated or eligible for designation under the Act.

50.    The City's NIZ was designated on August 28, 2011, and took effect on September 6, 2012.  It consists of approximately 128 acres in downtown Allentown and along the western side of the Lehigh River.

51.    There is no other NIZ anywhere in the Commonwealth of Pennsylvania.

52.    The NIZ Act does not include an explanation of its purposes or the legislature's rationale for adopting it.

53.    According to Senator Browne, he drafted the legislation to "revitalize and expand the tax base" of financially-struggling Allentown.  Senator Browne is a third-term state Senator for the 16th District, which includes Lehigh County, where Allentown is situated.  Senator Browne is the current Chairman of the Senate Appropriations Committee, which reviews all legislation for fiscal impact and plays a crucial role in developing the state budget.

54.    Creation of the NIZ has spurred substantial new construction in Allentown.

55.     The first project to come to fruition in the NIZ was the PPL Center, an event arena home to the Lehigh Valley Phantoms, the professional minor-league hockey team affiliated with the Philadelphia Flyers.

56.     Other projects include City Center Lehigh Valley ("City Center"), a major mixed-use development.  When construction is completed, City Center will consist of four Class A office buildings with 650,000 square feet of rentable office space, a full-service hotel, 170 luxury apartments, and 100,000 square feet of upscale retail and restaurant space.  City Center is being developed by City Center Investment Corporation ("CCIC"), and its founder and CEO, J.B. Reilly.

57.     In addition, the Waterfront will be a 26-acre, mixed-use campus located on the banks of the Lehigh River, comprised of six Class A office buildings with 610,000 square feet of rentable office space, 124 residences, and restaurant and retail shopping space.  Construction on the Waterfront started in October 2015, and the complex is projected to be built out over a ten year period.

**E.     ANIZDA**

58.     ANIZDA is the local authority empowered under the Act to take all actions with respect to neighborhood improvement and development within the NIZ.  ANIZDA's Board of Directors has the power to pass resolutions concerning all aspects of improvement and development within the NIZ, and to allocate and disburse all NIZ funds.

59.     Under the Act, businesses located in or operating within the NIZ report state and local taxes paid in any calendar year to the DOR.  The DOR "certifies" NIZ amounts, and the State Treasurer then transfers the certified amounts into a "special fund" established "for the benefit of" ANIZDA (the "NIZ Fund").  72 Pa. C.S.A § 8904-B(d).  Tax revenues eligible for

-10-

inclusion in the NIZ Fund include those generated by the PPL Center, as well as state and local tax revenues generated by any business operating in or located within the NIZ. *Id.* §§ 8902-B, 8904-B(b)(8).

60.     ANIZDA then allocates and distributes monies in the NIZ Fund "for the purpose of improvement and development within the neighborhood improvement zone." *Id.* §§ 8903-B, 8904-B(b)(8).

61.     Under the Act, NIZ funds may be utilized as follows:

(i)     "For payment of debt service, directly or indirectly through a multi-tiered ownership structure or other structure authorized by a contracting authority to facilitate financing mechanisms, on bonds or on refinancing loans used to repay bonds issued to finance or refinance:

(a)     the improvement and development of all or any part of the neighborhood improvement zone.

(b)     the construction of all or part of a facility or facility complex.

(ii)    For payment of debt service on bonds issued to refund those bonds.

(iii)   For replenishment of amounts required in any debt service reserve funds established to pay debt service on bonds."

*Id.* § 8904-B(e)(1).

62.     The statute is otherwise silent as to for whom and for what purposes ANIZDA may allocate and disburse NIZ funds.

**F.     ANIZDA Guidelines**

63.     ANIZDA has promulgated guidelines that discriminate against Plaintiff by intentionally excluding Plaintiff – and no other Class A commercial property owner or landlord – from NIZ benefits.

64.     The guidelines are not mandated under the Act, but rather are based on ANIZDA's own authority and interpretation of appropriate uses for NIZ funds.

-11-

65.     The guidelines, as approved on September 11, 2013 and amended on March 4, 2015, do not mention Plaintiff by name.   Nonetheless, it is clear that three sections of the guidelines, when read together, specifically and intentionally target Plaintiff for exclusion from NIZ benefits.

66.     First, the guidelines restrict NIZ funds to "new businesses starting up or moving into the NIZ."

67.     Second, section 2.6.5 of the guidelines deem ineligible "any project proposing to relocate tenants, occupants or business existing in the NIZ to another location within the NIZ."

68.     In addition, section 3.1 of the guidelines deem ineligible the following types of expenses:  (i) "working capital"; (ii) "rolling stock"; (iii) "inventory/receivable financing"; (iv) "relocation costs for a business or its employees moving into the NIZ"; and (v) "molds and dies."

69.     None of these restrictions are contained within the statute.

70.     Taken together, these restrictions make NIZ funds available to all Class A commercial property owners and landlord in the NIZ *except Plaintiff.*

71.     There was no rational basis for excluding Plaintiff from NIZ funds when ANIZDA did not exclude any other commercial property owner or landlord.

72.     As a direct result of Plaintiff's exclusion under the guidelines, PPL Plaza will become a vacant building and will "go dark" in April 2018.   Such an outcome is contrary to the intent of the NIZ Act, which is to "revitalize and expand the tax base" of financially-struggling Allentown.

73.     Upon information and belief, in issuing the guidelines, ANIZDA purposefully and intentionally discriminated against Plaintiff because Plaintiff's members and shareholders are not

-12-

represented on ANIZDA's board of directors or native to Allentown, and ANIZDA was willing to disregard Plaintiff's rights in favor of local interests.

74.    Upon information and belief, ANIZDA's guidelines were issued with full knowledge of, and willful disregard for, their devastating impact on Plaintiff.

**G.    Reduced Rent Rates for Class A Office Space in the NIZ**

75.    Today, Class A commercial office space in the NIZ rents for between $8 and $18 per square foot, which is well below pre-NIZ rates.

76.    The reduction in rental rates is a direct result of NIZ funding granted by ANIZDA to Class A commercial property owners and landlords.

77.    CCIC, for example, has received more than $40 million in NIZ tax revenues from ANIZDA, making CCIC's new construction not only possible, but able to be completed while offering substantially discounted, below-market rental rates to prospective tenants. *See* Matt Assad, *How Five City Center is cashing in on Allentown's NIZ*, The Morning Call (Dec. 12, 2015), attached hereto as Exhibit C.

78.    As a result of NIZ funding, CCIC can rent Class A office space for "$15 to $18 a square foot – 20 to 30 percent below market rate for Class A office space." *See id.* at 4.

79.    Similarly, Waterfront Development Co. advertised a 75% reduction in base rent at the Waterfront properties due to NIZ benefits.

80.    This artificially suppressed rental market is a direct result of the NIZ legislation.

**H.    Reduced Rent Rates Caused Further Harm to Plaintiff**

81.    In December 2014, PPL (Talen's corporate predecessor and the then-current tenant of PPL Plaza) sought from Plaintiff an abatement or reduction of net base rent from $27.20 to $12.00 per rentable square foot, on the grounds that PPL Plaza is located in the NIZ.

-13-

82.     On January 28, 2015, PPL sent a letter to Barry Pincus, asset manager for Plaza LP, expressing interest in purchasing PPL Plaza from Plaza LP for $41 million.  PPL offered, in the alternative, to continue to pay net base rent at the rate of $8.00 per square foot.

83.     PPL's proposed $41 million purchase price is more than $50 million less than the $92 million that Plaintiff paid to acquire PPL Plaza, substantially less than Plaintiff's investment in the property to date, and substantially less than the mortgage on the property.

84.     Plaintiff could not accept any of PPL's proposals for reduced rent because even though PPL is correct that PPL Plaza is located in the NIZ, Plaintiff has been excluded from NIZ benefits, and thus has no NIZ funds at its disposal to pass through to a tenant.  Had Plaintiff accepted any of the reduced rent rates proposed by PPL, Plaintiff would have been agreeing to operate PPL Plaza at a massive loss, and would not have been able to pay its debt service on the property.

85.     Plaintiff and Talen continued this dialogue after Talen spun off from PPL in 2015.

86.     On October 14, 2015, Paul Farr, CEO of Talen, emailed Plaintiff's attorney, stating that although it would be "ideal" for Talen to remain in PPL Plaza, Talen had received lower rent offers from new, NIZ-financed buildings, and Mr. Farr's discussions with ANIZDA and other relevant government officials made plain that Plaintiff and PPL Plaza will not be included in NIZ benefits:

> . . . [I]t would probably be ideal to stay [in PPL Plaza], all else being equal, but all else is not equal.  Since we engaged with your team, we've received even more compelling base rent offers in new facilities.  We've also been told repeatedly by ANIZDA and other important local stakeholders, that there is no possibility under the NIZ law to get a benefit for this building [PPL Plaza] and it's [sic] debt. . . .

87.     Plaintiff's attorney responded to Mr. Farr via email on October 15, 2015, seeking Talen's cooperation in an "omnibus meeting with ALL of the relevant officials" to discuss

-14-

whether there is an "accommodation that would work for all." The officials that Plaintiff proposed meeting with included "(1) the appropriate representative of the Wolf administration; (2) Senator Browne . . . (3) ANIZDA officials, such as Mr. Traub[;] (4) the Talen team and (5) Mr. Spence or a suitable representative from the office of the chief executive of PPL."

88.    Mr. Farr responded on October 16, 2015, declining the meeting:

> Isaac, thanks for the note, but our current negotiations are very advanced and close to being consummated. **Given our prior dialogue with these very stakeholders you propose meeting with, based on the way the NIZ law was drafted, we do not see a path forward that would get us to a deal with you that is anywhere close to the economics a new building can provide.** This would just set us back and create a timing issue for use to get a new building built in time for our requirements at lease end. I very much understand the frustration and have been living with it for well over a year. [Emphasis added.]

89.    Plaintiff cannot compete with the artificially-suppressed rent rates of $8 to $18 per square foot available to Talen in NIZ-subsidized buildings because, as discussed above, Plaintiff has been deprived of NIZ funds.

90.    Without NIZ funds, Plaza cannot pass on NIZ-subsidized rent rates to Talen or to any other replacement tenant. If Plaintiff were to match the rents offered by NIZ-funded landlords, PPL Plaza would operate at a massive loss, and would not have been able to pay its debt service on the property.

91.    As a result, as reported in the Morning Call on August 16, 2017, Talen has publicly announced that it has made a "five-year commitment" to rent office space in Tower 6, a new, to-be-built office building in the NIZ. The move will take effect in the "second quarter of 2018." A true and correct copy of the August 16, 2017 Morning Call article is attached hereto as Exhibit D.

92.    Tower 6 is a part of City Center, and is owned and leased by CCIC.

93.   Talen will be afforded full NIZ benefits once it relocates to Tower 6, including but not limited to discounted rent.

94.   Talen is vacating existing suitable space for lower-cost, new construction subsidized by NIZ benefits.

95.   Despite ongoing efforts to advertise and market the property, Plaintiff has been unable to acquire any replacement tenant willing to pay more than $8 per square foot, and as discussed below, PPL Plaza is now at imminent risk of foreclosure.

## I.   The Foreclosure Action

96.   PPL Plaza was financed based on the income stream from the Lease.  At the time that the Loans were procured in 2006, it was expected that the Lease would continue through the Extension Terms to 2038.

97.   Also at the time that the Loans were procured in 2006, the market for office space in Allentown was unencumbered by the damaging NIZ legislation.  Prior to passage of the NIZ legislation, PPL Plaza was the only suitable commercial office space in the local area and had, in fact, been built specifically to suit PPL's needs and requirements.  PPL Plaza commanded net base rent of $27.20 per square foot.

98.   In anticipation of the Loans maturing on December 1, 2016, Plaintiff attempted to obtain replacement financing, but was unable to locate any lender willing to provide such financing given the property's drastically reduced value from its 2006 purchase price of $92 million dollars to its current depressed valuation and Plaintiff's anticipated inability to generate rental income after Talen vacates the property.

99.   Plaintiff likewise found no investor willing to provide the necessary capital to avoid default.  Indeed, no rational person or bank would invest in PPL Plaza when NIZ-

-16-

subsidized rent offered at all other Class A office buildings in the NIZ is less than half of the rent that Plaintiff must charge in order to satisfy its debt service.

100.   As a result, Plaintiff was unable to pay off the Loans on their maturity date, which was December 1, 2016.

101.   On May 18, 2017, Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-CIBC18, Commercial Mortgage Pass-Through Certificates, Series 2007-CIBC18 (the "Lender"), initiated a mortgage-foreclosure action against Plaintiff in the Pennsylvania Court of Common Pleas, Lehigh County (the "Foreclosure Action").

102.   In the Foreclosure Action, the Lender moved for appointment of a receiver on the grounds that Plaintiff has been unable to extend or renew its lease with Talen, and unable to find any suitable replacement tenant(s) willing to pay rent in an amount sufficient to satisfy Plaintiff's mortgage obligations.

103.   The Court of Common Pleas appointed Harlyn Consulting, LLC (the "Receiver") as receiver for PPL Plaza on August 9, 2017.

104.   In August 2017, NAI Summit, as agent for the Receiver, attempted to negotiate with a prospective replacement tenant for 120,000 square feet of rentable office space at PPL Plaza for a term of ten years, beginning on July 1, 2018.  The proposal made by NAI Summit was for the top four floors of PPL Plaza at $12 per square foot.

105.   The prospective tenant rejected this proposal on the grounds that it was not competitive with an offer from a NIZ-subsidized property, where – including rent incentives – net monthly rent would be less than $8.50 per square foot.

-17-

106.    To Plaintiff's knowledge, the Receiver has been unable to locate any tenant willing to pay more than $8.50 per square foot, and PPL Plaza will sit vacant after Talen relocates to Tower 6.

107.    The Foreclosure Action remains pending in the Court of Common Pleas of Lehigh County.

108.    Plaintiff is a single-purpose entity formed to own and operate PPL Plaza.  If PPL Plaza is foreclosed upon, Plaintiff will lose its sole property and its ability to operate as a going concern.

J.    **Efforts to Collaborate with Officials on a Solution for PPL Plaza Prior to Commencing Litigation.**

109.    Since the NIZ was enacted, Plaintiff and its representatives repeatedly have attempted to obtain cooperation and assistance from City and state officials, as well as ANIZDA, on a solution for PPL Plaza, to no avail.

110.    Plaintiff's representatives met with Senator Browne on April 2, 2015.  Senator Browne recognized  the effect of the NIZ on PPL Plaza, but offered no help to Plaintiff or to the Plaza.

111.    In May 2015, counsel for Plaintiff sent a letter to Defendant Pawlowski, Mayor of the City of Allentown, and Senator Browne, requesting a meeting to discuss PPL Plaza's plight and their suggestions for possible assistance to Plaintiff.

112.    The solicitor for ANIZDA responded to the letter to Defendant Pawlowski and arranged a meeting with Seymour Traub, Chairman of ANIZDA, in June 2015.  At that meeting, counsel for Plaintiff was informed that ANIZDA could not assist Plaintiff because PPL Plaza was not new construction and because Plaza LP was not proposing renovations to the PPL Plaza.

-18-

113.    In a news article published by the Morning Call on June 27, 2015, Mr. Traub was quoted, in part, as saying: "[w]e can't do anything about [PPL Plaza]." In his comments in the article, Mr. Traub blamed the Plaza's situation on PPL's spin-off to Talen, and not on the NIZ or ANIZDA's restrictive and unreasonable implementation of the NIZ Act.

114.    On October 23, 2015, Plaintiff and its representatives met with Don Cunningham, President & CEO of Lehigh Valley Economic Development Corp. Like Senator Browne, Mr. Cunningham recognized the effect of the NIZ on PPL Plaza, but was unable to directly assist Plaintiff or the Plaza.

115.    On November 9, 2015, Plaintiff and its representatives met again with ANIZDA officials in a further attempt to obtain assistance to preserve their investment in PPL Plaza. In advance of that meeting, Plaintiff's counsel sent a proposal to the solicitor for ANIZDA. The proposal discussed one possible means of assistance to PPL Plaza. However, Plaintiff was again informed that ANIZDA could not assist Plaintiff because PPL Plaza was not new construction and because Plaza LP was not proposing renovations or capital improvements to the existing building.[3]

**K.    This Litigation**

116.    This litigation was commenced on December 15, 2015.

117.    Timothy Reese (in his official capacity as State Treasurer), Eugene DePasquale (in his official capacity as Auditor General of Pennsylvania), and Governor Wolf were also named as defendants in this action, but were voluntarily dismissed on February 3, February 10, and March 9, 2016, respectively.

---

[3]     Plaintiff asserts that these efforts are sufficient to exhaust any administrative requirement to seek compensation from state officials. Plaintiff nonetheless reserves its right to pursue an eminent domain action in state court, and to seek permission from this Court to amend this Amended Complaint pending the outcome of that action.

118.    On February 16, 2016, Defendants Governor Wolf and Eileen McNulty filed a Motion to Dismiss the Complaint (ECF No. 34) (the "Commonwealth Defendants Motion").

119.    On February 22, 2016, Defendants City of Allentown and Ed Pawlowski filed a Motion to Dismiss the Complaint, in Part, Pursuant to Fed. R. Civ. P. 12(b)(6) and Motion for More Definite Statement Pursuant to Fed. R. Civ. P. 12(e) (ECF Nos. 38-41) (the "City Defendants Motions").

120.    On February 22, 2016, Defendant Allentown Neighborhood Improvement Zone Development Authority ("ANIZDA") filed an Answer (ECF No. 36) and Motion for Judgment on the Pleadings (ECF No. 37) (the "ANIZDA Motion," and collectively with the Commonwealth Defendants Motion and City Defendants Motions, the "Motions to Dismiss").

121.    Plaintiff opposed the Motions to Dismiss on March 23, 2016.

122.    On September 12, 2017, the Court issued an Opinion and Order dismissing the Complaint with leave to re-plead in a manner consistent with the Court's Opinion.  (ECF Nos. 65 and 66).

123.    Plaintiff files this Amended Complaint in accordance with the Order dated September 12, 2017 (ECF No. 66).

## CLAIMS FOR RELIEF

## COUNT I

### Declaratory Judgments Act
### 28 U.S.C. §§ 2201-2202
### (All Defendants)

124.    The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

-20-

125.    The Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202, provides that a Court of competent jurisdiction has the power to construe legislation and declare rights and legal relations thereunder.

126.    A real and justiciable controversy exists between Plaintiff and Defendants regarding the constitutionality of the neighborhood improvement zone legislation and its implementation by ANIZDA, including but not limited to the ANIZDA guidelines.

127.    Accordingly, this Court may construe the legislation and render a decree declaring the Act and the ANIZDA guidelines as void as unconstitutional.

## COUNT II

**Violation of Article I, Section 10 of the U.S. Constitution –
Contract Clause
(All Defendants)**

128.    The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

129.    The Contract Clause, part of Article I, Section 10, Clause 1, of the United States Constitution provides, in pertinent part, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

130.    A law impairs the "Obligation of Contracts" if there is an already-existing contractual relationship, a change in law impairs that contractual relationship, and the impairment was substantial. (*See* Memorandum, ECF No. 65 at 30.)

131.    The Lease is an enforceable contract between Plaintiff and Talen.

132.    As set forth above, the Lease pre-dates enactment of both the NIZ Act and the ANIZDA guidelines.

-21-

133.    At the time that Plaintiff acquired PPL Plaza and the Lease in 2006, it was contemplated that the Lease would run through the Current Term and the Extension Terms, until 2038.

134.    However, as a direct result of the NIZ and its interpretation and implementation by Defendants as set forth above, Talen will relocate in 2018 to Tower 6, which is (or, is soon to be) a NIZ-subsidized building.  The Lease will therefore terminate at the end of the Current Term on April 30, 2018, and will not run through the Extension Terms until 2038 as contemplated at the time that PPL Plaza was acquired by Plaintiff.

135.    Enactment of the neighborhood improvement zone legislation, along with ANIZDA's subsequent promulgation of its guidelines, constitutes a change in law that has substantially impaired the Lease in violation of Article I, Section 10 of the U.S. Constitution.

136.    Further, by heavily subsidizing all Class A office space in the NIZ *except for PPL Plaza*, the NIZ Act and Defendants' interpretation and implementation of the Act has rendered meaningless the provisions of the Lease that set rental rates at "market value."  The NIZ has made it impossible for the Lease to continue past April 2018 on terms that satisfy Plaza LP's capital needs.  The Act and guidelines, therefore, frustrate Plaintiff's understanding at the time it entered into the Lease – that is, that the Plaza would continue to be rentable, Class A office space in Allentown.  This is an additional substantial interference with the Lease in violation of Article I, Section 10 of the U.S. Constitution.

137.    Such substantial interference with the Lease has resulted in significant harm to Plaintiff.  As set forth above, PPL Plaza is at risk of imminent foreclosure, and Plaintiff is at imminent risk of losing its ownership of and entire investment in the property.

-22-

138.    Defendants have advanced no permissible justification for abridging Plaintiff's contractual rights in this manner.

## COUNT III

### Violation of Fourteenth Amendment to the U.S. Constitution – Equal Protection Clause (Plaintiff v. ANIZDA)

139.    The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

140.    The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution prohibits states from denying any person within its jurisdiction the "equal protection of the laws." U.S. Const. Amend. XIV § 1.

141.    As set forth above, ANIZDA's implementation of the NIZ Act arbitrarily and capriciously treats Plaintiff unequally from all other Class A office buildings in the zone, to the immediate detriment of Plaintiff, by making NIZ funds available to all Class A commercial property owners and landlords in the NIZ *except Plaintiff.*

142.    As a direct result of Plaintiff's exclusion under the guidelines, PPL Plaza will become a vacant building and will "go dark" in April 2018.   Such an outcome is contrary to the intent of the NIZ Act, which is to "revitalize and expand the tax base" of financially-struggling Allentown.   In contrast, allowing Plaintiff to remain eligible for NIZ funds would have been consistent with the purpose of the Act because it would have contributed to the maintenance, development, and improvement of downtown Allentown.

143.    Even if ANIZDA's guidelines are enforceable as written, which Plaintiff asserts that they are not, ANIZDA's arbitrary and unreasonable implementation of the authority delegated to it under the Act violates Plaintiff's right to equal protection under the law.

-23-

144.    ANIZDA has articulated no rational basis for excluding Plaintiff from NIZ benefits, and indeed, no rational basis exists.

145.    Further, ANIZDA purposefully and intentionally discriminated against Plaintiff because Plaintiff's members and shareholders are not represented on ANIZDA's board of directors or native to Allentown, and ANIZDA was willing to disregard Plaintiff's rights in favor of local interests.

146.    ANIZDA's guidelines were issued with full knowledge of, and with willful disregard for, their devastating impact on Plaintiff.

147.    Such purposeful and discriminatory treatment puts Plaintiff in a class-of-one.

148.    ANIZDA's actions violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT IV

### Civil Rights Violation – 42 U.S.C. § 1983
### (All Defendants)

149.    The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

150.    Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

151.    Defendants are state and city government actors and agencies, and are required to act within the bounds of the Equal Protection and Contracts Clauses of the U.S. Constitution.

-24-

152.   42 U.S.C. § 1983 creates a private right of action against defendants for violation of Plaintiff's constitutional rights through the conduct of state officials and agents, as more fully described in the preceding paragraphs.

153.   All of Defendants' actions, including but not limited to those of defendants Pawlowski, Hassell, the City and ANIZDA, were taken in their official capacities as authorized agents of the Commonwealth, and the Commonwealth and its agencies are therefore liable for all harm caused by their actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order:

    (iv)    Declaring the Act unconstitutional;

    (v)    Declaring the ANIZDA guidelines unconstitutional;

    (vi)    Enjoining defendants from enforcing the Act and the ANIZDA guidelines;

    (vii)    Awarding monetary damages to Plaintiff;

    (viii)    Awarding counsel fees, interest, and costs to Plaintiff; and

    (ix)    Directing such other and further relief as may be appropriate.

Dated: October 3, 2017    By: _____

    Michael K. Coran (PA I.D. No. 55876)
    Rona J. Rosen (PA I.D. No. 32440)
    Teri M. Sherman (PA I.D. No. 319874)
    KLEHR HARRISON HARVEY BRANZBURG LLP
    1835 Market Street, Suite 1400
    Philadelphia, PA 19103
    Telephone: (215) 569-2700
    Fax: (215) 568-6603
    mcoran@klehr.com
    rrosen@klehr.com
    tsherman@klehr.com

    *Attorneys for Plaintiff The Plaza at 835 West
    Hamilton Street LP*

PHIL1 6519878v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of October, 2017, I caused a true and correct copy of the foregoing Amended Complaint for Declaratory, Injunctive and Monetary Relief to be served upon the following counsel of record via First Class Mail:

> Abraham C. Reich
> Gerald E. Arth
> FOX ROTHSCHILD LLP
> 2000 Market Street, 20th Floor
> Philadelphia, PA 19103
> *Counsel for Defendant ANIZDA*
>
> Barry N. Kramer
> PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL
> 21 S. 12th Street, 3rd Floor
> Philadelphia, PA 19107-3603
> *Counsel for Defendant C. Daniel Hassell (Dept. of Revenue)*
>
> Frances A. Fruwirth
> CITY OF ALLENTOWN SOLICITOR'S OFFICE
> 435 Hamilton Street
> Allentown, PA 18101
>
> Susan Ellis Wild
> GROSS MCGINLEY, LLP
> P.O. Box # 4060
> 33 South Seventh Street
> Allentown, PA 18105-4060
> *Counsel for Defendants City of Allentown and Mayor Pawlowski*

_____
Michael K. Coran

PHIL1 6519878v.1

# Exhibit A







# Exhibit B

OFFICE AND GARAGE LEASE AGREEMENT

between

LIBERTY PROPERTY DEVELOPMENT CORP. ("Landlord")

and

PPL ENERGYPLUS, LLC ("Tenant")

Dated:  December 2], 2001

# OFFICE AND GARAGE LEASE AGREEMENT

(Multi-Tenant Office Building with Adjacent Parking Garage)

<u>INDEX</u>

| §   | Section | Page |
| --- | --- | --- |
| 1.  | Basic Lease Terms and Definitions | 1 |
| 2.  | Premises | 5 |
| 3.  | Use | 5 |
| 4.  | Term; Possession. | 6 |
| 5.  | Rent | 8 |
| 6.  | Operating Expense Adjustments; Reconciliation; Management Fee | 8 |
| 7.  | Utilities | 10 |
| 8.  | Insurance; Indemnification | 12 |
| 9.  | Maintenance and Repairs | 14 |
| 10. | Compliance | 14 |
| 11. | Signs; Satellite Dish and Antenna; and Security System | 16 |
| 12. | Alterations | 18 |
| 13. | Mechanics' Liens. | 19 |
| 14. | Landlord's Right of Entry | 20 |
| 15. | Damage by Fire or Other Casualty | 20 |
| 16. | Condemnation | 21 |
| 17. | Quiet Enjoyment | 21 |
| 18. | Assignment and Subletting | 22 |
| 19. | Subordination; Mortgagee's Rights | 23 |
| 20. | Tenant's Certificate; Financial Information; Recording | 23 |
| 21. | Surrender; Abandoned Property | 24 |

22.   Defaults - Remedies............................................................................................25

23.   Authority.............................................................................................................29

24.   Liability of Landlord ..........................................................................................29

25.   Miscellaneous.....................................................................................................30

26.   Notices ................................................................................................................31

27.   Security Deposit .................................................................................................31

28.   Brokers................................................................................................................31

29.   Construction of Base Building and Tenant Improvements; Construction of
      Garage; Pedestrian Bridges ...............................................................................32

30.   Commencement Date...........................................................................................32

31.   Additional Contiguous Space..............................................................................33

32.   Keystone Opportunity Zone Provisions...............................................................33

33.   Right of First Offer To Purchase.........................................................................34

34.   Right to Terminate...............................................................................................35

35.   Related Agreements and Lease Amendment........................................................35

## INDEX OF DEFINED TERMS

| Defined Term | Section Reference |
|---|---|
| ADA | Addendum 1 |
| Additional Rent | Addendum 1 |
| Additional Space | § 31 |
| Affiliate | Addendum 1 |
| Agents | Addendum 1 |
| Alteration | Addendum 1 |
| Annual Operating Expenses | § 1(i) |
| Base Building Design Development Documents | Exhibit "G" ¶ 1(b)(ii) |
| Base Building Schematic Documents | Exhibit "G" ¶ 1(b)(i) |
| Base Building Scope Documents | Exhibit "G" ¶ 1(b) |
| Base Building Work | Exhibit "G" ¶ 1(a) |
| Building | § 1(b) |
| Building Operating Expenses | Addendum 1 |
| Building Premises | § 1(a)(i) |
| Building Rules | Exhibit "E" |
| Building System | Addendum 1 |
| Business Day | Addendum 1 |
| Commencement Date | § 1(f), § 30 |
| Common Areas | Addendum 1 |
| Conditioned Air | Addendum 1 |
| Conditioned Air Charge | Addendum 1 |
| Construction Warranty Period | Exhibit "G" ¶ 7 |

| Defined Term | Section Reference |
|---|---|
| Environmental Laws | Addendum 1 |
| Event of Default | Addendum 1 |
| Excusable Delays | Exhibit "G" ¶ 5 |
| Expiration Date | § 1(g) |
| Extension Term | § 1(e), § 4(b) |
| Extension Option | § 4(b) |
| "50% Complete" Base Building Construction Documents | Exhibit "G" ¶ 1(b)(iii) |
| "50% Complete" TI Construction Documents | Exhibit "G" ¶ 2(c) |
| Final Base Building Construction Documents | Exhibit "G" ¶ 1(b)(iii) |
| Final Construction Documents | Exhibit "G" ¶ 2(c) |
| Final Punch List | Exhibit "G" ¶ 4 |
| Final TI Construction Documents | Exhibit "G" ¶ 2(c) |
| First Phase Rent Commencement Date | § 30 |
| Garage | § 1(c) |
| Garage Cost | § 1(h)(ii) |
| Garage Land | § 1(c) |
| Garage Operating Expenses | Addendum 1 |
| Garage Premises | § 1(a)(ii) |
| Hazardous Materials | Addendum 1 |
| Holidays | Addendum 1 |
| "100% Complete" Base Building Construction Documents | Exhibit "G" ¶ 1(b)(iii) |
| "100% Complete" TI Construction Documents | Exhibit "G" ¶ 2(c) |

| Defined Term | Section Reference |
|---|---|
| HVAC | Addendum 1 |
| 24/7 HVAC Floors | § 7(c) |
| HVAC Specs | § 7(c) |
| Initial Monthly Rent | § 1(j) |
| Initial Term | § 1(d), § 4(a) |
| Interest Rate | Addendum 1 |
| Land | Addendum 1 |
| Landlord | Preamble |
| Landlord's General Contractor | Exhibit "G" ¶ 1(a) |
| Landlord Guarantor | § 1(p) |
| Latent Defects | Exhibit "G" ¶ 4 |
| Laws | Addendum 1 |
| Lease Amendment | § 35 |
| Lyons | Exhibit "G" ¶ 1(b)(iv) |
| Lyons Delay | Exhibit "G" ¶ 1(b)(iv) |
| Maintain | Addendum 1 |
| Maintenance | Addendum 1 |
| Market Value | § 4(d) |
| M&E Documents | Exhibit "G" ¶ 1(b)(iv) |
| Minimum Annual Rent | § 1(h) |
| Monthly Rent | Addendum 1 |
| Mortgage | Addendum 1 |
| Mortgagee | Addendum 1 |

| Defined Term | Section Reference |
|---|---|
| Operating Expenses | Addendum 1 |
| Ordinary Business Hours | Addendum 1 |
| Permitted Activities | § 10(d) |
| Permitted Materials | § 10(d) |
| Per Space Rental | § 1(h)(ii) |
| Phase | Exhibit "G" |
| Phase Target Turnover Date | § 1(s) |
| Premises | § 1(a) |
| Property | Addendum 1 |
| Proposed Base Building Design Development Documents | Exhibit "G" ¶ 1(b)(ii) |
| Proposed TI Design Development Documents | Exhibit "G" ¶ 2(b) |
| Qualified Appraiser | § 4(c) |
| Rent | Addendum 1 |
| Rentable Square Feet | Addendum 1 |
| Retail Lease | § 35 |
| ROFO Lease Terms | § 31(a)§ |
| ROFO Price | § 33(a) |
| Second Phase Rent Commencement Date | § 30 |
| Substantial Completion | Exhibit "G" ¶ 5 |
| Supplemental HVAC Rate | Addendum 1 |
| Taken or Taking | Addendum 1 |
| Telecommunications Equipment | § 11(b) |
| Tenant | Preamble |

| Defined Term | Section Reference |
|---|---|
| Tenant Electricity | Addendum 1 |
| Tenant's Floor Share | Addendum 1 |
| Tenant Guarantor | § 1(p) |
| Tenant Improvement Price | Exhibit "G" ¶ 2(d) |
| Tenant Improvements | Exhibit "G" ¶ 2 |
| Tenant's Share | § 1(k), Addendum 1 |
| Term | § 4 |
| Third Phase Rent Commencement Date | § 30 |
| TI Design Development Documents | Exhibit "G" ¶ 2(b) |
| TI Schematic Documents | Exhibit "G" ¶ 2(a) |
| TI Scope Documents | Exhibit "G" ¶ 2 |
| Transfer | Addendum 1 |
| Use | § 1(l) |

THIS OFFICE AND GARAGE LEASE AGREEMENT is made by and between LIBERTY PROPERTY DEVELOPMENT CORP., a Pennsylvania corporation ("Landlord") and PPL ENERGYPLUS, LLC, a limited liability company organized under the laws of Delaware ("Tenant"), and is dated as of the date on which this lease has been fully executed by Landlord and Tenant.

    1.    **Basic Lease Terms and Definitions.**

        (a)    **Premises:** the Building Premises and the Garage Premises.

            (i)    **Building Premises:** Approximately 202,394 Rentable Square Feet in the Building for general office purposes (and for the other uses specified in clauses (i) through (iii) of subparagraph 1(k) below), consisting of all of floors 2, 4, 5, 6, 7, and 8, all as outlined in red on the floor plan attached hereto as **Exhibit "A"**.

            (ii)    **Garage Premises:** Such number of parking spaces in the Garage as shall be designated by Tenant and set forth in the Lease Amendment and at that time depicted on **Exhibit "I"** (all in accordance with Section 35 below); provided, however that such number shall be not less than 85%, and not more than 90%, of the total number of spaces to be constructed in the Garage.

        (b)    **Building:** Building to be constructed in accordance with this Lease, containing approximately 258,007 Rentable Square Feet:

            Address: Intersection of Hamilton and N. Ninth Streets, Allentown, PA

        (c)    **Garage:** Parking garage to be constructed on land being acquired by Landlord from PPL Electric Utilities Corp. (the **"Garage Land"**), in accordance with this Lease and the Lease Amendment, which garage shall initially contain not fewer than 1,190 parking spaces and not more than 1300 parking spaces.

        (d)    **Initial Term** (§4): The period of time from the Commencement Date until the Expiration Date.

        (e)    **Extension Term:** Two (2) consecutive options to extend the term, each for a period of ten (10) years.

        (f)    **Commencement Date:** To be determined pursuant to Section 30 below.

        (g)    **Expiration Date:** Subject to extension in accordance with Section 4(b) below, the last day of the calendar month in which occurs the fifteenth (15th) anniversary of the earlier of (i) the Third Phase Rent Commencement Date, or (ii) the thirty-fifth (35th) day following the First Phase Rent Commencement Date.

        (h)    **Minimum Annual Rent:** collectively, the following:

            (i)    **As to the Building Premises:**

| Lease Year | Annual | Monthly |
|------------|--------|---------|
| 1 | $4,993,059.98 | $416,088.33 |
| 2 | $5,092,921.18 | $424,410.10 |
| 3 | $5,194,779.60 | $432,898.30 |
| 4 | $5,298,675.20 | $441,556.26 |
| 5 | $5,404,648.70 | $450,387.39 |
| 6 through 15 | $5,512,741.67 | $459,395.14 |

Prior to the Commencement Date, Landlord shall cause Landlord's architect to measure the Rentable Square Feet of the Building Premises. If such measurement discloses that the Rentable Square Feet for the Premises as determined by such measurement is less than the Rentable Square Feet for the Premises stated in Section 1(a)(i) of this Lease by a difference of 100 Rentable Square Feet or more, the Minimum Annual Rent (and Monthly Rent relating thereto) for the Building Premises shall be adjusted so that the Minimum Annual Rent for the Building Premises for Lease Year 1 shall be the actual Rentable Square Feet of the Premises times $24.67 per Rentable Square Feet and the Minimum Annual Rent for each subsequent Lease Year up to and including Lease Year 6 shall be equal to the product of the actual Rentable Square Feet of the Building Premises times the then applicable rental rate, which is calculated as being $24.67 per Rentable Square Foot, increased by two percent (2%) for each Lease Year following Lease Year 1 up to and including Lease Year 6. In no event shall any such measurement of the Building Premises by Landlord's architect result in any increase in Minimum Annual Rent for the Building Premises.

Notwithstanding the foregoing, for each calendar day from and including the Commencement Date up to (but excluding) the Third Phase Rent Commencement Date, the Minimum Annual Rent payable by Tenant for the Building Premises, and Tenant's Share, shall be determined in accordance with the following:

(1)     Commencing on the First Phase Rent Commencement Date (as defined in Section 30, below), Tenant shall pay Minimum Annual Rent only for the Rental Square Feet of the Building Premises contained in Floors 7 and 8, at the rate of $24.67 per Rentable Square Foot; and the Tenant's Share shall be 22.81% (except that with respect only to the cost to Maintain the elevators and related equipment in the Building Tenant's share shall be 24.30%); and

(2)     Commencing on the Second Phase Rent Commencement Date (as defined in Section 30, below). Tenant shall pay Minimum Annual Rent only for the Rental Square Feet of the Building Premises contained in Floors 4, 5, 6, 7 and 8, at the rate of $24.67 per Rentable Square Foot; and the Tenant's Share shall be 65.53% (except that with respect only to the cost to Maintain the elevators and related equipment in the Building Tenant's share shall be 70.37%).

(ii)  **As to the Garage Premises:** Minimum Annual Rent for the Initial Term shall be calculated as being the product of the Per Space Rental times the number of spaces comprising the Garage Premises, as shall be computed and set forth in the Lease Amendment. Minimum Annual Rent for the Extension Term shall be calculated in accordance with Section 4 below. Minimum Annual Rent for the Garage shall commence upon Substantial Completion of the Garage. The **"Per Space Rental"** means the result of dividing (A) the product of 0.11 times the Garage Cost by (B) the total number of parking spaces in the Garage. As used in this Lease, **"Garage Cost"** shall mean the aggregate of all costs projected to be incurred by Landlord (as shall be detailed by Landlord in a project budget to be presented to Tenant and subject to Tenant's reasonable approval and upon mutual approval shall be confirmed in the Lease Amendment pursuant to Section 35 below) in connection with the development and construction of the Garage, including (without limitation) the following: costs of acquisition of the Garage Land (including the purchase price thereof plus title insurance premiums, realty transfer taxes and other reasonable closing costs); costs of obtaining all licenses, variances, zoning changes, building permits and other governmental approvals and certificates; the fees and expenses of all architects and other design professionals, engineers and environmental consultants; the fees and expenses of lawyers incurred in connection with the acquisition of the Garage Land and the permitting, developing and construction of the Garage; costs of demolition of existing structures and removal of the resulting debris; costs of all site preparation and infrastructure improvements; costs of obtaining utility service for the Garage; the costs of constructing the Garage, including the cost of a Guaranteed Maximum Price general construction contract and all other costs of labor, materials, supplies and equipment, if any, not included in such construction contract; the cost of acquiring and installing all furnishings, fixtures and equipment in or on the Garage; all real estate taxes, utilities, insurance and other carrying costs incurred by Landlord prior to the substantial completion of the Garage; and a development fee in an amount equal to 2.1% of the total of all the foregoing costs.

(i)  **Annual Operating Expenses:** With regard to the Building Premises, estimated to be approximately $1,226,507.64 for calendar year 2003 (inclusive of the management fee referenced in Section 6(d) hereof), payable in monthly installments of $102,208.97, subject to adjustment as provided in this Lease. With respect to the Garage Premises, the estimate shall be set forth in the Lease Amendment.

(j)  **Initial Monthly Rent (monthly Minimum Annual Rent plus monthly Annual Operating Expenses):** Estimated to be approximately $518,297.30, with respect to the Building Premises. With respect to the Garage Premises, the estimate shall be set forth in the Lease Amendment.

(k)  **Tenant's Share:** collectively, (i) 78.32% as to the Building Operating Expenses, except that Tenant's Share with respect only to the cost to Maintain the elevators and related equipment in the Building shall be 84.24%, subject to the terms of Section 1(h) above; and (ii) with respect to the Garage Operating Expenses, a fraction, the numerator of which is the number of spaces comprising the Garage Premises (as shall be set forth in the Lease Amendment) and the denominator of which is the total number of spaces in the Garage.

(l)  **Use:** With respect to the Building Premises, general office purposes, also including (i) technology services, (ii) trading and financial services, and (iii) incidental and

supporting employee services, such as cafeteria, fitness room, etc. With respect to the Garage Premises, parking of vehicles, including Tenant's fleet vehicles, as long as the parking of such fleet vehicles is compatible with the structural design of the Garage.

     (m)  **Security Deposit:** N/A

     (n)  **Address For Notices:**

> Landlord:  Liberty Property Limited Partnership
> 8 Penn Center, Suite 1100
> Philadelphia, PA  19103
> Attention: John S. Gattuso, Senior Vice President

> with a copy to:

> Liberty Property Limited Partnership
> Lehigh Valley Corporate Center
> 1510 Valley Center Parkway, Suite 240
> Bethlehem, PA  18107
> Attention: Robert L. Kiel, Senior Vice President/
>            Regional Director

> Tenant:  Before the Rent Commencement Date:

> PPL EnergyPlus, LLC
> Two North Ninth Street
> Allentown, PA  18101
> Attention: Peter D. Cleff, Manager
> Energy Operations & Services

> On or after the Commencement Date:

> PPL EnergyPlus, LLC
> c/o PPL Services Corporation
> Two North Ninth Street
> Allentown, PA  18101
> Attention: Manager, Real Estate (Robert Farley)

     (o)  **Broker:** None

     (p)  **Tenant Guarantor:** PPL Energy Supply, LLC

          **Landlord Guarantor:** Liberty Property Limited Partnership, as to certain obligations of Landlord hereunder

     (q)  **Tenant Improvement Allowance:** an amount for the build-out of the Tenant Improvements (including, without limitation, the cost of architectural and engineering design, permits and approvals, wiring of voice and data telecommunications lines), calculated at $35.00 per rentable square foot.

(r)     **Additional Defined Terms:** See Addendum 1 for the definitions of other capitalized terms.

(s)     **Phase Target Turnover Date:** See Exhibit "G-6".

(t)     **Contents:** The following are attached to and made a part of this lease:

| | | |
|---|---|---|
| Addenda: | "1" | - Additional Definitions |
| | | - Operating Expenses Exhibit to Addendum 1 |
| Exhibits: | "A" | - Plan showing Building Premises and Additional Space |
| | "B" | - Intentionally Omitted |
| | "C" | - HVAC Design Specifications and Criteria |
| | "D" | - Cleaning Schedule |
| | "E" | - Building Rules |
| | "F-1" | - Tenant Estoppel Certificate Form |
| | "F-2" | - Landlord Estoppel Certificate Form |
| | "G" | - Construction of Base Building and Tenant Improvements |
| | "G-1" | - Base Building Scope Documents |
| | "G-2" | - Timetable for Plan Approval for Base Building Work |
| | "G-3" | - Approved Design Professionals |
| | "G-4" | - Approved General Contractors |
| | "G-5" | - Timetable for Plan Approval for Tenant Improvements |
| | "G-6" | - Schedule for Delivery of Phases of Building Premises |
| | "H" | - Construction of Garage |
| | "I" | - Plot Plan showing Garage Footprint |
| | "J" | - Design Plans and Specifications for Garage |
| | "K" | - Construction Schedule for Garage |

2.     <u>Premises.</u> Landlord leases to Tenant and Tenant leases from Landlord the Premises, together with the right in common with others to use the Common Areas.

3.     <u>Use.</u>

(a)     Tenant may occupy and use the Building Premises for and only for the Use specified in Section 1(l) above and the Garage Premises only for parking, in each case in compliance with all Laws, and shall not use the Premises for any other use. Tenant shall not permit any conduct or condition under its control which may endanger, disturb or otherwise unreasonably interfere with any other Building occupant's normal operations or with the management of the Building. Tenant shall not use or permit the use of the Common Areas for other than their intended purposes. At all times Landlord shall have exclusive control of the Common Areas. For so long as the area demised to Tenant in the Building under this Lease

comprises more than 50% of the office space in the Building, the remainder of the space in the Building shall not be used for any purpose other than general office purposes and retail uses that are compatible with those typically found in first class office buildings comparable to the Building.

(b)     For so long as the area demised to Tenant in the Building under this Lease comprises more than 50% of the office space in the Building, if Landlord desires to lease space in the Building to an energy company that competes with Tenant and its Affiliates, Landlord shall send Tenant written notice thereof specifying the name of such entity and requesting Tenant's approval thereof, which Tenant may withhold in its sole discretion. Tenant shall have ten (10) business days following such notice from Landlord to approve or disapprove of Landlord's leasing to such Tenant, and if Tenant fails to respond within such ten (10) business day period, Tenant shall be deemed to have approved the leasing by Landlord to the energy company named in Landlord's notice.

(c)     Tenant hereby covenants that from and after the first anniversary of the Commencement Date through the seventh (7th) full year thereafter, Tenant shall continuously occupy at least 50% of the Building Premises and shall not vacate or abandon in excess of 50% of the Building Premises.

4.     **Term; Possession.**

(a)     The Initial Term of this Lease shall commence on the Commencement Date and shall end on the Expiration Date, unless sooner terminated in accordance with the terms of this Lease.

(b)     Provided that at the time of exercise thereof Tenant is not in default under this Lease with respect to the payment of Rent, Tenant shall have the option (the **"Extension Option"**) to extend the Term of this Lease for two (2) additional periods of ten (10) years each (each such extension period being referred to hereinafter as the **"Extension Term"**). The second such Extension Option shall not be available to Tenant unless Tenant shall have exercised the first Extension Option. All of the terms, provisions and conditions of this Lease in effect immediately prior to the commencement of each Extension Term shall equally pertain to, and be in full force and effect during, such Extension Term, except that the Minimum Annual Rent for the Premises during such Extension Term shall be the Market Value (as determined pursuant to the provisions set forth below) and that Tenant shall have only the two (2) Extension Options provided herein. As used herein, **"Term"** means the Initial Term, as it may be extended by one or both Extension Terms.

(c)     Each Extension Option may be exercised by Tenant (subject to revocation as set forth below) only by notice given to Landlord at least eighteen (18) months, but not more than twenty-four (24) months, prior to the expiration of the then current Term. Within thirty (30) days after receipt of such notice from Tenant, Landlord shall forward to Tenant in writing Landlord's determination of Market Value (as defined below) of the Premises for the applicable Extension Term. If Tenant objects to the Market Value as quoted by Landlord, Landlord and Tenant shall attempt in good faith to negotiate a mutually acceptable determination of the Market Value within a period of thirty (30) days following the initial quotation by Landlord. If such

negotiations have not been concluded by a mutual agreement within such thirty (30) day period, Landlord shall engage an independent certified MAI appraiser having at least 10 years of experience appraising office buildings in Lehigh County, eastern Pennsylvania and central New Jersey (a "**Qualified Appraiser**") and shall instruct such appraiser to notify Landlord and Tenant of his or her determination of Market Value within thirty (30) days.  Upon receipt of such appraisal, if Tenant disputes the Market Value as so determined by the first appraiser, Tenant shall have the right to engage, at Tenant's expense, a second independent Qualified Appraiser, who shall be instructed to deliver his or her appraisal of the Value to Landlord and Tenant within thirty (30) days.  If the two appraisals differ by less than 5% of the lower appraisal, the Market Value shall be conclusively deemed to be equal to the arithmetic average between the two appraisals.  If the two appraisals differ by more than 5%, the two appraisers shall be instructed to jointly designate a third Qualified Appraiser, who shall be instructed to provide his or her appraisal to the parties within twenty (20) days.  Thereupon the Market Value shall be deemed to be the arithmetic average of the two closest appraisals, with the third appraisal being disregarded. The determination of Market Value in the manner set forth above shall be final and binding on Landlord and Tenant.  If based on the determination of Market Value as aforesaid Tenant does not desire to proceed with the then applicable Extension Term, Tenant shall have the right to revoke its exercise of the Extension Option pertaining thereto by giving notice to Landlord within twenty (20) days after the such determination, but in no event later than one (1) year prior to the expiration of the then current Term.  The cost of Landlord's appraiser shall be borne by Landlord, the cost of Tenant's appraiser shall be borne by Tenant, and the cost of the third appraisal shall be shared equally between Landlord and Tenant; provided, however, that if Tenant revokes its exercise of the Extension Option as permitted by the preceding sentence, Tenant shall be responsible for the fees and expenses of all appraisers.

(d)     The "**Market Value**" shall be defined as the fair market rental value of the Premises (determined separately, in the manner set forth below in this paragraph, for the Building Premises and the Garage Premises) for the applicable Extension Term.  With respect to the Building Premises, such fair market value shall be determined based on the then current base rental rates being offered and accepted for both new leases and renewals of Class A corporate headquarter facilities of comparable size to the Premises, with comparable amenities to the Premises (excluding the Garage Premises) and, for such purpose, the Qualified Appraiser may consider such comparable properties as may be located in any of Lehigh, Northampton, Bucks, Chester, Delaware and Montgomery Counties of Pennsylvania or the Mercer, Somerset and Hunterdon Counties of New Jersey, taking into account (and making appropriate adjustments for) the size of the space being leased, the length of the term of each lease, the condition of the respective premises demised thereunder, the actual location of the respective premises and the other provisions of this Lease.  The Market Value shall be determined as of the date that the applicable Extension Term is to commence and shall reflect the full period of such Extension Term.  The Market Value of the Garage Premises shall be determined by the Qualified Appraisers separately from the Market Value of the Building Premises and the foregoing provisions of this subsection (d) shall apply with respect to the Garage Premises except that the aforesaid Counties in Pennsylvania and New Jersey shall be replaced with Northampton and Lehigh Counties of Pennsylvania.

(e)     At the request of either party after the Third Phase Rent Commencement Date, Landlord and Tenant shall mutually execute and deliver a supplement to this Lease

confirming the Third Phase Rent Commencement Date and the Expiration Date and also confirming the actual area in Rentable Square Feet of the Building Premises, as determined pursuant to Section 1(h)(i) above and, if such determination results in an adjustment to the Minimum Annual Rent and Tenant's Share, confirming the amounts thereof as so adjusted.

5. **Rent.**

(a)     Tenant agrees to pay to Landlord, without deduction or offset (except for such offsets as are expressly permitted pursuant to Section 22(e) below), to an account designated by Landlord via (unless Landlord designates otherwise) wire transfer, or other electronic transmittal mutually acceptable to the parties, of immediately available funds in lawful money of the United States, the following: (i) the Monthly Rent, in advance, on the first day of each calendar month during the Term, and (ii) all Additional Rent, as and when due and payable under this Lease. If the Commencement Date is not the first day of the month, the Initial Monthly Rent for that month shall be apportioned on a per diem basis and shall be paid on or before the Commencement Date.

(b)     Any Rent not paid within 5 days after the due date will bear interest at the Interest Rate from the date due to the date paid.

(c)     Nothing in this Lease shall be interpreted as requiring Tenant to pay any income, excess profits, franchise or corporate capital stock tax or any tax upon the Rent imposed or assessed upon Landlord, unless such tax or any similar tax is levied or assessed in lieu of all or any part of any real estate tax or an increase in any real estate tax on, or as requiring Tenant to pay any special or betterment assessments for improvements which are required to be completed prior to the Commencement Date. With respect to any other special or betterment assessments for improvements the cost for which is payable in installments, Tenant shall pay Tenant's Share of the cost of such items on a basis concurrent with the timing of the payment of such installments by Landlord and only for the Term; if the cost for such special or betterment assessments is levied in a single charge and is not payable in installments, Tenant shall pay only for the portion of the useful life of the improvement which falls within the Term which shall be determined based upon the normal useful life of such item as specified in accordance with generally accepted accounting principles.

(d)     If it shall not be lawful for Tenant to reimburse Landlord for any of the taxes, special assessments, fees or other charges imposed against Landlord by any authority with respect to the Rent (subject to the application of Section 5(c) above), the Minimum Annual Rent shall be increased by the amount of such charges, unless prohibited by law.

(e)     At the request of Tenant from time to time during the Term, Landlord shall provide to Tenant copies of receipts evidencing the payment of all ad valorem taxes, assessments and other lienable charges (except those required to be paid directly by Tenant under this Lease).

6. **Operating Expense Adjustments; Reconciliation; Management Fee.**

(a)     The amount of the Annual Operating Expenses set forth in Section 1(i) represents Tenant's Share of the estimated Operating Expenses for the calendar year in which the

Commencement Date occurs. Landlord may adjust such amount from time to time but not more often than two (2) times in any calendar year if the estimated annual Operating Expenses increase or decrease; Landlord may also invoice Tenant separately from time to time for Tenant's Share of any extraordinary or unanticipated Operating Expenses, rather than waiting until the year-end reconciliation. By March 31st of each year (and as soon as practical after the expiration or termination of this Lease or, at Landlord's option, after a sale of the Property), Landlord shall provide Tenant with a statement of the Operating Expenses for the preceding calendar year or part thereof. Within 20 days after delivery of the statement to Tenant, Landlord or Tenant shall pay to the other the amount of any overpayment or deficiency then due from one to the other or, at Landlord's option, Landlord may credit Tenant's account for any overpayment. Landlord's and Tenant's obligation to pay any overpayment or deficiency due the other pursuant to this Section shall survive the expiration or termination of this Lease. Notwithstanding any other provision of this Lease to the contrary, Landlord may, in its reasonable discretion, determine from time to time the method of computing and allocating Operating Expenses to take into account the different uses of space within the Building, namely retail uses versus general office uses and any greater than de minimis impact on Operating Expenses arising out of a particular use (such as, by way of illustration only, more frequent trash and garbage removal created by a restaurant use within the retail portion of the Building) that, absent such determination by Landlord and using only the stated "Tenant's Share" for calculating a particular tenant's share of Operating Expenses, would result in an inequitable allocation of Operating Expenses among the tenants in the Building, and Tenant will be bound by such determination.

(b)  For so long as the area demised to Tenant in the Building under this Lease comprises more than 50% of the office space in the Building, upon Tenant's request, Landlord shall bring proceedings to contest the validity or amount of any real estate tax or special assessments or to recover payments therefor. Tenant shall cooperate with Landlord with respect to such proceedings to the extent reasonably necessary and shall pay to Landlord Tenant's Proportionate Share of all reasonable costs, fees and expenses incurred in connection with such proceedings as additional rent promptly upon being billed.

(c)  Tenant shall be entitled at any reasonable time during regular business hours, but no more than once in each calendar year, after giving to Landlord at least five (5) business days prior written notice, to inspect in Landlord's business office all Landlord's records necessary to satisfy itself that all charges have been correctly allocated to Tenant, for either or both of the two (2) calendar years immediately preceding the year during which such notice is given, and to obtain an audit thereof by an independent certified public accountant (selected by Tenant with Landlord's written consent, which shall not be withheld unreasonably) to determine the accuracy of Landlord's certification of the amount of Additional Rent charged Tenant. If it is determined that Tenant's liability for Additional Rent for either such calendar year is less than ninety-five percent (95%) of that amount which Landlord previously certified to Tenant for such calendar year, Landlord shall pay to Tenant the cost of such audit and regardless of such percentage shall refund promptly to Tenant the amount of the Additional Rent paid by Tenant for such calendar year which exceeds the amount for which Tenant actually is liable, as determined following such audit. Except as set forth above, Tenant shall bear the total cost of any such audit. If Tenant's audit establishes that Tenant's liability for Additional Rent for either such calendar year is materially less than ninety-five percent (95%) of that amount which Landlord previously certified to Tenant for such calendar year, Tenant shall have the right to conduct an

audit by its independent certified public accountant selected as aforesaid for any or all of the five (5) calendar years immediately preceding the calendar year in which the audit is conducted. If Tenant does not request an audit of a particular year's calculation of Annual Operating Expenses within the time period set forth above in this paragraph, Tenant will be deemed to have waived the right to contest Landlord's statement with respect to such year.

(d)    Tenant shall pay to Landlord as Additional Rent, concurrently with its payment of Operating Expenses, a management fee equal to 5% of the then current Minimum Annual Rent under this Lease (but excluding the portion thereof attributable to the Garage Premises).

## 7.    **Utilities.**

(a)    Landlord will provide municipal hot and cold water to the Building Premises for drinking and sanitary purposes.

(b)    Landlord will furnish the Building Premises with electricity 24 hours per day, 7 days per week for the normal use and occupancy of the Building Premises for the Use and will furnish the Garage Premises with light and electrical power 24 hours per day, 7 days per week for the normal use and occupancy of the Garage for the Use relating thereto. If Tenant shall require electricity or install electrical equipment including but not limited to electrical heating, refrigeration equipment, electronic data processing machines, which may, in Landlord's reasonable opinion, in any way exceed or overload the capacity of the utility systems of the Building available to any floor of the Building or Tenant's Share thereof (it being agreed that Tenant's need for 220 volt equipment or lights, if any, shall not be included for this purpose), Tenant will obtain Landlord's prior written approval and will pay for the resulting additional expense, including the expense resulting from the installation of additional equipment and meters, as additional rent promptly upon being billed. Tenant shall pay to Landlord as additional rent, within 15 days after receipt from Landlord of each statement of the amount due in each period chosen by Landlord, the cost of supplying Tenant Electricity (including, without limitation, the cost charged by the utility company for taxes, fuel adjustment charges, transfer charges and other like charges regularly passed on to the consumer by the public utility furnishing electricity to the Building), it being agreed that the basic cost for Tenant Electricity shall be based on usage as measured by meters installed at the Building Premises.

(c)    Landlord will furnish the Building Premises with HVAC for the normal use and occupancy of the Building Premises for the Use during Ordinary Business Hours and will furnish Floors 7 and 8 of the Building Premises (the **"24/7 HVAC Floors"**) with HVAC 24 hours per day, 7 days per week for the normal use and occupancy thereof, all in accordance with the HVAC design specifications and criteria attached to and made a part of this Lease as **Exhibit "C"** (the **"HVAC Specs"**). At Landlord's election, Tenant shall either: (i) pay the Conditioned Air Charge to the provider of the Conditioned Air, promptly as and when billed therefor; or (ii) pay to Landlord, as additional rent, within 15 days after receipt from Landlord of each statement of the amount due in each period chosen by Landlord, the cost of supplying Conditioned Air to the Building Premises at the Conditioned Air Charge. In either case, the charge shall be based on Tenant's usage thereof as measured in the manner set forth in the definition of Conditioned Air and without any mark-up by Landlord. If due to the use of the Building Premises in a

manner exceeding the **HVAC Specs** or if Tenant has requested and (with Landlord's consent) installed a supplementary HVAC system that taps into the chilled water, condensate or Conditioned Air provided by the HVAC system, then Tenant shall pay to Landlord as additional rent (or, at Landlord's election, pay directly to the provider of the chilled water, condensate or Conditioned Air), within 15 days after receipt from Landlord of each statement of the amount due in each period chosen by Landlord, the cost of supplying such chilled water, condensate or Conditioned Air to the Building Premises, at the Supplemental HVAC Rate. Upon four (4) hours prior request from Tenant, Landlord shall provide HVAC beyond Ordinary Business Hours to portions of the Building Premises in addition to the 24/7 HVAC Floors.

(d)     Tenant shall pay all charges for, and taxes on, the furnishing of water and sewer service, electric energy and, if the Building Systems should be converted to receive same, steam or fuel and other utility services, as well as telephone and other communication services, supplied to the Building Premises. Tenant shall, subject to Landlord's consent where required in this Lease, obtain service in its own name, timely pay all charges directly to the provider and install, maintain and repair all wiring, telephone and other communications equipment at its sole cost and expense. Landlord shall not be responsible or liable for any interruption in utility, telephone or other communication service, nor shall such interruption affect the continuation or validity of this Lease unless such interruption was caused by the negligence or willful misconduct of Landlord; its employees, agents or contractors in which event: (i) Landlord shall bear the cost of supplying alternate utility service for the period beginning with the sixth (6th) consecutive hour of such interruption until such original utility service has been fully restored and (ii) in the case of a cessation of electrical, telephone or other telecommunication services, Tenant shall receive an abatement of Rent with respect to both the Building Premises and the Garage Premises retroactive to the date and time of interruption if such interruption continues for more than 72 consecutive hours. Landlord shall have the right, upon obtaining Tenant's reasonable approval of the timing thereof (except in the case of an emergency, in which event such approval shall not be necessary and advance notice shall be given that is reasonable under the circumstances), to interrupt or turn off utility, telephone and other communications services in the event of an emergency or as necessary in connection with repairs to the Building or installation of telephone and other communications equipment for other tenants in the Building. Landlord shall have the exclusive right to select, and to change, the companies providing utility services to the Building, the Garage or the Premises; provided, however, that so long as Tenant (or its Affiliates) is a provider of electric power or gas and is leasing and occupying in excess of 50% of the office space in the Building, Landlord shall, at Tenant's request, select Tenant or the appropriate Affiliate of Tenant to supply electricity or gas, respectively, to the Building, the Garage or the Premises. Tenant shall cooperate at all times with Landlord and any companies providing utility services to the Building and, when and as reasonably necessary, shall allow Landlord and such providers reasonable access to the Building electric lines, feeders, risers, wiring and any other machinery within the Building Premises.

(e)     No telecommunication carrier shall have the right to do any work for Tenant or use any space or facilities in the Building without Landlord's prior written consent (which shall not be unreasonably withheld or delayed), and shall be subject to Landlord and such carrier entering into a License Agreement in customary and reasonable form mutually acceptable to Landlord and such carrier, and subject to compliance by Tenant and such carrier with the reasonable and non-discriminatory requirements of Landlord's handbook governing procedures

for use of equipment areas, risers and other facilities in the Building.  Notwithstanding the foregoing sentence, so long as Tenant (or its Affiliates) is a provider of telecommunications services and is leasing and occupying in excess of 50% of the office space in the Building, Landlord shall, at Tenant's request, select Tenant or the appropriate Affiliate of Tenant to supply telecommunications services to the Building or the Building Premises. Alternatively, so long as Tenant (or its Affiliates) is a provider of telecommunications services and is leasing and occupying in excess of 50% of the office space in the Building, Tenant may designate the telecommunication carrier for the Building subject to Landlord's reasonable approval. Any wiring, cabling or other equipment necessary to connect Tenant's telecommunications equipment to the main point of presence in the Building and from the equipment room on the floor on which the Building Premises is located throughout the Building Premises shall be at Tenant's sole responsibility and cost, and shall be installed in a location and manner reasonably approved by Landlord. Any wiring, cabling or other equipment necessary to connect Tenant's telecommunications equipment from the main point of presence in the Building through the main riser to the equipment room on the floor on which the Building Premises is located shall be coordinated by Landlord or a subcontractor approved by Landlord and all associated third party costs shall be paid by Tenant to Landlord within 20 days after receipt of invoice therefor.

8.    **Insurance; Indemnification.**

(a)    Landlord shall maintain insurance, on an all-risk form, against loss or damage to the Building, the Garage or the Property with coverage for perils as set forth under the Causes of Loss-Special Form (risks of direct physical loss policy on ISO Form CP 1030 or latest edition under the Insurance Services Office commercial property program) in an amount equal to the full insurable replacement cost of the Garage and the Building (including permanent leasehold improvements constructed by Tenant but excluding coverage of Tenant's personal property in, and any Alterations (other than permanent leasehold improvements) by Tenant to, the Building Premises), and such other insurance, including 12 months' rent loss coverage, as Landlord may reasonably deem appropriate or as may be required by any Mortgagee. In clarification of and without limiting the preceding sentence, Landlord shall carry commercial general liability insurance, garage keepers insurance (which may be incorporated into Landlord's commercial general liability insurance), Workers' Compensation and Employer's Liability insurance and, specifically during Landlord's construction of the Building and the Garage and any Alterations, Landlord shall also carry builders' risk insurance. As a condition of Landlord's obligation to provide insurance coverage for Tenant's permanent leasehold improvements and to restore such permanent leasehold improvements following a casualty in accordance with Section 15 below, Tenant shall provide Landlord with a written statement certifying the value of such permanent leasehold improvements, accompanied by such supporting documentation as may be reasonably requested by Landlord or its insurance carrier, at the time of their completion.

(b)    Tenant, at its own expense, shall keep in effect commercial general liability insurance, including contractual liability insurance, covering Tenant's operations on or about the Premises and Property, with such limit of liability as Landlord may reasonably determine from time-to-time, but not less than a combined single limits of $5,000,000 per occurrence and in the aggregate for bodily injury or property damage (the aggregate limits shall apply separately to each of Tenant's locations if more than the Premises); however, such limits shall not limit the liability of Tenant hereunder. The policy shall name Landlord, and if

requested by Landlord, Landlord's Mortgagee(s) as additional insureds with respect to the Premises, shall be written on an "occurrence" basis or a "claims first made" basis, shall be endorsed to provide that it is primary to and not contributory to any policies carried by Landlord, shall contain a severability of interests clause, shall provide that it shall not be cancelable or reduced without at least 30 days prior written notice to Landlord and shall be issued in form satisfactory to Landlord; provided, however, that if Tenant's insurance is written on a "claims first made" basis, then such insurance policy shall remain in force for a period of not less than two (2) years following the expiration or earlier termination of this Lease. The insurer shall be a responsible insurance carrier which is authorized to issue such insurance and licensed to do business in the state in which the Property is located and which has at all times during the Term a rating of no less than A VII in the most current edition of Best's Insurance Reports. Tenant shall deliver to Landlord on or before the Commencement Date, and at least 10 days prior to the date of each policy renewal thereafter, a certificate of insurance evidencing such coverage and the waiver of subrogation described below. Notwithstanding the foregoing provisions of this Section 8(b), all insurance required to be maintained by Tenant may be provided under a plan of self-insurance adequate to provide coverage equal to the policies required to be maintained by Tenant hereunder and Tenant shall furnish Landlord with a certificate of insurance with respect thereto in form and substance reasonably acceptable to Landlord. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 8(b), then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance.

(c)     Landlord and Tenant each waive, and release each other from and against, all claims for recovery against the other for any loss or damage to the property of such party arising out of fire or other casualty coverable by a standard "Causes of Special Loss" property insurance policy even if such loss or damage shall be brought about by the fault or negligence of the other party or its Agents. This waiver and release is effective regardless of whether the releasing party actually maintains the insurance described above in this subsection and is not limited to the amount of insurance actually carried, or to the actual proceeds received after a loss. Each party shall have its insurance company that issues its property coverage waive any rights of subrogation, and shall have the insurance company include an endorsement acknowledging this waiver, if necessary. Each of Landlord and Tenant assumes all risk of damage to its own personal property located in or on the Premises or the Property, including any loss or damage caused by water leakage, fire, windstorm, explosion, theft, act of any other tenant, or other cause (including fault on the part of the other party hereto), except that: (i) subject to the first two sentences of this Section 8(c), each party hereto shall be responsible for damage to the personal property of the other party caused by the recklessness or willful misconduct of the first party, and (ii) nothing contained herein shall affect the obligations of Tenant under Section 10(d) below.

(d)     Subject to subsection (c) above, and except to the extent caused by the negligence or willful misconduct of Landlord or its Agents, Tenant will indemnify, defend, and hold harmless Landlord and its Agents from and against any and all claims, actions, damages, liability and expense (including fees of attorneys, investigators and experts) which may be asserted against, imposed upon, or incurred by Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the

DSC:821298.10/LJB035-156363                    - 13 -

Term. Tenant's obligations pursuant to this subsection (d) shall survive the expiration or termination of this Lease.

9. **Maintenance and Repairs.**

(a) Landlord shall Maintain the entire Building, the entire Garage and all interior and exterior Common Areas, excluding Maintenance of the interior of the Building Premises that is routine and non-structural, which exclusion shall be Tenant's responsibility. Tenant shall (subject to the services to be provided by Landlord pursuant to paragraphs (c) and (d) below in this Section 9 and reimbursed to Landlord through Operating Expenses) perform routine day-to-day Maintenance of the interior of the Building Premises. Landlord shall further Maintain all utilities in the walls, floors and ceilings (including above drop ceilings) other than Tenant's electrical and communications lines. If Tenant becomes aware of any condition that is Landlord's responsibility to repair, Tenant shall promptly notify Landlord of the condition. Landlord's obligation to perform Maintenance pursuant to this Section 9 shall be subject to reimbursement by Tenant from Operating Expenses, to the extent provided for in the definition of "Operating Expenses".

(b) Alterations, repairs and replacements to the Property, including the Premises, made necessary because of Tenant's Alterations or installations, any specialized use or circumstances special or particular to Tenant (other than general office uses as to the Building Premises and parking as to the Garage Premises), or any negligent or willful act or omission of Tenant or its Agents (excluding any casualty which is insured or required to be insured hereunder) shall be made at the sole expense of Tenant.

(c) Landlord will provide Tenant with trash removal and janitorial services pursuant to a cleaning schedule attached as **Exhibit "D"**. Notwithstanding such schedule, Landlord agrees to handle promptly any requests from Tenant for cleaning up ordinary spills, unclogging drains and toilets, and similar occurrences requiring prompt attention.

(d) With respect to light fixtures standard in the Building, Landlord shall furnish and install all replacement fluorescent tubes, starters, lamps and ballasts required in the Building Premises, at Tenant's expense (payments to be made to Landlord within 30 days after Tenant's receipt of each bill therefor).

(e) Landlord shall have the right to make Alterations to the Common Areas from time to time, except that for so long as the area demised to Tenant in the Building under this Lease comprises more than 50% of the office space in the Building, Landlord shall not make any material changes to the Common Areas without first having obtained Tenant's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

10. **Compliance.**

(a) Tenant will, at its expense, promptly comply with all Laws now or subsequently pertaining to the nature of Tenant's use of the Premises and any improvements made by Tenant to the Building Premises, and Landlord will, subject to its right to reimbursement consistent with Section 6 of this Lease, comply with all Laws (including, without limitation, ADA except to the extent provided in the last sentence of this Section 10(a))

otherwise applicable to the Premises, the Building, the Garage and the Common Areas. Tenant will pay any taxes or other charges by any authority on Tenant's property or trade fixtures or relating to Tenant's use of the Premises. Neither Tenant nor its Agents shall use (other than for general office uses as to the Building Premises and for parking as to the Garage Premises) the Premises in any manner that under any Law would require Landlord to make any Alteration to or in the Building, the Garage or the Common Areas. Tenant shall be responsible for compliance with the ADA, and any other Laws regarding accessibility, solely with respect to Tenant's Alterations or improvements or its specific manner of use of the Premises (other than general office uses as to the Building Premises and parking as to the Garage Premises).

(b)     Tenant will comply, and will cause its Agents to comply, with the Building Rules attached as **Exhibit "E"**. Landlord shall have the right to make reasonable and uniformly applicable changes to the Building Rules at any time; provided, however, that any material changes thereto shall require Tenant's consent which shall not be unreasonably withheld, conditioned or delayed. Whenever Landlord's consent is required under the Building Rules, such consent shall not be unreasonably withheld, conditioned or delayed. To the extent any provision of the Building Rules conflicts with any provision of this Lease, the terms of this Lease shall govern. Landlord agrees that all Building Rules will be enforced in a uniform and non-discriminatory manner as among all tenants of the Building.

(c)     Excepting the use of the Building Premises for general office purposes and the use of the Garage Premises for parking purposes and any Alterations and improvements permitted under this Lease, Tenant agrees not to do anything or fail to do anything which will increase the cost of Landlord's insurance or which will prevent Landlord from procuring policies (including public liability) from companies and in a form reasonably conforming to industry standards for comparable projects. If any breach of the preceding sentence by Tenant causes the rate of fire or other insurance to be increased, Tenant shall pay the amount of such increase as additional Rent within 30 days after being billed.

(d)     Tenant agrees that (i) no activity will be conducted on the Premises that will use or produce any Hazardous Materials, except for activities which are conducted in accordance with all Environmental Laws (**"Permitted Activities"**); (ii) the Premises will not be used for storage of any Hazardous Materials, except for materials used in the Permitted Activities which are properly stored in a manner and location meeting all Environmental Laws (**"Permitted Materials"**); (iii) no portion of the Premises or Property will be used by Tenant or Tenant's Agents for disposal of Hazardous Materials; and (iv) Tenant will, promptly upon knowledge thereof, notify Landlord of any violation by Tenant or Tenant's Agents of any Environmental Laws at the Premises or the release or suspected release of Hazardous Materials in, under or about the Premises, and Tenant shall promptly deliver to Landlord a copy of any notice received by Tenant with respect to the foregoing. If at any time during or after the Term, any portion of the Property is found to be contaminated by Tenant or Tenant's Agents or subject to conditions prohibited in this Lease caused by Tenant or Tenant's Agents, Tenant will indemnify and hold Landlord harmless from all claims, demands, actions, liabilities, costs, expenses, attorneys' fees, damages and obligations of any nature arising from or as a result thereof.

(e)     Landlord and Tenant acknowledge that, on or about the date of this Lease, Landlord has acquired or is about to acquire the Building Land from Tenant. Landlord further acknowledges that a portion of the material used to backfill the Building Land after demolition of improvements previously located thereon consists of blast furnace slag ("**Waylite**") produced by Waylite Corporation. Landlord: (i) accepts the condition of the Building Land (including its soil and sub-surface condition and the presence of the Waylite thereon) for all purposes hereunder; (ii) releases and discharges Tenant and its Affiliates from all loss, liability or additional costs arising at any time from the presence of the Waylite in or on the Building Land; (iii) agrees that the presence of such Waylite in or on the Building Land throughout the Term shall not be deemed a violation of Tenant's obligations under this Section 10; (iv) agrees to comply with all legal requirements, if any, governing the use and/or disposal of the Waylite; and (v) agrees that any additional costs incurred by Landlord in connection with the disposal of Waylite or repairs or remediation resulting from the presence thereof shall not constitute Operating Expenses under this Lease and shall not otherwise be charged to Tenant.

## 11.     **Signs; Satellite Dish and Antenna; and Security System.**

(a)     Except as described below in this Section and except for signs that are located wholly within the interior of the Building Premises and not visible from the exterior of the Building Premises, no signs shall be placed on the Property without the prior written consent of Landlord, which shall not be unreasonably withheld. All signs installed by Tenant shall be maintained by Tenant in good condition. Tenant shall remove its signs at the termination of this Lease, shall repair any resulting damage, and shall restore the Property to its condition existing prior to the installation of Tenant's signs. Landlord and Tenant shall cooperate and work together in the development of a mutually acceptable comprehensive signage package which shall include tenant identification signage, monument signage and directional signage to be located on the exterior of the Building and/or on the Property and which shall be developed and completed within a time frame that will not delay or hinder the development and completion of the Building or the Building Premises. The sign package so developed shall contain, without limitation, sign plans which have been approved by Landlord and Tenant as well as Landlord's prior reasonable approval as to method of installation and as to the design and physical attributes of the proposed signs (including, by way of example, its texture and structural components and how it may be illuminated). Tenant shall have the right to name the Building and re-name the Building from time to time during the Term, subject to compliance with all Law and Requirements, and provided that all expenses related to re-naming the Building and signage in connection therewith shall be borne by Tenant. Notwithstanding the foregoing, Tenant's right to name the Building shall be subject to the following restrictions: (a) Tenant shall not use the words "Liberty" or "Liberty Property Trust" in the name of the Building, (b) such name shall comply with all Laws and Requirements and (c) Landlord shall have the right to change the name of the Building upon the expiration or earlier termination of this lease. So long as Tenant is leasing and occupying in excess of 50% of the office space in the Building, Landlord agrees to use the name of the Building in all of Landlord's advertising or press releases with respect to the Building and/or the Property and Landlord shall not permit other users of the Building to install signage on the exterior of the Building without Tenant's prior written consent, which consent shall not be unreasonably withheld.

(b) Provided that Tenant is not in default in the payment of Rent under this Lease, Tenant shall have the right to install, maintain and repair one or more satellite dishes and related telecommunications equipment (collectively, the **"Telecommunications Equipment"**) on the roof of the Building for use exclusively by Tenant and its Affiliates, under and subject to the following conditions:

(i) Tenant shall comply with all Laws and Requirements (including, but not limited to, obtaining all required permits and licenses, as to which Landlord agrees to assist Tenant provided Landlord shall not bear the costs, charges or fees of any such permits or licenses or the application therefor) and shall obtain, and deliver to Landlord written evidence of, any approval(s) required under recorded covenants or restrictions applicable to the Property, if any. Telecommunications Equipment permitted hereunder shall be limited to equipment serving the business operations of Tenant and its Affiliates, and no unrelated Telecommunications Equipment shall be permitted.

(ii) Tenant shall obtain Landlord's prior approval (which shall not be unreasonably withheld, delayed or conditioned) of the location of the Telecommunications Equipment on the roof of the Building and of the specifications for each item of the Telecommunications Equipment. If Landlord gives its approval to such installation, Tenant agrees to use Landlord's roofing contractor to ensure that the installation will be performed in a manner that will not result in an impairment of any warranty for the roof obtained by Landlord or result in any damage to the roof other than incidental damage normally associated with such installation, shall use the installer that it uses for all or substantially all of its installations and shall cause such installer to cooperate with Landlord's roofing contractor. Tenant shall pay all costs reasonably and necessarily incurred by Landlord in connection with the Telecommunications Equipment including, without limitation, all architectural, engineering, contractors' and legal fees.

(iii) Tenant shall comply with the provisions of Section 12(b)(i) through (iv) of this Lease.

(iv) At least 3 business days prior to installation, Tenant shall notify Landlord of the date and time of the installation.

(v) Tenant shall maintain the Telecommunications Equipment in a safe, good and orderly condition. The installation, maintenance, repair and removal of the Telecommunications Equipment shall be performed at Tenant's sole expense in a manner which will not impair the integrity of, damage or adversely affect the warranty applicable to, the roof or any other portion of the Property.

(vi) No later than the expiration or sooner termination of the Term, at Tenant's sole expense, Tenant shall remove the Telecommunications Equipment and repair any resulting damage.

(vii) Tenant's indemnification of Landlord pursuant to Section 15 of this Lease also applies to the Telecommunications Equipment and Tenant's use of any portion of the Property therefor. Without limiting the foregoing, Tenant solely shall be responsible for any

damages or injury caused by or in any way relating to the Telecommunications Equipment, including, but not limited to, damage or injury caused by reason of the Telecommunications Equipment collapsing or being blown from the roof or any other portion of the Property.

(viii)  The rights granted to Tenant under this Section 11(b) are non-exclusive, and Landlord hereby reserves the right, exercisable from time to time, to grant to other tenants of the Building the right or license to use the roof of the Building for telecommunications purposes (including, but not limited to, the installation of other telecommunications equipment) so long as such right or license will not adversely interfere with Tenant's use of its Telecommunications Equipment as permitted herein. Tenant agrees that if it maintains multiple satellite dishes and related equipment on the roof of the Building, the size and scope of Tenant's use thereof shall not be so extensive as to preclude Landlord from making portions of the roof available to other tenants of the Building for similar uses related to the business conducted by such tenants in the Building, and Tenant agrees that, with the exception of any Telecommunications Equipment installed as part of the initial construction of the Base Building Work or the Tenant Improvements, Tenant may not install or erect any Telecommunications Equipment that would interfere with the then existing Telecommunications Equipment serving other tenants of the Building. Landlord shall also have the right to install, or permit others to install, Telecommunications Equipment serving purposes other than the business needs of tenants in the Building, but all such uses shall be subordinate to the rights of Tenant under this Section 11 and shall not interfere therewith.

(c)  Landlord shall institute at the Building a security system for access to the Building that will be integrated and compatible (including, specifically, with respect to hardware, software and database) with Tenant's security system from time to time in use. Such security system instituted by Landlord shall restrict access to the Building and, separately, to the Building Premises. Additionally, Landlord shall provide a security guard in the lobby of the Building 24 hours per day, seven (7) days a week. Landlord shall implement a security program at the Garage, including the following components: (i) security cameras at all parking levels and elevator lobbies; (ii) periodic patrols by security personnel; (iii) key-card gate system (or equivalent) to prevent entry by unauthorized persons; and (iv) prohibition of parking by any persons other than Tenant and other tenants of the Building (and their employees, invitees and licensees) and others holding a monthly (or longer) parking contract and utilizing key-card (or equivalent) access rights.

12.  **Alterations.**

(a)  Tenant may install its trade fixtures and equipment in the Building Premises, provided that the installation and removal of them will not materially affect any structural portion of the Property or any Building System or any utility lines, communications lines, equipment or facilities in the Building serving any other occupant. At the expiration or termination of this Lease and at the option of Landlord or Tenant, Tenant shall remove such trade fixtures and equipment and, in the event of such removal, Tenant shall repair any resulting damage and shall restore the Property to its condition existing prior to installing such trade fixtures and equipment. If Tenant, with Landlord's written consent, elects not to remove any such trade fixtures or equipment, such trade fixtures or equipment shall remain on the Property and become the property of Landlord without payment by Landlord.

(b)      Without the need for Landlord's prior consent, Tenant may make any interior, non-structural Alterations and any Alterations to the systems furniture and wiring solely related thereto in or within the Building Premises. Tenant shall not make or permit any other Alterations in or to the Premises without first obtaining Landlord's written consent, which consent shall not be unreasonably withheld. Landlord shall be deemed reasonable in withholding its consent to the proposed Alteration if in Landlord's commercially reasonable judgment: (1) the proposed Alteration will adversely affect the structure of the Building or any Building System, (2) the proposed Alteration will adversely affect the perception of the Building from the exterior, and/or (3) the proposed Alteration will reduce the value of the Building or the Building Premises. Notwithstanding anything to the contrary contained in the immediately preceding three sentences, if any Alterations proposed by Tenant (w) will result in a modification to the electrical distribution panels in the Building, (x) will adversely affect the structure of the Building or any Building System, (y) will adversely affect the exterior appearance of the Building and/or (z) will reduce the value of the Building or the Building Premises, Landlord shall have the right to approve such proposed Alteration in its sole discretion (which approval, in the case of clause (w) above, shall not be unreasonably withheld). With respect to any Alterations made by or on behalf of Tenant (whether or not the Alteration requires Landlord's consent): (i) not less than 10 days prior to commencing any Alteration, Tenant shall deliver to Landlord the plans, specifications or other depiction or description of the Alteration as appropriate and necessary permits for the Alteration, together with certificates evidencing that Tenant's general contractor has adequate insurance coverage naming Landlord and Landlord's Agents as additional insureds, (ii) solely with respect to Alterations that require Landlord's consent hereunder, Tenant shall obtain Landlord's reasonable prior written approval of any general contractor who is to perform work on the Building Premises, (iii) the Alteration shall be constructed with new materials, in a good and workmanlike manner, and in compliance with all Laws and the plans and specifications delivered to, and, if required above, approved by Landlord, and (iv) if the cost of any Alteration exceeds $75,000, Tenant shall, prior to commencing any such Alteration, provide evidence of the filing with the Prothonotary of Lehigh County of appropriate waivers of lien by Tenant's contractors, suppliers and materialmen. Any Alteration by Tenant shall be the property of Tenant until the expiration or termination of this Lease; at that time any Alteration (other than trade fixtures and other movable equipment and furnishings) shall remain on the Property and become the property of Landlord without payment by Landlord unless Landlord gives written notice to Tenant at the time of Landlord's approval of the making of such Alteration to remove it, in which event, prior to the expiration or termination of this Lease, Tenant will remove it, will repair any resulting damage and will restore the Building Premises to the condition existing prior to Tenant's Alteration. At Tenant's request prior to Tenant making any Alterations, Landlord will notify Tenant in writing whether Tenant is required to remove the Alterations at the expiration or termination of this Lease.

13.    **Mechanics' Liens.**

(a)      Tenant shall promptly pay for any labor, services, materials, supplies or equipment furnished to Tenant in or about the Building Premises. Tenant shall keep the Premises and the Property free from any liens arising out of any labor, services, materials, supplies or equipment furnished or alleged to have been furnished to Tenant. Tenant shall take all steps permitted by law in order to avoid the imposition of any such lien, including requiring Tenant's contractors, suppliers and materialmen to file with the Prothonotary of Lehigh County

appropriate waivers of lien prior to the commencement of any work or the delivery of any materials to the Premises. Should any such lien or notice of such lien be filed against the Premises or the Property, Tenant shall bond against or discharge the same within 20 days after Tenant has notice that the lien or claim is filed regardless of the validity of such lien or claim.

(b)     Notwithstanding Section 13(a) above, Tenant may in good faith and with reasonable diligence contest the validity or amount of any mechanic's lien filed against the Premises or the Property and defer payment and discharge thereof during the pendency of such contest, provided that:

(i)     Such contest shall have the effect of preventing the sale or forfeiture of the Premises or the Property or any part thereof to satisfy such mechanic's lien;

(ii)    Within ten (10) days after Tenant has been notified of the filing of such mechanic's lien, Tenant shall have notified Landlord in writing of Tenant's intention to contest such mechanic's lien; and

(iii)   Tenant prosecutes the contest with diligence and keeps Landlord informed of the status of the contest.

14.     **Landlord's Right of Entry.**  Tenant shall permit Landlord and its Agents to enter the Premises at all reasonable times during normal business hours (except in an emergency) following reasonable notice (except in an emergency) to inspect, Maintain, or make Alterations to the Premises or Property, to exhibit the Premises for the purpose of sale or financing, and, during the last 12 months of the Term, to exhibit the Premises to any prospective tenant; provided, however, that Landlord and its Agents may enter the Garage Premises at any time for the aforesaid purposes. Landlord will not unreasonably inconvenience Tenant in exercising such rights, but Landlord shall not be liable for any incidental interference with Tenant's occupancy resulting from Landlord's entry. Except in the event of an emergency, Tenant may require a representative of Tenant to accompany Landlord or its Agents when Landlord enters the Building Premises pursuant to this Section.

15.     **Damage by Fire or Other Casualty.**  If the Premises or Building or Garage shall be damaged or destroyed by fire or other casualty, Tenant shall promptly notify Landlord and Landlord, subject to the conditions set forth in this Section 15, shall repair such damage and restore the Premises (including the Tenant Improvements defined in **Exhibit "G"** and any Alterations which are improvements that are permanently affixed to the Premises) or the Building or Garage, as applicable, to substantially the same condition in which they were immediately prior to such damage or destruction, but not including the repair, restoration or replacement of Tenant's removable trade fixtures or any Alterations installed by Tenant other than those described above in this sentence. Landlord shall notify Tenant in writing, within 75 days after the date of the casualty, if Landlord anticipates that the restoration will take more than 18 months from the date of the casualty to complete (or, if the casualty occurs in the last two (2) years of the Term and Landlord anticipates that the restoration will take longer than that period which is one-half (1/2) of the actual period then remaining in the Term); in such event, Tenant may terminate this Lease effective as of the date of casualty by giving written notice to Landlord within 30 days after Landlord's notice. Further, if damage in excess of $1,000,000 (increased

over the Term of this Lease by mutual agreement of Landlord and Tenant to reflect increases, if any, in the Consumer Price Index as determined by the Federal Bureau of Labor Statistics or any replacement agency or successor thereto) occurs due to a casualty that is not insured against and is uninsurable under policies then available at commercially reasonable rates, or if a casualty with a cost to repair in excess of $3,000,000 (increased over the Term of this Lease by mutual agreement of Landlord and Tenant to reflect increases, if any, in the Consumer Price Index as determined by the Federal Bureau of Labor Statistics or any replacement agency or successor thereto) occurs during the last 36 months of the Initial Term, Landlord may cancel this Lease unless Tenant has the right to extend the Initial Term pursuant to an Extension Option and does so within 30 days after the date of the casualty. Tenant will receive an abatement of Minimum Annual Rent and Operating Expenses and all other charges to the extent the Premises are rendered untenantable as a result of the casualty.

16.     **Condemnation.** If (a) all of the Premises are Taken, (b) any part of the Premises is Taken and the remainder is insufficient for the reasonable operation of Tenant's business, or (c) any of the Property is Taken, and, in Landlord's opinion, it would be impractical or the condemnation proceeds are insufficient to restore the remainder, then this Lease shall terminate as of the date the condemning authority takes possession. If this Lease is not terminated pursuant to this Section, Landlord shall restore the Building or the Garage, as the case may be, to a condition as near as reasonably possible to the condition prior to the Taking, the Minimum Annual Rent shall be abated equitably, and this Lease shall be amended appropriately to reflect the deletion of the space Taken. The compensation awarded for a Taking shall belong to Landlord, and in the event of a Taking affecting Tenant, Tenant shall have all rights available to a tenant at law to make a claim against the condemnor for moving expenses, business dislocation damages and the value of its trade fixtures and other leasehold improvements to the extent that such claim does not reduce the sums otherwise payable by the condemnor to Landlord. Except as set forth in the immediately preceding sentence, Tenant hereby assigns all claims against the condemnor to Landlord; provided, however, that if prior to such condemnation Tenant shall have made permanent Alterations to the Building Premises (excluding the Tenant Improvements) and the unamortized cost thereof then exceeds $1,000,000, Tenant shall be entitled to receive an equitable portion of the condemnation award based on the relative amount by which such Alterations contribute to the overall value of the Building at the time of the condemnation. Notwithstanding the foregoing, if during the time that Tenant is leasing and occupying more than 50% of the office space in the Building any portion of the Building is taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its general office operations in the Building Premises and Landlord and Tenant, having used good faith efforts, are unable to find a solution to enable Tenant to resume general office operations from the Building (such as by way of example only, finding comparable alternate space within the Building or reconfiguring the Building or the Building Premises in a mutually acceptable manner), then Tenant shall have the right to terminate this Lease by giving at least 60 days' prior written notice to Landlord within 30 days following the termination of Landlord's and Tenant's efforts to find such solution.

17.     **Quiet Enjoyment.** Landlord covenants that Tenant, upon performing all of its covenants, agreements and conditions of this Lease, shall have quiet and peaceful possession of the Premises as against anyone claiming by, through or under Landlord, subject, however, to the terms of this Lease.

18. **Assignment and Subletting.**

(a)     Except as provided in Section 18(b) below, Tenant shall not Transfer or permit any Transfer of any interest of Tenant in this Lease or in the Premises, voluntarily or by operation of law, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Landlord's consent shall not be required in the case of a Transfer that consists of Tenant's licensing the use of a portion of its Premises to any consulting services or other third parties serving Tenant's needs on an integrated basis. Without limitation, Tenant agrees that Landlord's consent shall not be considered unreasonably withheld if (i) the proposed transferee is an existing tenant of Landlord or an affiliate of Landlord, (ii) the nature of the use of the Building Premises by the proposed transferee is not compatible with uses generally found in first class office buildings comparable to the Building, or (iii) Tenant is in default under this Lease or any act or omission has occurred which would constitute a default with the giving of notice and/or the passage of time and such default is not cured within any applicable cure period. A consent to one Transfer shall not be deemed to be a consent to any subsequent Transfer. In no event shall any Transfer relieve Tenant from any obligation under this Lease Landlord's acceptance of Rent from any person shall not be deemed to be a waiver by Landlord of any provision of this Lease or to be a consent to any Transfer. Any Transfer not in conformity with this Section 18 shall be void at the option of Landlord.

(b)     Landlord's consent shall not be required in the event of any Transfer by Tenant to an Affiliate of Tenant provided that (i) Tenant's Affiliate is at least as creditworthy as Tenant as of the date of this Lease or Tenant remains liable under this Lease or a guarantor of comparable credit is provided, (ii) if the Transfer constitutes an assignment of this Lease, Tenant provides Landlord written notice of the Transfer not later than 10 business days after the effective date of such Transfer, and (iii) if Landlord requests, Tenant delivers to Landlord a commercially reasonable assumption agreement executed by Tenant and the transferee. Landlord's consent shall not be required in the event of any Transfer by Tenant to a successor to Tenant by merger or consolidation or acquisition of all or substantially all of the stock or membership interests or all or substantially all of the assets, as the case may be, of Tenant or any Affiliate of Tenant.

(c)     If Tenant proposes to Transfer all of the Premises (other than to an Affiliate or as otherwise permitted under Section 18(b) above) and Landlord consents to such Transfer, Tenant shall pay to Landlord, as Additional Rent, the sum equal to 50% of the excess of (i) all sums and other economic consideration received by Tenant at any time whatsoever as a result of the Transfer to the extent the same is payable with respect to the occupancy of the Premises, whether denominated rentals or otherwise which exceed, in the aggregate, the total sums which Tenant is obligated to pay and does pay Landlord under this Lease (prorated to reflect obligations allocable to that portion of the Premises which is the subject of the Transfer) without affecting or reducing any other obligation of Tenant hereunder, minus (ii) sums actually paid by Tenant to Landlord on account of Minimum Annual Rent and Operating Expenses, all reasonable and actual third-party expenses incurred by Tenant in connection with such Transfer which are not otherwise reimbursed to Tenant (including brokerage commissions, leasehold improvement costs expended solely in connection with and at the time of such Transfer pursuant to a bona fide obligation undertaken with such transferee, reasonable attorney's fees and accounting expenses), the fair and reasonable market value of all leasehold improvements

constructed by Tenant at the Building Premises and conveyed to the transferee, and the fair and reasonable value of all inventory, trade fixtures and personal property conveyed to such transferee.

(d) If Tenant requests Landlord's consent to a Transfer (other than a Transfer pursuant to Section 18(b) above), Tenant shall provide Landlord, at least 15 days prior to the proposed Transfer, current financial statements of the transferee certified by an executive officer of the transferee, a complete copy of the proposed Transfer documents, any other information Landlord reasonably requests and, if Landlord requests, a commercially reasonable assumption agreement executed by Tenant and the transferee. Tenant agrees to reimburse Landlord for reasonable accounting and attorneys' fees in connection with the processing and documentation of any Transfer for which Landlord's consent is requested.

(e) Notwithstanding anything to the contrary contained in this Section 18, in the case of a Transfer that involves a proposed sublease of a portion of the Building Premises by Tenant to a third party, Landlord shall not unreasonably withhold its approval to such sublease so long as in Landlord's reasonable determination the use of the portion of the Building Premises that is the subject of such sublease is compatible with the uses of the other tenants in the Building and the proposed sublessee is compatible with the character mix of the other tenants in the Building.

(f) Landlord shall not Transfer any interest of Landlord in this Lease until after the occurrence of Substantial Completion (as defined in Paragraph 5 of **Exhibit "G"**) of the third Phase of the Building Premises and Substantial Completion of the Garage.

19. **Subordination; Mortgagee's Rights.** This Lease shall be subordinate to any Mortgage now or in the future affecting the Premises, provided that Tenant's right of possession of the Premises shall not be disturbed by the Mortgagee so long as Tenant is not in default under this Lease beyond the expiration of any applicable notice and/or grace period provided for herein, such subordination being subject to and conditioned upon Landlord's providing Tenant with a Subordination, Non-disturbance and Attornment Agreement from any such Mortgagee, in recordable form and in a form mutually acceptable to Landlord, Tenant and such Mortgagee. Within 10 days after written request, Tenant shall execute and deliver any further instruments confirming such subordination of this Lease and any further instruments of attornment that the Mortgagee may reasonably request. However, any Mortgagee may at any time subordinate its Mortgage to this Lease, without Tenant's consent, by giving notice to Tenant, and this Lease shall then be deemed prior to such Mortgage without regard to their respective dates of execution and delivery; provided that such subordination shall not affect any Mortgagee's rights with respect to condemnation awards, casualty insurance proceeds, intervening liens or any right which shall arise between the recording of such Mortgage and the execution of this Lease.

20. **Tenant's Certificate; Financial Information; Recording.**

(a) Within 20 days after Landlord's written request from time to time, Tenant shall execute, acknowledge and deliver to Landlord, for the benefit of Landlord, Landlord's Mortgagee, any prospective Mortgagee, and any prospective purchaser of Landlord's interest in the Property, an estoppel certificate in the form of attached **Exhibit "F-1"** (or other form

requested by Landlord and reasonably acceptable to Tenant, modified as necessary to accurately state the facts represented). Tenant understands that the estoppel certificate may be relied upon by Landlord, Landlord's Mortgagee and any prospective Mortgagee or purchaser of Landlord's interest in the Property, and their respective successors and assigns.

(b)  Within 20 days after Tenant's written request from time to time, Landlord shall execute, acknowledge and deliver to Tenant, for the benefit of Tenant, Tenant's lender, any prospective lender of Tenant, and any prospective purchaser of all or substantially all of Tenant's assets or stock, an estoppel certificate in the form of attached **Exhibit "F-2"** (or other form requested by Tenant and reasonably acceptable to Landlord, modified as necessary to accurately state the facts represented). Landlord understands that the estoppel certificate may be relied upon by Tenant, Tenant's lender and any prospective lender of Tenant or purchaser of all or substantially all of Tenant's assets or stock, and their respective successors and assigns.

(c)  Within 20 days after Landlord's written request from time to time, Tenant shall furnish to Landlord, Landlord's Mortgagee, prospective Mortgagee and/or purchaser reasonably requested financial information, provided that if Tenant or Guarantor is a publicly held corporation, a copy of the most recently filed Form 10K and/or 10Q in respect of such entity shall be deemed to satisfy this requirement and if the debt obligations of Tenant or Guarantor are rated by a nationally recognized rating agency, then the submission of evidence of Tenant's or Guarantor's rating issued by such rating agency shall be deemed to satisfy this requirement as to such entity.

(d)  This Lease shall not be recorded, but the parties shall enter into a short form memorandum of lease in recordable form simultaneously with the execution of this Lease. Such memorandum of lease may be recorded by either party at its expense at any time following the full execution of this Lease. Upon Landlord's written request following the expiration or earlier termination of this Lease in accordance with its terms, Tenant shall enter into a termination of memorandum of lease with Landlord which shall be in recordable form and in form reasonably acceptable to both parties. The covenant in the immediately preceding sentence shall survive the expiration or earlier termination of this Lease.

21.  **Surrender; Abandoned Property.**

(a)  On the date on which this Lease expires or terminates, Tenant shall return possession of the Premises to Landlord in the condition in which Tenant is required to Maintain the Premises, except for ordinary wear and tear, and except for casualty damage or other conditions that Tenant is not required to remedy under this Lease. Tenant shall give Landlord all keys, access cards and passes for the Premises and the Building and will inform Landlord of combinations of any locks or safes on the Building Premises. If Tenant does not return possession of the Premises to Landlord in the condition required under this Lease, Tenant shall pay Landlord the costs of any damage to the Premises.

(b)  Upon or prior to the expiration or termination of this Lease, Tenant shall remove from the Property any personal property not belonging to Landlord. Any personal property not so removed shall be deemed abandoned, and Landlord, at Tenant's expense, may remove, store, sell or otherwise dispose of such property in such manner as Landlord may see fit

and/or Landlord may retain such property as its property. If any part thereof shall be sold, then Landlord may receive and retain the proceeds of sale and apply the same, at its option, against the expenses of the sale, the cost of moving and storage and any Rent.

(c)     If Tenant remains in possession of the Premises after the expiration or termination of this Lease, Tenant's occupancy of the Premises shall be that of a tenancy at will. Tenant's occupancy during any holdover period shall otherwise be subject to the provisions of this Lease (unless clearly inapplicable), except that the Monthly Rent shall be 150% times the Monthly Rent payable for the last full month immediately preceding the holdover and if Landlord and Tenant are at that time in the process of good faith negotiations to extend the Term of this Lease, such increased Monthly Rent shall not be payable until the earlier to occur of (x) the termination of such negotiations without an extension of the Lease Term having been agreed upon or (y) the 30th day after the expiration or termination of this Lease. No holdover or payment by Tenant after the expiration or termination of this Lease shall operate to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. Any provision in this Lease to the contrary notwithstanding, any holdover by Tenant shall constitute a default on the part of Tenant under this Lease entitling Landlord to exercise, without obligation to provide Tenant any notice or cure period, all of the remedies available to Landlord in the event of a Tenant default, and Tenant shall be liable for all damages, including consequential damages but excluding any punitive damages, that Landlord suffers as a result of the holdover.

22.     **Defaults - Remedies.**

(a)     It shall be an Event of Default:

(i)     If Tenant does not pay in full when due any and all Rent and, except as provided in Section 22(c) below, Tenant fails to cure such default on or before the date that is 10 days after Landlord gives Tenant written notice of default;

(ii)     If Tenant fails to observe and perform or otherwise breaches any other provision of this Lease, and, except as provided in Section 22(c) below, Tenant fails to cure the default on or before the date that is 30 days after Landlord gives Tenant notice of default; provided, however, if the default cannot reasonably be cured within 30 days following Landlord's notice, Tenant shall be afforded additional reasonable time to cure the default if Tenant begins to cure the default within 30 days following Landlord's notice and continues diligently in good faith to completely cure the default;

(iii)     If Tenant becomes insolvent or bankrupt or makes a general assignment for the benefit of creditors or offers a settlement to creditors, or if a petition in bankruptcy or for reorganization or for an arrangement with creditors under any federal or state law is filed by or against Tenant, or a bill in equity or other proceeding for the appointment of a receiver for any of Tenant's assets is commenced, or if any of the real or personal property of Tenant shall be levied upon; provided that any proceeding brought by anyone other than Landlord or Tenant under any bankruptcy, insolvency, receivership or similar law shall not constitute an Event of Default until such proceeding has continued unstayed for more than 120 consecutive days.

(iv)     If an Event of Default has occurred under the Retail Lease.  The parties agree that if Tenant subsequently cures any Event of Default under the Retail Lease to the satisfaction of the landlord thereunder, then from and after such cure an Event of Default shall not be deemed to exist under this Lease; provided, however, that nothing in this sentence shall be deemed to grant Tenant a further right to cure an Event of Default under this Lease or the Retail Lease or prevent Landlord from exercising any and all remedies available to it under this Lease while an Event of Default exists under this Lease.

(b)     If an Event of Default occurs, Landlord shall have the following rights and remedies:

(i)     Landlord, without any obligation to do so, may elect to cure the default on behalf of Tenant, in which event Tenant shall reimburse Landlord upon demand for any sums paid or costs incurred by Landlord (together with an administrative fee of 15% thereof) in curing the default, plus interest thereon at the Interest Rate from the respective dates of Landlord's incurring such costs, which sums and costs together with interest at the Interest Rate shall be deemed additional Rent;

(ii)     To enter and repossess the Premises by judicial process, and remove all persons and all or any property by action at law, without being liable for prosecution or damages, and Landlord may, at Landlord's option, make Alterations and repairs in order to relet the Premises and relet all or any part(s) of the Premises for Tenant's account. Tenant agrees to pay to Landlord on demand any deficiency that may arise by reason of such reletting. In the event of reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease for such previous breach.

(iii)     If Landlord obtains a final and unappealable judicial determination that Tenant is in default in the payment of Monthly Rent for a total of six (6) months or more (taking into account the expiration of any applicable cure period without Tenant having effected a cure), and if Tenant shall not have cured such delinquency within thirty (30) days after the entry of such judgment (or, if later, the date on which it becomes final), then Landlord shall have the further right to require Tenant, by giving written notice to Tenant, to pay all Rent during the balance of the Term in semi-annual (as opposed to monthly) payments, each payable in advance, without Landlord's being required to obtain separate judgments for any other default in the payment of Rent. Landlord agrees to credit against any such payments (or if collected during any period for which Tenant shall have made such advance payment of Monthly Rent, Landlord shall pay to Tenant within twenty (20) days after receipt thereof) actually made by Tenant the rentals actually received by Landlord on account of any reletting of the Premises by Landlord, net of the reasonable costs of reletting and preparing the premises for the replacement tenant.

(iv)     In the event of a material Event of Default, to terminate this Lease and the Term without any right on the part of Tenant to save the forfeiture by payment of any sum due or by other performance of any condition, term or covenant broken.

(c)     Any provision to the contrary in this Section 22 notwithstanding, (i) Landlord shall not be required to give Tenant the notice and opportunity to cure provided in Section 22(a) above more than twice in any consecutive 12-month period, but before Landlord

may declare an Event of Default on account of a subsequent Section 22(a) default that otherwise requires the provision of notice and an opportunity to cure in such 12-month period without affording Tenant any of the notice and cure rights afforded under this Lease, Landlord shall give Tenant a telecopied notice stating such subsequent default and providing a cure period of 24 hours from the delivery of such notice and if Tenant fails to cure such default within three (3) business days, Landlord thereafter may declare an Event of Default without affording Tenant any of the notice and cure rights provided under this Lease, and (ii) Landlord shall not be required to give such notice prior to exercising its rights under Section 22(b) if Tenant fails to comply with the provisions of Sections 13, 18 or 20(a) or in an emergency.

(d)     No waiver by Landlord of any breach by Tenant shall be a waiver of any subsequent breach, nor shall any forbearance by Landlord to seek a remedy for any breach by Tenant be a waiver by Landlord of any rights and remedies with respect to such or any subsequent breach. Landlord shall use commercially reasonable efforts to mitigate damages, but in satisfying Landlord's responsibility to mitigate its damages, Landlord shall not be obligated: (i) to solicit or entertain negotiations with any other prospective tenants for the Premises until Landlord obtains full and complete possession of the Premises including the final and unappealable legal right to re-let the Premises free of any claim of Tenant for possession, or to lease the Premises on terms which are not commercially reasonable under the circumstances; and (ii) to lease to a proposed substitute tenant who does not have, in Landlord's reasonable opinion, sufficient creditworthiness. Efforts by Landlord to mitigate the damages caused by Tenant's default shall not constitute a waiver of Landlord's right to recover damages hereunder. No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy provided herein or by law, but each shall be cumulative and in addition to every other right or remedy given herein or now or hereafter existing at law or in equity. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the total amount due Landlord under this lease shall be deemed to be other than on account, nor shall any endorsement or statement on any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of Rent due, or Landlord's right to pursue any other available remedy.

(e)     If Landlord shall have breached any of its obligations under this Lease, Tenant, without any obligation to do so, may elect to cure such breach on behalf of Landlord only after (i) a first written notice to and after Landlord has failed to cure such breach within 30 days or, if the nature of such breach is such that it cannot reasonably be cured within 30 days, such longer period of time as is reasonably necessary to effect such cure provided Landlord has commenced to cure within 30 days and diligently prosecutes such cure to completion, and (ii) a second written notice to Landlord advising Landlord of Tenant's intention to cure such breach on behalf of Landlord and Landlord's failure to cure within ten (10) days thereafter; provided further that (A) with respect to both clauses (i) and (ii) above, in the case of emergency, the requirement for advance written notice shall be satisfied by Tenant's providing Landlord advance notice of its election to cure as is appropriate under the circumstances and Tenant may take action promptly as is warranted under the circumstances without waiting for the aforesaid cure periods to elapse; and, in any event, Tenant shall give Landlord notice of Tenant's exercise of its rights hereunder within 24 hours after the occurrence of such emergency; and (B) if Landlord's breach consists of Landlord's failure to pay the premium for the insurance coverage required to be maintained by Landlord under this Lease but the insurance policy has

not lapsed and is still in force, Tenant may elect to cure such breach on behalf of Landlord after written notice to Landlord and only after Landlord has failed to cure such breach within fifteen (15) days after such notice (and if such insurance policy has lapsed because of Landlord's failure to pay the premium therefor, Tenant may elect to cure such breach on behalf of Landlord promptly but with written notice to Landlord after the placing of such insurance and Tenant shall subsequently cancel such insurance promptly following Landlords reinstatement of its insurance). Tenant shall promptly submit to Landlord an invoice for any sums paid or costs incurred by Tenant in curing such breach by Landlord pursuant to this paragraph, and Landlord shall reimburse Tenant for such costs within 30 days after receipt of such invoice. If Tenant obtains a final and unappealable judicial determination that Landlord is in breach of its obligations under this Lease and of the amount to which Tenant is entitled to be reimbursed pursuant to the foregoing provisions of this Section 22(e), and if Landlord shall not have reimbursed such amount to Tenant within thirty (30) days after the entry of such order (or, if later, the date on which it becomes final), then Tenant shall have the right to offset such amount against one or more installments of Minimum Annual Rent hereunder; provided, however, that in no event shall any such offset exceed twenty-five percent (25%) of the Minimum Annual Rent for any calendar month. In addition to Tenant's self-help right and offset right provided for in this Section 22(e), Tenant may bring an action for specific performance or injunctive relief with respect to any default by Landlord under this Lease which is not cured within the applicable cure period provided for herein.

(f)     If either party commences an action against the other party arising out of or in connection with this Lease, the prevailing party shall be entitled to have and recover from the losing party attorneys' fees, costs of suit, investigation expenses and discovery costs, including costs of appeal.

(g)     LANDLORD AND TENANT HEREBY ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS LEASE WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE, EACH PARTY KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVES ANY RIGHT EACH PARTY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION OF ONE PARTY WITH THE OTHER. TENANT AND LANDLORD HEREBY CERTIFY THAT NO REPRESENTATIVE OR AGENT OF EITHER PARTY (INCLUDING ITS COUNSEL) HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT IT WOULD NOT IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL. LANDLORD AND TENANT ACKNOWLEDGE THAT EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS LEASE WITH THE OTHER BY, INTER ALIA, THE PROVISIONS OF THIS PARAGRAPH. EACH PARTY FURTHER CERTIFIES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS LEASE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. EACH PARTY FURTHER CERTIFIES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND EFFECT OF THIS WAIVER.

(h)     EACH OF LANDLORD AND TENANT HEREBY AGREES TO
THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN
THE COMMONWEALTH OF PENNSYLVANIA, AND FURTHER AGREES THAT
ALL SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL DIRECTED TO
IT AT ITS ADDRESS SET FORTH ABOVE, AND SERVICE SO MADE WILL BE
DEEMED TO BE COMPLETED AS PROVIDED IN SECTION 26, PROVIDED THAT
NOTHING CONTAINED HEREIN WILL PREVENT EITHER PARTY FROM
BRINGING ANY ACTION OR EXERCISING ANY RIGHTS AGAINST ANY
SECURITY OR AGAINST THE OTHER PARTY INDIVIDUALLY, OR AGAINST ANY
PROPERTY OF THE OTHER PARTY WITHIN ANY OTHER STATE OR NATION TO
ENFORCE ANY AWARD OR JUDGMENT OBTAINED IN THE VENUE PROVIDED
ABOVE (IN THE CASE OF ACTION BROUGHT BY TENANT AGAINST LANDLORD,
HOWEVER, SUBJECT TO SECTION 24 BELOW).

23.    **Authority.**

(a)     Tenant represents and warrants to Landlord that if Tenant is a corporation,
limited liability company, partnership or any other form of business association or entity: (i)
Tenant is duly formed, validly existing and in good standing under the laws of the state under
which Tenant is organized, (ii) Tenant is qualified to do business in the state in which the
Property is located, (iii) Tenant has the power and authority to enter into this Lease, (iv) the
person(s) signing on behalf of Tenant are authorized to do so, and (v) this Lease constitutes a
valid and binding obligation of Tenant enforceable in accordance with its terms. At the time this
Lease is executed, Tenant shall provide Landlord with resolutions or other documentation
acceptable to Landlord evidencing that Tenant has the power and authority to enter into this
Lease and that the person(s) signing on behalf of Tenant have the authority to bind Tenant.

(b)     Landlord represents and warrants to Tenant that if Landlord is a
corporation, limited liability company, partnership or any other form of business association or
entity: (i) Landlord is duly formed, validly existing and in good standing under the laws of the
state under which Landlord is organized, (ii) Landlord is qualified to do business in the state in
which the Property is located, (iii) Landlord has the power and authority to enter into this Lease,
(iv) the person(s) signing on behalf of Landlord are authorized to do so, and (v) this Lease
constitutes a valid and binding obligation of Landlord enforceable in accordance with its terms.
At the time this Lease is executed, Landlord shall provide Tenant with resolutions or other
documentation acceptable to Tenant evidencing that Landlord has the power and authority to
enter into this Lease and that the person(s) signing on behalf of Landlord have the authority to
bind Landlord.

24.    **Liability of Landlord.** The word "Landlord" in this Lease includes the
Landlord executing this Lease as well as its successors and assigns, each of which shall have the
same rights, remedies, powers, authorities, privileges and obligations as it would have had it
originally signed this Lease as Landlord. Each person or entity that may from time to time be the
"Landlord" hereunder, whether or not named in this Lease, shall have no liability under this
Lease (except for obligations already accrued) after it ceases to hold title to the Premises,
provided that the successor to such transferring person or entity shall have assumed in writing
the obligations of Landlord under this Lease accruing from and after such transfer. Tenant shall

look solely to Landlord's successor in interest for the performance of the covenants and obligations of the Landlord hereunder which subsequently shall accrue. Landlord shall not be deemed to be in default under this Lease unless Tenant gives Landlord notice specifying the nature of the default and Landlord fails to cure the default within 30 days following Tenant's notice or, if the nature of such breach is such that it cannot reasonably be cured within 30 days, such longer period of time as is reasonably necessary to effect such cure provided Landlord has commenced to cure within 30 days and diligently prosecutes such cure to completion. In no event shall Landlord be liable to Tenant for any loss of business or profits of Tenant or for consequential, punitive or special damages of any kind. Neither Landlord nor any principal of Landlord nor any owner of the Property, whether disclosed or undisclosed, shall have any personal liability with respect to any of the provisions of this Lease or the Premises; Tenant shall look solely to the equity of Landlord in the Property and to the future rents, issues and profits therefrom (including sale, insurance, condemnation and refinancing proceeds) for the satisfaction of any claim by Tenant against Landlord. Nothing contained in this Section shall be construed to limit, impair or reduce the liability and obligations of Liberty Property Limited Partnership under a certain Completion Guaranty dated on or about the date of this Lease and made in favor of Tenant.

25. **Miscellaneous.**

(a)     The captions in this Lease are for convenience only, and are not a part of this Lease and do not in any way define, limit, describe or amplify the terms of this Lease.

(b)     This Lease represents the entire agreement between the parties hereto and there are no collateral or oral agreements, representations, warranties, conditions, promises or understandings between Landlord and Tenant with respect to the Premises or the Property. No rights, easements or licenses are acquired in the Property or any land adjacent to the Property by Tenant by implication or otherwise except as expressly set forth in this Lease. Without limiting the foregoing, this Lease does not grant any easement or rights for light, air and view and any diminution or blockage of light, air and view by any structure or condition now or later erected will not affect this Lease or impose any liability on Landlord. This Lease shall not be modified in any manner except by an instrument in writing executed by the parties. The masculine (or neuter) pronoun and the singular number shall include the masculine, feminine and neuter genders and the singular and plural number. The word "including" followed by any specific item(s) is deemed to refer to examples rather than to be words of limitation. The word "person" includes a natural person, a partnership, a corporation, a limited liability company, an association and any other form of business association or entity. Both parties having participated fully and equally in the negotiation and preparation of this Lease, this Lease shall not be more strictly construed, nor any ambiguities in this lease resolved, against either Landlord or Tenant.

(c)     All of the terms and conditions set forth in this Lease shall apply throughout the Term unless otherwise expressly set forth herein.

(d)     If any provisions of this Lease shall be declared unenforceable in any respect, such unenforceability shall not affect any other provision of this Lease, and each such provision shall be deemed to be modified, if possible, in such a manner as to render it enforceable and to preserve to the extent possible the intent of the parties as set forth herein.

This Lease shall be construed and enforced in accordance with the laws of the state in which the Property is located.

(e)     This Lease shall be binding upon and inure to the benefit of Landlord and its heirs, personal representatives, successors and assigns, and Tenant, and its heirs, personal representatives and permitted successors and assigns.

(f)     All persons liable for the obligations of Tenant under this Lease shall be jointly and severally liable for such obligations.

(g)     Wherever in this Lease it provides that a party's consent or approval is to be reasonable or shall not be unreasonably withheld, such provision shall be construed to mean that such party's consent or approval shall not be unreasonably withheld, conditioned or delayed.

26.     **Notices.**  Any notice or other communication under this Lease shall be in writing and addressed to Landlord or Tenant at their respective addresses specified in Section 1 above (or to such other address as either may designate by notice to the other) with a copy of any notice of default to any Mortgagee or other party designated by Landlord of whom Tenant has been given written notice.  Each notice or other communication shall be deemed given if sent by prepaid overnight delivery service or by certified mail, return receipt requested, postage prepaid or in any other manner, with delivery in any case evidenced by a receipt, and shall be deemed received on the day of actual receipt or refusal by the intended recipient or on the business day delivery is refused.  The giving of notice by Landlord's or Tenant's attorneys, representatives and agents under this Section shall be deemed to be the acts of Landlord or Tenant, respectively; however, the foregoing provisions governing the date on which a notice is deemed to have been received shall mean and refer to the date on which a party to this Lease, and not its counsel or other recipient to which a copy of the notice may be sent, is deemed to have received the notice.

27.     **Security Deposit.**  INTENTIONALLY OMITTED.

28.     **Brokers.**  Each of Landlord and Tenant represents and warrants to the other that Broker is the only broker or finder that it had any dealings, negotiations or consultations with relating to the Premises or this Lease and that no other broker or finder called the Premises to its attention for Lease or took any part in any dealings, negotiations or consultations relating to the Premises or this Lease.  Absent an express written agreement to the contrary with Landlord, neither Broker nor any other agent or broker retained by Tenant, whether retained at or before the date of this Lease or at any time thereafter, shall be entitled to any commission upon any renewal or extension of this Lease or any expansion of the Premises.  Absent an express written agreement to the contrary with Tenant, neither Broker nor any other agent or broker retained by Landlord, whether retained at or before the date of this Lease or at any time thereafter, shall be entitled to any commission upon any renewal or extension of this Lease or any expansion of the Premises.  Tenant agrees to indemnify, defend and hold harmless Landlord from and against all costs, fees (including, without limitation, attorney's fees), expenses, liabilities and claims incurred or suffered by Landlord arising from any breach by Tenant of Tenant's representation and warranty in this Section.  Landlord agrees to indemnify, defend and hold harmless Tenant from and against all costs, fees (including, without limitation, attorney's fees), expenses,

liabilities and claims incurred or suffered by Tenant arising from any breach by Landlord of Landlord's representation and warranty in this Section.

29. **Construction of Base Building and Tenant Improvements; Construction of Garage; Pedestrian Bridges.** The construction of the Building, the Tenant Improvements and all related site work and other improvements to be constructed by Landlord pursuant to this Lease shall be governed by the provisions of **Exhibit "G"** attached hereto and made a part hereof. The construction of the Garage and all related site work and improvements shall be governed by the provisions of **Exhibit "H"** attached hereto and made a part hereof, and in accordance with the terms of Section 35 below. Tenant shall have the right to construct one or more pedestrian bridges connecting the Building to Tenant's existing building at Two North Ninth Street and/or connecting the Garage to Tenant's existing building at Two North Ninth Street, subject to: (a) Landlord's approval of the design and method of connection of such pedestrian bridge(s), which approval shall not be unreasonably withheld, (b) Tenant's construction and connection of such bridge(s) in a good and workmanlike manner and in compliance with all applicable laws, and (c) Tenant's payment of all costs associated with the design, construction and connection of such bridge(s), including, without limitation, the cost of Landlord's consultants and professionals to review Tenant's plans, documents, approvals and applications therefor, and legal compliance.

30. **Commencement Date.** The date on which the Term of this Lease shall commence (the **"Commencement Date"**) shall be the earlier to occur of (a) the date on which Tenant or anyone claiming under or through Tenant occupies the Building Premises or any Phase (as defined in Exhibit "G") for the conduct of business or (b) the 30th day following Substantial Completion (as defined in Paragraph 5 of **Exhibit "G"**) of the first Phase of the Premises. The Phases of the construction and completion of the Building are in the order and content as set forth in Exhibit "G-6" to this Lease.

The **"First Phase Rent Commencement Date"** means the earlier to occur of (a) the date on which Tenant or anyone claiming under or through Tenant occupies all or any part of Floors 7 and 8 of the Building Premises for the conduct of business, or (b) the 30th day following Substantial Completion (as defined in Paragraph 5 of Exhibit "G") of the first Phase of the Premises (as described on Exhibit "G-6").

The **"Second Phase Rent Commencement Date"** means the date, simultaneously with or after the occurrence of the First Phase Rent Commencement Date, that is earlier to occur of (a) the date on which Tenant or anyone claiming under or through Tenant occupies all or any part of Floors 4, 5 and 6 of the Building Premises for the conduct of business, or (b) the 30th day following Substantial Completion (as defined in Paragraph 5 of Exhibit "G") of the second Phase of the Premises (as described on Exhibit "G-6").

The **"Third Phase Rent Commencement Date"** means the date, simultaneously with or after the occurrence of the Second Phase Rent Commencement Date, that is earlier to occur of (a) the date on which Tenant or anyone claiming under or through Tenant occupies all or any part of Floor 2 of the Building Premises for the conduct of business, or (b) the 30th day following Substantial Completion (as defined in Paragraph 5 of Exhibit "G") of the third Phase of the Premises (as described on Exhibit "G-6").

31.     **Additional Contiguous Space.** After the initial lease-up by Landlord of the office space within the Building shown as "Additional Space" on **Exhibit "A"** (the **"Additional Space"**), if and when any such Additional Space first becomes available for rental during the Term of this Lease and provided that Landlord has not given Tenant notice of default more than two (2) times during the immediately preceding twelve (12) months, and provided further that there then exists no Event of Default by Tenant under Section 22(a)(i) of this Lease nor any event that with the giving of notice and/or the passage of time would constitute an Event of Default under Section 22(a)(i) of this Lease, and that Tenant is the sole occupant of the Building Premises, Tenant shall have the right of first offer to lease all or any portion of the Additional Space, subject to the following:

(a)     Landlord shall notify Tenant when the Additional Space first becomes available for rental by any party other than the tenant then in occupancy of the Additional Space (it being agreed that if such tenant has a right of renewal, such Additional Space is deemed to be unavailable unless and until such tenant elects not to exercise its right of renewal) and the term and rental at which Landlord desires to lease such space (the **"ROFO Lease Terms"**), and Tenant shall have ten (10) business days following receipt of such notice within which to notify Landlord in writing that Tenant is interested in leasing such Additional Space on the ROFO Lease Terms. If Tenant notifies Landlord within such time period that Tenant is so interested, then Landlord and Tenant shall have 30 days following Landlord's receipt of such notice from Tenant within which to negotiate and execute a mutually satisfactory amendment to this lease incorporating the ROFO Lease Terms and any other terms agreed to by the parties or a new lease for the Additional Space.

(b)     If Tenant does not notify Landlord within such ten (10) business days of its interest in leasing the Additional Space on the ROFO Lease Terms or if Tenant does not execute such amendment or lease within such 30 days, if applicable, then this right of first offer to lease the Additional Space will lapse and be of no further force or effect and Landlord shall have the right to lease all or part of the Additional Space to any other party at any time on any terms and conditions acceptable to Landlord.

(c)     This right of first offer to lease the Additional Space is a continuing right after the initial lease-up thereof by Landlord, and shall be applicable if and whenever Additional Space becomes available (and only after the then existing tenant of the Additional Space has elected not to renew its lease pursuant to the terms of its lease) on the ROFO Lease Terms and is non-transferable to any party other than a transferee pursuant to a Transfer permitted under this Lease.

32.     **Keystone Opportunity Zone Provisions.** The parties acknowledge that the Property is located within a Keystone Opportunity Zone and that both parties intend to take full advantage of the benefits that inure to the parties and the Property by reason thereof, with the understandings and agreements, however: (i) Landlord makes no representations or warranties that the Property or Tenant's use and occupancy thereof will comply with requirements for reaping the benefits of the Keystone Opportunity Zone, (ii) in developing and operating the Property as described in this Lease, Landlord shall follow the procedures to obtain the most favorable treatment under the tax provisions of the rules and regulations applicable to the Keystone Opportunity Zone (and if Landlord fails to follow or elects not to follow such

procedures, Landlord shall not charge Tenant through Rent or otherwise for any taxes imposed with respect to the Property or this Lease that would have been abated had Landlord complied with such procedures), and (iii) in no event shall Landlord have any liability by reason of the Property's losing its entitlement to the benefits afforded it by virtue of its location within a Keystone Opportunity Zone.

33.   **Right of First Offer To Purchase.**

(a)   If at any time during the Term of this Lease, except as set forth in subsections (b) and (c) below, Landlord desires to sell the Property to a non-related entity for full consideration, Landlord agrees to notify Tenant in writing of such desire and the price (the **"ROFO PRICE"**) and other terms at which Landlord so desires to sell the Property. Tenant shall advise Landlord within 15 business days after receiving such notice if Tenant is interested in purchasing the Property by Tenant for the ROFO Price and such other terms. If Tenant fails to respond within such time period and/or if Tenant responds that Tenant is not interested in purchasing the Property, then Tenant shall have no further right hereunder to purchase the Property under the terms set forth in Landlord's notice. However, if Tenant notifies Landlord within such time period that Tenant is interested in purchasing the Property at the ROFO Price and upon such other terms, then Landlord and Tenant shall have 30 days following Landlord's receipt of such notice from Tenant within which to negotiate and execute a mutually satisfactory agreement for the sale of the Property to Tenant. Landlord agrees that it will not sell the Building or the Garage separately.

(i)   In the event that Landlord and Tenant fail to enter into an agreement of sale and purchase within such 30 days, then Tenant shall have no further right hereunder to purchase the Property with respect to such offer, subject to the balance of this paragraph. Thereafter, Landlord may negotiate with any third party for the sale and purchase of the Property; provided, however, that Landlord will not finally enter into an agreement of sale with any third party for a purchase price that is less than 95% of the ROFO Price (or on terms materially less favorable to Landlord than those offered to Tenant with the ROFO Price) unless Landlord first allows Tenant 15 business days within which to agree to purchase the Property at such lesser price. Landlord shall have a period of 270 days from the date, as applicable, (A) of Tenant's rejection or deemed rejection of Landlord' offer described in the immediately preceding paragraph, (B) following the expiration of the 30-day period during which Landlord and Tenant were to have entered into an agreement of sale and purchase as described in the first sentence of this subparagraph (i) but did not or (C) following Tenant's negative response (or deemed negative response on account of failing to respond within 15 business days) to purchase the Property at the lesser price described in the second sentence of this subparagraph (i), to consummate the sale of the Property to such third party, failing which Landlord shall not again market the Property to any third party without first complying with the provisions of this Section 33. Any such sale to a third party shall be subject to the terms of this Lease, including (without limitation) this Section 33.

(ii)   If Landlord and Tenant enter into an agreement of sale and purchase but transfer of the Property to Tenant is not consummated because of Tenant's default under such agreement of sale and purchase, then Tenant shall have no further right hereunder to purchase the Property.

(b)     Tenant's right of first offer set forth above shall not apply to (i) any transfer of the Property in mortgage foreclosure, by deed in lieu of foreclosure or as part of a settlement with the mortgagee, or (ii) a Taking or transfer by deed in lieu of Taking, nor shall such right apply to any transfer of the Property to an affiliate of Landlord or to a joint venture in which Landlord or its affiliate is a controlling venturer or has a material interest. In the case of (x) any such mortgage enforcement transaction, (y) a Taking or transfer by deed in lieu of Taking, or (z) any transfer to an affiliate of Landlord or joint venture described in the immediately preceding sentence, Tenant shall have no rights relating to the purchase of the Property and no such rights shall survive the conveyance of the Property by Landlord pursuant to such mortgage enforcement transaction or Taking or transfer by deed in lieu of Taking.

(c)     Landlord shall have no obligation to notify Tenant of Landlord's intention to sell and Tenant shall have no right to purchase the Property (or any portion thereof) at any time during which Tenant is in default under any of the provisions of this Lease beyond the expiration of any applicable notice and cure period, it being agreed for purposes of this Section 33 only that if Tenant is in default under Section 22(a)(ii) hereof, the aforesaid cure period shall be deemed to expire 30 days after Landlord's notice of default regardless of the additional cure period contemplated by Section 22(a)(ii). In addition, Tenant's right of first offer shall terminate automatically if Tenant transfers this Lease in violation of Section 18.

(d)     From the time of Tenant's exercise of its right to purchase the Property as aforesaid until the closing of the conveyance of the Property to Tenant, Tenant and Landlord shall continue to enjoy and be bound by all of their respective rights and obligations under this Lease, including the obligation of Tenant to pay Rent as required herein through the date of such conveyance.

34.     **Right to Terminate.** If the conditions set forth in clauses (a) and (b) below have not been satisfied by May 31, 2002, then either party, upon notice to the other party, shall have the right to terminate this Lease, following which termination the parties shall have no further liability or obligation to each other except for any liabilities or obligations that are expressly provided to survive such termination: (a) the acquisition by Landlord or its affiliated entity of the Land (and in the event of acquisition by Landlord's affiliated entity, Landlord shall assign this Lease to such affiliated entity, which shall assume this Lease), and (b) Landlord's having obtained all permits and approvals required or necessary for the construction of the Base Building Work, as defined in **Exhibit "G"**. Landlord agrees to act diligently and in good faith in seeking such permits and approvals.

35.     **Related Agreements and Lease Amendment.**

(a)     Contemporaneous with the execution of this Lease, Landlord and Tenant are entering into a Retail Lease Agreement for Landlord's master leasing to Tenant the retail portion of the Building (the **"Retail Lease"**), for a term of fifteen (15) years and for a Minimum Annual Rent of $213,084 per year, subject to reduction as set forth therein. As soon as reasonably practicable, but in no event later than March 1, 2002, Landlord and Tenant shall enter into an amendment to this Lease (the "Lease **Amendment**") which shall set forth: (a) a plan showing the footprint of the location of the Garage on the Garage Land and stating the number of parking spaces therein that will comprise the Garage Premises, which plan will become a part of

this Lease as **"Exhibit I"**, (b) the design plans and specifications for the Garage that will have been approved by Landlord and Tenant and that will become a part of this Lease as **Exhibit "J"**, (c) the construction schedule for the Garage, including the Target Turnover Date for the Garage, that will become a part of this Lease as **Exhibit "K"**, and (d) a statement of the Minimum Annual Rent for the Garage Premises, computed in the manner set forth in Section 1(h)(ii) above, together with estimates of Annual Operating Expenses and Initial Monthly Rent with regard to the Garage Premises, as contemplated in Sections 1(i) and 1(j) above. In connection with their obligation to agree upon the foregoing matters to be contained in the Lease Amendment, Landlord and Tenant shall act reasonably, diligently and in good faith.

(b)    As a material inducement to Landlord's agreement to enter into this Lease, Tenant is delivering to Landlord contemporaneously with the execution of this Lease a Guaranty of Tenant's obligations under this Lease by Tenant Guarantor. As a material inducement to Tenant's agreement to enter into this Lease, Landlord is delivering to Tenant contemporaneously with the execution of this Lease a Completion Guaranty of certain of Landlord's obligations under this Lease by Landlord Guarantor.

SIGNATURE PAGE TO OFFICE AND GARAGE LEASE AGREEMENT
BETWEEN LIBERTY PROPERTY DEVELOPMENT CORP. AND
PPL ENERGYPLUS, LLC

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease on the respective date(s) set forth below.

**Landlord:**

**LIBERTY PROPERTY DEVELOPMENT CORP.**

Date signed:

Dec 21, 2001

By: _____
Name: William Hankowsky
Title: Executive Vice President

By: _____
Name:     John  S   Gattuso
Title:     Senior  Vice President

Date signed:

_____

**Tenant:**

**PPL ENERGYPLUS, LLC**

By: _____
Name:
Title:

**SIGNATURE PAGE TO OFFICE AND GARAGE LEASE AGREEMENT
BETWEEN LIBERTY PROPERTY DEVELOPMENT CORP. AND
PPL ENERGYPLUS, LLC**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease on the respective date(s) set forth below.

**Landlord:**

**LIBERTY PROPERTY DEVELOPMENT CORP.**

Date signed:

By:_____
Name:
Title:

By:_____
Name:
Title:

Date signed:                    **Tenant:**

Dec. 21, 2001                   **PPL ENERGYPLUS, LLC**

By:_____
Name:
Title:

## Addendum 1 to Lease Agreement

### DEFINITIONS

"ADA" means the Americans With Disabilities Act of 1990 (42 U.S.C. § 1201 et seq.), as amended and supplemented from time to time.

"Additional Rent" means all amounts payable by Tenant to Landlord under this Lease, except for Minimum Annual Rent.

"Affiliate" means (i) any entity controlling, controlled by, or under common control of, Tenant, (ii) any successor to Tenant by merger, consolidation or reorganization, and (iii) any purchaser of all or substantially all of the assets of Tenant as a going concern.

"Agents" of a party means such party's employees, agents, representatives, contractors, licensees or invitees.

"Alteration" means any addition, alteration or improvement to the Building Premises, the Common Areas or the Property, as the case may be.

"Building Operating Expenses" means all Operating Expenses other than Garage Operating Expenses.

"Building Rules" means the rules and regulations attached to this Lease as **Exhibit "E"**.

"Building System" means any electrical, mechanical, structural, plumbing, HVAC, sprinkler, life safety or security system serving the Building.

"Business Day" means any day other than Saturday, Sunday or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, Pennsylvania.

"Common Areas" means all areas and facilities as provided by Landlord from time to time for the use or enjoyment of all tenants in the Building or Property, including, if applicable, lobbies, hallways, elevators, stairways, driveways, sidewalks, parking, loading and landscaped areas and plazas.

"Conditioned Air" means the conditioned air supplied to the Building, as measured in cubic feet per minute by flow meters located in the Variable Air Volume (VAV) boxes serving the Building, and with respect to the Building Premises, the conditioned air supplied to the Building Premises, as measured in cubic feet per minute by flow meters located in the Variable Air Volume (VAV) boxes serving the Building Premises and located on each floor of the Building.

"Conditioned Air Charge" means the charge established by Landlord from time to time for the cost of supplying Conditioned Air to the Building Premises.

"Days", when used in the context of any period for review, approval or notice under this Lease, shall mean "business days" if the specified number of days is ten (10) or fewer, or "calendar

days" if the specified number of days exceeds ten (10), except that all periods of days for curing a default by either party hereunder shall, unless expressly provided otherwise, mean calendar days.

"Environmental Laws" means all present or future federal, state or local laws, ordinances, rules or regulations (including the rules and regulations of the federal Environmental Protection Agency and comparable state agency) relating to pollution, to the protection of the environment, or to the environmental condition of the Property.

"Event of Default" means a default described in Section 22(a) of this Lease.

"Garage Operating Expenses" means all Operating Expenses attributable to or fairly allocated by Landlord to the ownership, operation or Maintenance of the Garage.

"Hazardous Materials" means pollutants, contaminants, toxic or hazardous wastes or other materials the removal of which is required or the use of which is regulated, restricted, prohibited or penalized by any Environmental Law.

"Holidays" means the days observed as holidays by the United States government, the Commonwealth of Pennsylvania or the City of Allentown, as well as days declared as holidays in any union contract affecting the operation of the Building.

"HVAC" means heating, ventilating and/or air conditioning.

"Interest Rate" means the rate of interest per annum from time to time published in The Wall Street Journal (or comparable financial publication designated by Landlord if The Wall Street Journal ceases to be published or ceases to publish a prime rate) as the "High Prime Rate", or the "Prime Rate" if only one "Prime Rate" is published, as the same may fluctuate from time to time, plus 5%, compounded annually.

"Land" means (a) the lot or plot of land on which the Building is situated or the portion thereof allocated by Landlord to the Building, and (b) the Garage Land.

"Laws" means all laws, ordinances, rules, orders, regulations and other requirements of federal, state or local governmental authorities now or subsequently pertaining to the Property or the use and occupation of the Property.

"Maintain" means to provide Maintenance.

"Maintenance" means such maintenance, repair and, to the extent necessary and appropriate, replacement, as may be needed to keep the Property in good condition and repair.

"Monthly Rent" means the monthly installment of aggregate Minimum Annual Rent for the Premises plus the monthly installment of aggregate estimated Annual Operating Expenses for the Premises payable by Tenant from time to time under this Lease.

"Mortgage" means any mortgage, deed of trust or other lien or encumbrance on Landlord's interest in the Property or any portion thereof, including without limitation any ground or master Lease if Landlord's interest is or becomes a leasehold estate.

"Mortgagee" means the holder of any Mortgage, including any ground or master lessor if Landlord's interest is or becomes a leasehold estate.

"Operating Expenses" means (a) the categories of costs, charges and expenses described on "Operating Expenses Exhibit to Addendum 1" attached hereto and made a part hereof (it being understood and agreed that the dollar figures set forth therein represent only Landlord's estimate of initial Operating Expenses), but not including any of the same or any item thereof expressly excluded under the exclusions set forth below in this definition, and (b) without duplication of the items in clause (a) above, the following costs, charges and expenses reasonably incurred by Landlord in connection with the ownership, operation, management, maintenance and repair of, and services and supplies provided to, the Property:

     (i)    wages and salaries (and taxes imposed upon employers with respect to such wages and salaries) and fringe benefits paid to persons (excluding executive personnel and personnel above the level of property manager) employed by Landlord or any management company, who either (A) perform services primarily on-site in connection with the Maintenance or operation of the Property, or (B) as a substantial part of their responsibilities, are directly responsible for the Property but may have an office off-site, together with a reasonable overhead and expenses in connection therewith (excluding the expenses, wages and salaries attributable to Landlord's administrative and bookkeeping staff);

     (ii)    the cost of electricity, gas, water, sewer, steam, fuel and any other utilities provided by Landlord to the Garage and to the Building (including, without limitation, Conditioned Air, as measured by the separate flow meters in the Variable Air Volume boxes serving the Common Areas) (other than the cost of utilities to individual tenant spaces within the Building, which shall be separately metered or submetered);

     (iii)    the cost of premiums of insurance carried by Landlord pursuant to Section 8 of this Lease together with the cost of any deductible not to exceed $50,000 paid by Landlord in connection with an insured loss;

     (iv)    the cost of supplies and Maintenance (including, but not limited to, with respect to the Building, the roof, the Building Systems and the elevators) performed by or on behalf of Landlord pursuant to Section 9 of this Lease, including, without limitation, janitorial service, trash removal, window cleaning, painting of Common Areas and elevator service;

     (v)    auditing and other non-legal professional and consulting fees incurred in connection with the management, operation and maintenance of the Property and not incurred in connection with leasing or the entity which is Landlord, and legal and other professional fees incurred in connection with any appeal of the tax assessment for the Property and with any contest by Landlord with respect to the compliance with any legal requirement;

     (vi)    costs of providing a security program for the Building and the Garage;

(vii)    subject to Section 32 of this Lease, all ad valorem real estate taxes, sales taxes, special assessments, license and permit fees, together with the reasonable cost of contesting any of the foregoing, which are applicable to the Term, and which are imposed by any authority or under any Law, upon or with respect to the Property, or any improvements thereto, or against Landlord because of Landlord's estate or interest in the Property, it being understood that, if the Building and the Garage are subject to a real estate tax abatement program and such program ceases to benefit the Building and the Garage during the Term, the real estate taxes will increase;

(viii)    landscaping and snow removal;

(ix)    the annual amortization of Includable Capital Expenditures (as defined below); and

(x)    without limiting any of the foregoing, any other reasonable, non-capital expense or charge which, in accordance with sound accounting and management principles generally accepted with respect to first-class office buildings in the City of Allentown and a parking garage serving such a building, would be construed as an operating expense, and which would customarily be assessed as a common area charge to a tenant leasing space within a multi-tenant office building with associated garage.

The foregoing notwithstanding, Operating Expenses will not include: (1) except as set forth above in clause (ix), Landlord's depreciation on the Building and the Garage or any equipment, improvements, furnishings or fixtures in, on or a part of the Property, (2) Landlord's direct financing and refinancing costs, principal or interest on debt or amortization payments on any mortgage or other credit facility, or rental under any ground or underlying lease, or (3) leasing commissions, advertising expenses, tenant improvements or other costs directly related to the leasing of the rentable area of the Property, (4) penalties, interest, income taxes, profits (net or gross), taxes, business taxes upon Landlord's entity, gross receipts taxes, capital stock taxes, inheritance taxes, estate taxes, succession taxes, realty transfer taxes, gift taxes, franchise taxes, corporation taxes, documentary stamp taxes, mortgage lien taxes, transfer gains taxes, tax increment financing or recording fees unless any such tax is levied or assessed in lieu of (and as to gross receipts taxes only, in whole or in partial substitution of) any item specified in clause (vii) above, (5) promotional or advertising expenses, (6) the cost of any special service provided to a tenant of the Building, other than Tenant, which is not provided generally to the other tenants of the Building, (7) attorney's legal fees, court costs and other legal expenses not covered in clause (v) above, (8) costs recoverable by Landlord pursuant to its insurance policies or insurance deductibles except as permitted under clause (iii) above, (9) costs resulting from defects in design, construction or workmanship in any of the materials used in the same during the applicable warranty period, (10) costs due to Landlord's default under this Lease, and/or costs due to the gross negligence or willful misconduct of Landlord or its employees, (11) any costs or expenditures for a repair, alteration, replacement or improvement which, in accordance with generally accepted accounting principles, are not fully chargeable to current expenses, excepting only the Includable Capital Expenditures.

"Includable Capital Expenditures" means all costs (including reasonable financing charges) of capital improvements or replacements which are made (A) pursuant to requirements of Laws, and which do not arise by reason of any failure on the part of Landlord to construct the

Building, the Garage or any portion of the Property in accordance with applicable Laws in effect upon the date of substantial completion thereof; (B) for the purpose of reducing Operating Expenses; and/or (C) for the purpose of directly enhancing the safety of the tenants in the Building and with respect to their use of the Garage, generally. Any Includable Capital Expenditures shall be amortized over the useful life of the improvements on a straight line basis.

In the event of a special assessment for a public or private improvement, the life of which extends beyond the term of the Lease, the assessment for such improvements shall be paid by Landlord and amortized over the life of the improvement, and Tenant shall only be responsible to pay Tenant's Share of the amortized portion as it is amortized during the Term. Notwithstanding the foregoing, if such assessment is permitted to be paid in installments under applicable Law, Landlord shall exercise such right of installment payment and Tenant shall only be responsible for Tenant's Share of each installment coming due during the Term of this Lease and shall not be responsible for any portion of the assessment which covers a period during which Tenant did not have the right to legally possess the Premises (unless such right is terminated by reason of Tenant's default). Special assessments shall not include infrastructural or capital improvements related to the initial construction of the Building or the Garage.

"Ordinary Business Hours" means Monday through Friday inclusive from 6:00 a.m. to 6:00 p.m. and Saturday from 8:00 a.m. to 1:00 p.m., with Holidays excepted.

"Property" means the Land, the Building, the Garage, the Common Areas, and all appurtenances to them.

"Rent" means the Monthly Rent and Additional Rent.

"Rentable Square Feet" means the rentable square feet set forth in Sections 1(a) and (b) of this Lease, as finally determined by Landlord's architect.

"Supplemental HVAC Rate" means the charge reasonably established by Landlord from time to time(based on actual costs without mark-up) for the cost of supplying chilled water, condensate or Conditioned Air to operate any excess cooling or supplementary HVAC system in the Building Premises as described in Section 7(c) of this Lease.

"Taken" or "Taking" means acquisition by a public authority having the power of eminent domain by condemnation or conveyance in lieu of condemnation.

"Tenant Electricity" means the quantity of electricity used by Tenant in connection with the Building Premises, which shall be determined by (i) a submeter installed at or for the Building Premises to measure electricity usage for lights and outlets, (ii) a submeter installed on the floor on which the Building Premises is located to measure electricity usage for the operation of the HVAC system on the floor, and (iii) a submeter installed on each floor on which the Building Premises is located to measure electricity usage for the operation of the electrical resistance heat to the Variable Air Volume boxes serving the Building Premises and for powering the fans in such VAV boxes which provide heat to the Building Premises. If any portion of the Building Premises is less than a full floor of the Building and there are other tenants occupying space on such floor, Tenant shall pay, as to submeter (ii), only Tenant's Floor Share of Tenant Electricity.

"Tenant's Floor Share" means the percentage calculated by dividing (a) the area in Rentable Square Feet of the portion of the Building Premises located on the subject floor during any billing period or portion thereof by (b) the aggregate of the total area in Rentable Square Feet located on such floor (including the Building Premises), times 100.

"Tenant's Share" means (i) as to the Building Premises the percentage obtained by dividing the Rentable Square Feet of the Building Premises by the aggregate Rentable Square Feet of the Building, as set forth in Section 1(k) of this Lease and as otherwise provided therein with respect to elevator Maintenance, and (ii) as to the Garage Premises, as calculated pursuant to Section 1(k) of this Lease.

"Transfer" means (i) any assignment, transfer, pledge or other encumbrance of all or a portion of Tenant's interest in this Lease, or (ii) any sublease, license or concession of all or a portion of Tenant's interest in the Premises.

Exhibit to Addendum 1

**PPL Corporate Trading Facility**
**9th and Hamilton Street, Allentown, Pennsylvania**
**2003 Operating Expense Budget**

258,007 Sq.Ft.

|  | Category | Description |  | PSF |
|---|---|---|---|---|
| Common Area |  |  |  | $6.06 |
|  | Insurance |  | $0.10 |  |
|  |  | Insurance |  | $0.10 |
|  | Mgmt Fees |  | $1.20 |  |
|  |  | Management Fees |  | $1.20 |
|  | Real Estate Taxes |  | $0.00 |  |
|  |  | Real Estate Taxes |  | $0.00 |
|  | Repairs & Maintenance |  | $4.01 |  |
|  |  | Asphalt & Concrete Repair |  | $0.02 |
|  |  | Window Cleaning |  | $0.06 |
|  |  | Elevator |  | $0.14 |
|  |  | Exterminating |  | $0.02 |
|  |  | Fire Protection |  | $0.08 |
|  |  | Generator Maintenance |  | $0.01 |
|  |  | HVAC Maintenance and Repair Services |  | $0.27 |
|  |  | Landscaping - Exterior |  | $0.10 |
|  |  | Landscaping - Interior |  | $0.11 |
|  |  | Janitorial Services |  | $1.27 |
|  |  | Janitorial Supplies |  | $0.13 |
|  |  | Maintenance & Repairs |  | $0.15 |
|  |  | Roof |  | $0.01 |
|  |  | Security Services |  | $1.03 |
|  |  | Snow Removal |  | $0.06 |
|  |  | Tenant Services |  | $0.43 |
|  |  | Trash Removal |  | $0.12 |
|  | Utilities |  | $0.75 |  |
|  |  | Electric |  | $0.61 |
|  |  | Water |  | $0.07 |
|  |  | Sewer |  | $0.04 |
|  |  | Diesel Fuel |  | $0.01 |
|  |  | Telephone |  | $0.02 |

*date:12-13-2001*

Note: All of the above figures are estimates only



BASEMENT

GROUND FLOOR

SECOND FLOOR

THE PLAZA AT PPL CENTER
ALLENTOWN, PA

ROBERT A.M. STERN ARCHITECTS
KENDALL/HEATON ASSOCIATES, INC.

SCALE: 1"= 50'-0"

NOVEMBER 27, 2001



THIRD FLOOR

FOURTH FLOOR

FIFTH FLOOR

THE PLAZA AT PPL CENTER
ALLENTOWN, PA

SCALE: 1"=50'-0"

ROBERT A.M. STERN ARCHITECTS
KENDALL/HEATON ASSOCIATES, INC.

NOVEMBER 27, 2001



SIXTH FLOOR

SEVENTH FLOOR

EIGHTH FLOOR

THE PLAZA AT PPL CENTER
ALLENTOWN, PA

SCALE: 1" = 50'-0"

ROBERT A.M. STERN ARCHITECTS
KENDALL/HEATON ASSOCIATES, INC.

NOVEMBER 27, 2001

## EXHIBIT "B"

### INTENTIONALLY OMITTED

DSC:821298.10/LIB035-156363

# EXHIBIT "C"

## HVAC DESIGN SPECIFICATIONS AND CRITERIA

[These specifications and criteria are contained in the Base Buiding Scope Documents
listed in Exhibit "G-1" below]

# EXHIBIT "D

## CLEANING SCHEDULE

DSC:821298.10/LIB035-156363

# EXHIBIT "D"

## CLEANING SERVICES

Prepared For:                          **LIBERTY PROPERTY TRUST**

Areas to be serviced:                  *Insert property (address) to be serviced*

**COMMON AREAS, VESTIBULE, LOBBY, STAIRWELLS & CORRIDOR, RESTROOMS, ELEVATORS**

| | DAILY | WEEKLY |
|---|---|---|
| **GENERAL HOUSEKEEPING** | | |
| Empty waste receptacles | X | |
| Sanitize and replace liners in waste receptacles as needed | X | |
| Wipe down wall near waste receptacles | X | |
| Wipe down trash containers as needed | | X |
| Empty paper recycle receptacles | X | |
| Remove boxes marked "trash" | X | |
| Remove all trash to designated area | X | |
| Clean and sanitize drinking fountains | X | |
| Dust horizontal surfaces to hand height | X | |
| Dust horizontal surfaces above hand height with proper tools | | As needed |
| Remove dust and cobwebs from ceiling areas with proper tools | | As needed |
| Spot clean reception lobby door glass entrances | X | |
| Clean entire lobby glass doors | | X |
| Clean exterior ash urns | X | |
| Clean and sanitize drinking fountains | X | |
| **TILE FLOORS** | | |
| Dry mop | X | |
| Damp mop   (general purpose cleaner) | X | |
| | | |
| **CARPET** | | |
| Vacuum traffic lanes | X | |
| Wall to wall detailed vacuum | | X |
| | | |
| **RESTROOMS** | | |
| Clean and sanitize all fixtures | X | |
| Clean glass and mirrors | X | |
| Spot clean wall, dispensers and partitions | X | |

| | | |
|---|---|---|
| Empty waste receptacles | X | |
| Sanitize and replace liners in waste receptacles as needed | X | |
| Wipe down trash containers as needed | X | |
| Refill all dispensers (hand soap, paper products and sanitary napkins) | X | |
| Dust horizontal surfaces to hand height | X | |
| Dust horizontal surfaces above hand height | | X |
| Dry mop | X | |
| Damp mop  (with an approved disinfectant) | X | |
| | | |
| | | |
| **LOUNGE AREAS** | | |
| | | |
| **STAIRWELLS  (Dust, high and low. Dry and wet mop)** | | X |
| | | |
| **MISCELLANEOUS SERVICES** | | |

## CLEANING SERVICES

Areas to be serviced:
**OFFICES**

| GENERAL HOUSEKEEPING | DAILY | WEEKLY |
|---|---|---|
| Empty waste receptacles | X | |
| Replace liners in waste receptacles as needed | X | |
| Wipe down wall near waste receptacles | | X |
| Empty paper recycle receptacles | | X |
| Remove any boxes marked "trash" | X | |
| Remove all trash to designated area (protect floors from leakage) | X | |
| Clean and sanitize telephone handsets | | X |
| Clean and sanitize drinking fountains | X | |
| Dust areas of furniture, desks, chairs, and tables | X | |
| Dust areas of filing cabinets, bookcases and shelves | X | |
| Dust horizontal surfaces to hand height | X | |
| Dust horizontal surfaces above hand height | | X |
| Remove dust and cobwebs from ceiling areas | | X |
| Spot clean visible areas of desk tops (do not disturb any paper, etc.) | X | |
| Spot clean reception lobby glass including front door | X | |
| Spot clean glass in partitions and doors through office space | | As needed |
| | | |
| TILE | | |
| Dry mop | X | |
| Spot (damp) mop | X | |
| Damp mop | | X |
| CARPET | | |
| Vacuum traffic lanes | X | |
| Wall to wall detailed vacuum | | X |
| | | |
| RESTROOMS | | |

Date Last Revised: 11/20/00

File Name: Cleaning Services

## EXHIBIT "E"

### BUILDING RULES

1.      Any sidewalks, lobbies, passages, elevators and stairways shall not be obstructed or used by Tenant for any purpose other than ingress and egress from and to the Premises. Landlord shall in all cases retain the right to control or prevent access by all persons whose presence, in the judgment of Landlord, shall be prejudicial to the safety, peace or character of the Property.

2.      The toilet rooms, toilets, urinals, sinks, faucets, plumbing or other service apparatus of any kind shall not be used for any purposes other than those for which they were installed, and no sweepings, rubbish, rags, ashes, chemicals or other refuse or injurious substances shall be placed therein or used in connection therewith or left in any lobbies, passages, elevators or stairways.

3.      Tenant shall comply with all safety, security, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency. Tenant shall provide such emergency information as Landlord may request.

4.      Nothing shall be placed by Tenant on the outside of the Building or on its window sills or projections. Windows, doors and transoms shall not be covered or obstructed by Tenant, and Tenant shall not install any window covering, except as reasonably approved in writing by Landlord. Tenant shall not remove, without Landlord's prior written consent, any shades, blinds or curtains in the Premises. Except as set forth in this Lease, no person shall go on the roof or install any equipment or any other item on the roof without Landlord's prior written permission.

5.      Except for the signs permitted to be installed by Tenant in accordance with Section 11(a) of the Lease, no sign, lettering, insignia, advertisement or notice, shall be inscribed, painted, installed or placed on any windows or in any window spaces or any other part of the outside or inside of the Premises, unless first approved in writing by Landlord.

6.      Without Landlord's prior written consent and except to the extent expressly permitted under the Lease, Tenant shall not hang, install, mount, suspend or attach anything from or to any sprinkler, plumbing, utility or other lines. If Tenant hangs, installs, mounts, suspends or attaches anything from or to any doors, windows, walls, floors or ceilings, Tenant shall spackle and sand all holes, if required by Landlord, and repair any damage caused thereby or by the removal thereof at or prior to the expiration or termination of the Lease.

7.      The janitor and the manager of the Building may at all times keep a pass key, entry card or other means of access to the Premises. Notwithstanding the above, Tenant may have a security card access system installed on the Premises.

8.      Tenant shall have the right to provide vending machines at the Premises subject to (a) Landlord's reasonable approval as to type of machine or fixture to be installed, (b) Landlord's reasonable approval as to the location thereof, (c) Landlord's approval as to the method of installation, and (d) Tenant's compliance with Landlord's reasonable standards of cleanliness, hygiene and maintenance and repair with respect to the use and operation of such vending machines. No cooking shall be done on the Premises without Landlord's consent. Tenant shall have the right to separate coffee machines, microwave ovens, toasters, toaster ovens and similar small appliances within the Premises for use of Tenant's employees and invitees, provided that Tenant pays the cost of installation, complies with all applicable Laws in the installation and operation of such facilities, and cleans, maintains and repairs such facilities at its own expense.

DSC:821298.10/LIB035-156363

9.    Bicycles may be stored in designated areas of the Building only.

10.    Tenant shall not do or commit, or suffer to done or committed, any act or thing whereby, or in consequence whereof, the rights of other tenants will be obstructed or interfered with, or other tenants will in any other way be injured or disrupted, or whereby the Building will be damaged nor shall Tenant cause or suffer to be caused any unreasonable noise, vibrations or electronic interference which disrupts other tenants, the operation of their equipment or the operation of any equipment in the Building. Tenant shall not suffer nor permit the Premises or any part thereof to be used in any manner or anything to be done therein nor suffer nor permit anything to be brought into or kept in the Premises which, in the reasonable judgment of Landlord (exercised in a manner consistent with the rights of Tenant under this Lease), shall in any way impair or tend to impair the character, reputation or appearance of the Building.

11.    Tenant shall not use nor keep in the Building any matter having an offensive odor, nor explosive or highly flammable material, nor shall any animals, other than dogs required to provide physical assistance to, and in the company of, their masters be brought into or kept in or about the Premises.

12.    If Tenant desires to introduce electrical, signaling, telegraphic, telephonic, protective alarm or other wires, apparatus or devices, Tenant shall submit its plans therefor to Landlord for its approval. Landlord shall have the right to prevent and to cut off the transmission of excessive or dangerous current of electricity or annoyances into or through the Building or the Premises and to require the changing of wiring connections or layout at Tenant's expense, to the extent that Landlord may deem necessary, and further to require compliance with such reasonable rules as Landlord may establish relating thereto, and in the event of non-compliance with the requirements or rules, Landlord shall have the right, after giving reasonable notice, to cut wiring or to do what it considers necessary to remove the danger, annoyance or electrical interference with apparatus in any part of the Building. All wires installed by Tenant must be clearly tagged at the distributing boards and junction boxes and elsewhere where required by Landlord, with the number of the office to which said wires lead, and the purpose for which the wires respectively are used, together with the name of the concern, if any, operating same.

13.    Tenant shall not place weights anywhere beyond the safe carrying capacity of the Building (as shall be set forth in the Final Construction Documents, as defined in Exhibit "G"), which is designed to normal office building standards for floor loading capacity, except that if Tenant desires to install personal property, equipment or fixtures that may exceed the aforesaid capacity, Tenant shall submit to Landlord for its approval, its plans to reinforce the affected floor and agrees to bear the cost of installation, maintenance, repair and removal of such reinforcement. Landlord shall have the right to exclude from the Building heavy furniture, safes and other articles which may be hazardous or to require them to be located at designated places in the Premises.

14.    The use of rooms as sleeping quarters is strictly prohibited at all times except in the case of emergency (including inclement weather) that would require Tenant to provide overnight staffing in order to conduct its business operations and then in such case, only for the duration of the emergency.

15.    Tenant shall not permit its Agents to smoke in the Building, which Landlord has designated as a non-smoking building, and smoking shall only be permitted in any Common Areas which Landlord may designate for such purpose.

16.    Canvassing, soliciting and distribution of handbills or any other written material, and peddling in the Building are prohibited, and Tenant shall cooperate to prevent same.

17.     Tenant shall provide Landlord with a written identification of any vendors engaged by Tenant to perform services for Tenant at the Premises (examples: security guards/monitors, telecommunications installers/maintenance). Tenant assumes all responsibility for protecting its Premises from theft and vandalism. Tenant may employ its own employees or contractors for special items (such as polishing desks) so long as Tenant's employment of such persons or entities is harmonious with the employees of Landlord engaged in the operation or construction of the Building and does not disrupt Landlord's labor relations with employees of the Building.

18.     Tenant shall provide reasonable advance notice to Landlord of any significant move-in or move-out activities contemplated by Tenant. Throughout the Term, Tenant shall also comply with the reasonable rules established by Landlord for the method and manner of transportation of furniture, packages, equipment, supplies or merchandise of Tenant into or out of the Building, or carried up or down in the elevators or stairways. At the end of the Term, if required by Landlord, Tenant's obligations regarding surrender of the Premises shall include Tenant's obligation to shampoo all carpet, strip and re-wax all vinyl composite tile and replace any damaged ceiling tiles.

19.     Tenant shall not place oversized cartons, crates or boxes in any corridor area for trash pickup without Landlord's prior approval. Landlord shall be responsible for trash pickup of normal office refuse placed in ordinary office trash receptacles only. Excessive amounts of trash or other out-of-the-ordinary refuse loads will be removed by Landlord upon request at Tenant's expense.

20.     [Intentionally deleted]

21.     In case of invasion, hostile attack, insurrection, mob violence, riot, public excitement or other commotion, explosion, fire or any casualty, Landlord reserves the right to bar or limit access to the Building for the safety of occupants or protection of property.

22.     Tenant shall use good faith efforts to cause all of Tenant's Agents to comply with these Building Rules.

23.     Landlord reserves the right to rescind, suspend or modify any rules or regulations and to make such other rules and regulations as, in Landlord's reasonable judgment, may from time to time be needed for the safety, care, maintenance, operation and cleanliness of the Property, except that any material changes thereto shall require Tenant's consent which shall not be unreasonably withheld, conditioned or delayed. Notice of any action by Landlord referred to in this section, given to Tenant, shall have the same force and effect as if originally made a part of the foregoing Lease. New rules or regulations will not, however, be unreasonably inconsistent with the proper and rightful enjoyment of the Premises by Tenant under the Lease.

24.     If Landlord does not enforce these Building Rules against any other tenants, Tenant shall have the right to compel Landlord to so enforce these Building Rules.

25.     Tenant shall be deemed to have read these Building Rules and to have agreed to abide by them as a condition to Tenant's occupancy of the Premises.

26.     There shall be no abandoned vehicles left by Tenant or its employees or invitees in the Garage.

## EXHIBIT "F-1"

### TENANT ESTOPPEL CERTIFICATE

Please refer to the documents described in Schedule 1 hereto, (the "Lease Documents") including the "Lease" therein described; all defined terms in this Certificate shall have the same meanings as set forth in the Lease unless otherwise expressly set forth herein. The undersigned Tenant hereby certifies that it is the tenant under the Lease. Tenant hereby further acknowledges that it has been advised that the Lease may be collaterally assigned in connection with a proposed financing secured by the Property and/or may be assigned in connection with a sale of the Property and certifies both to Landlord and to any and all prospective mortgagees and purchasers of the Property, including any trustee on behalf of any holders of notes or other similar instruments, any holders from time to time of such notes or other instruments, and their respective successors and assigns (the "Mortgagees") that as of the date hereof:

1.      The information set forth in attached Schedule 1 is true and correct.

2.      Tenant is in occupancy of the Premises and the Lease is in full force and effect, and, except by such writings as are identified on Schedule 1, has not been modified, assigned, supplemented or amended since its original execution, nor are there any other agreements between Landlord and Tenant concerning the Premises, whether oral or written.

3.      All conditions and agreements under the Lease to be satisfied or performed by Landlord have been satisfied and performed.

4.      Tenant is not in default under the Lease Documents, Tenant has not received any notice of default under the Lease Documents, and, to Tenant's knowledge, there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Tenant under the Lease Documents.

5.      Tenant has not paid any Rent due under the Lease more than 30 days in advance of the date due under the Lease and Tenant has no rights of setoff, counterclaim, concession or other rights of diminution of any Rent due and payable under the Lease except as set forth in Schedule 1.

6.      To Tenant's knowledge, there are no uncured defaults on the part of Landlord under the Lease Documents, Tenant has not sent any notice of default under the Lease Documents to Landlord, and there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Landlord thereunder, and that at the present time Tenant has no claim against Landlord under the Lease Documents.

7.      Except as expressly set forth in Part G of Schedule 1, there are no provisions for any, and Tenant has no, options with respect to the Premises or all or any portion of the Property.

8.      No action, voluntary or involuntary, is pending against Tenant under federal or state bankruptcy or insolvency law.

9.      The undersigned has the authority to execute and deliver this Certificate on behalf of Tenant and acknowledges that all Mortgagees will rely upon this Certificate in purchasing the Property or extending credit to Landlord or its successors in interest.

10.     This Certificate shall be binding upon the successors, assigns and representatives of Tenant and any party claiming through or under Tenant and shall inure to the benefit of all Mortgagees.

IN WITNESS WHEREOF, Tenant has executed this Certificate this ____ day of _____, 2____.

 

 

 

_____
Name of Tenant

By:_____
Title:_____

## SCHEDULE 1 TO TENANT ESTOPPEL CERTIFICATE

<u>Lease Documents, Lease Terms and Current Status</u>

A.  Date of Lease:

B.  Parties:

    1.  Landlord:

    2.  Tenant d/b/a:

C.  Premises known as:

D.  Modifications, Assignments, Supplements or Amendments to Lease:

E.  Commencement Date:

F.  Expiration of Current Term:

G.  Options:

H.  Security Deposit Paid to Landlord: $

I.  Current Fixed Minimum Rent (Annualized): $

J.  Current Additional Rent (and if applicable, Percentage Rent)(Annualized): $

K.  Current Total Rent: $

L.  Square Feet Demised:

## EXHIBIT "F-2"

### LANDLORD ESTOPPEL CERTIFICATE

Please refer to the documents described in Schedule 1 hereto, (the "Lease Documents") including the "Lease" therein described; all defined terms in this Certificate shall have the same meanings as set forth in the Lease unless otherwise expressly set forth herein. The undersigned hereby certifies that it is the landlord under the Lease. Landlord hereby certifies both to Landlord and to any and all prospective lenders to Tenant [and all prospective assignees of Tenant's interest in the Lease], including any trustee on behalf of any holders of notes or other similar instruments, any holders from time to time of such notes or other instruments, and their respective successors and assigns (collectively, the "Transferees") that as of the date hereof:

1. The information set forth in attached Schedule 1 is true and correct.

2. The Lease, to our knowledge, is in full force and effect, and, except by such writings as are identified on Schedule 1, has not been modified, assigned, supplemented or amended since its original execution, nor are there any other agreements between Landlord and Tenant concerning the Premises, whether oral or written.

3. To Landlord's knowledge, all conditions and agreements under the Lease to be satisfied or performed by Landlord have been satisfied and performed.

4. Landlord has not received any written notice of default under the Lease Documents, and, to Landlord's knowledge, Landlord is not in default under the Lease Documents and there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Landlord under the Lease Documents.

5. Landlord has not received from Tenant any Rent due under the Lease more than 30 days in advance of the date due under the Lease.

6. To Landlord's knowledge, there are no uncured defaults on the part of Tenant under the Lease Documents, Landlord has not sent any notice of default under the Lease Documents to Tenant, and there are no events which have occurred that, with the giving of notice and/or the passage of time, would result in a default by Tenant thereunder, and that at the present time Landlord has no claim against Tenant under the Lease Documents.

7. The undersigned has the authority to execute and deliver this Certificate on behalf of Landlord and acknowledges that all Transferees will rely upon this Certificate in acquiring Tenant's interest in the Lease or extending credit to Tenant or its successors in interest.

8. This Certificate shall be binding upon the successors, assigns and representatives of Landlord and any party claiming through or under Landlord and shall inure to the benefit of all Transferees.

IN WITNESS WHEREOF, Landlord has executed this Certificate this _____ day of _____, 2_____.

Name of Landlord

By:_____
Title:_____

## SCHEDULE 1 TO LANDLORD ESTOPPEL CERTIFICATE

Lease Documents, Lease Terms and Current Status

A.  Date of Lease:

B.  Parties:

    1.  Landlord:

    2.  Tenant d/b/a:

C.  Premises known as:

D.  Modifications, Assignments, Supplements or Amendments to Lease:

E.  Commencement Date:

F.  Expiration of Current Term:

G.  Options:

H.  Security Deposit Paid to Landlord: $

I.  Current Fixed Minimum Rent (Annualized): $

J.  Current Additional Rent (and if applicable, Percentage Rent)(Annualized): $

K.  Current Total Rent: $

L.  Square Feet Demised:

## EXHIBIT "G"

### CONSTRUCTION OF BASE BUILDING AND TENANT IMPROVEMENTS

The project comprising the Base Building Work (as defined below) and the Tenant Improvements (as defined below) shall be constructed and completed in three (3) phases (each, a **"PHASE"**) as more particularly described on Exhibit "G-6" attached hereto and made a part hereof.

1.    **Base Building Work.**

(a)    **Generally.** The Building, Common Areas, and all site work and other improvements to be constructed in connection therewith by Landlord (including, without limitation, the security system, lighting system, utility systems, life safety system and fire suppression system), with the exception of the Tenant Improvements (collectively, the **"BASE BUILDING WORK"**), will be described in the Final Base Building Construction Documents (as hereinafter defined).    Landlord shall contract with Landlord's general contractor (**"LANDLORD'S GENERAL CONTRACTOR"**) to perform the Base Building Work in accordance with the Final Base Building Construction Documents. All such work shall be performed in a good and workmanlike manner and in accordance with all local, state and federal laws, ordinances, building codes (including any variances lawfully granted) and other applicable requirements of duly constituted public authorities and in accordance with the terms of this Lease. Landlord shall be responsible for obtaining all necessary building permits and other governmental permits and approvals necessary for the construction of the Base Building Work. Tenant shall cooperate with Landlord, at Landlord's cost, in Landlord's efforts to obtain such permits and other approvals. All costs incurred in connection with performing the Base Building Work, as more precisely described in the Base Building Scope Documents (as defined below), shall be borne solely by Landlord.

(b)    **Final Base Building Construction Documents.**    The Base Building Work is generally described in **Exhibit "G-1"** collectively, the **"BASE BUILDING SCOPE DOCUMENTS"**), which shall be developed into the Final Base Building Construction Documents in the following manner:

(i)    Landlord shall cause Landlord's architect to prepare, and forward to Tenant for Tenant's review, schematic design documents for the Base Building Work (the **"BASE BUILDING SCHEMATIC DOCUMENTS"**).    The Base Building Schematic Documents shall include, without limitation, the raised floor systems on Floors 7 and 8 of the Premises as well as the mechanical systems and vaulted ceilings to be located on or within such Floors.   **Exhibit "G-2"** hereto sets out the time schedule for submittal of the Base Building Schematic Documents to Tenant, for Tenant's comments thereon to Landlord and Landlord's architect, and for the resubmittal of revised Base Building Schematic Documents by Landlord's architect to Tenant.   In the event Tenant fails to provide any comment within the appropriate time period indicated on **Exhibit "G-2"**, the Base Building Schematic Documents so submitted shall be deemed to have been approved by Tenant.   Any comments or suggested changes of Tenant shall be in writing and may be noted on the applicable drawings and plans provided they are legible and sufficiently detailed as warranted under the circumstances, including specific

references and notations on applicable drawings and plans to highlight areas in which changes are requested. Except for (A) comments or suggested changes with respect to newly developed features of Base Building Schematic Documents (as opposed to refinements of features that existed in the previously approved set of Base Building Scope Documents), and (B) comments or suggested changes to correct any aspect of the Base Building Schematic Documents that is inconsistent with the Base Building Scope Documents, Tenant shall not withhold its approval of the Base Building Schematic Documents. If Tenant so advises Landlord's architect of such changes as permitted above in a timely manner in accordance with **Exhibit "G-2"** hereto, Landlord shall incorporate such changes into the Base Building Schematic Documents within the time period provided in **Exhibit "G-2"**. Tenant's approval of any plans, specifications and documents pursuant to this Lease shall be for the purpose of achieving mutual approval of the Final Base Building Construction Documents and shall not affect or impair Landlord's responsibility to cause the design and construction of a building that meets legal requirements and shall not affect or impair Tenant's rights with respect to the construction warranty set forth in Section 7 of this **Exhibit "G".**

(ii)     Landlord shall cause Landlord's architect to prepare, and forward to Tenant for Tenant's review, design development documents for the Base Building Work which shall be consistent with the Base Building Scope Documents and the Base Building Schematic Documents (the **"PROPOSED BASE BUILDING DESIGN DEVELOPMENT DOCUMENTS"**), which shall consist of drawings and other documents to fix and describe the size and character of the Base Building Work as to architectural, structural, mechanical and electrical systems, materials and such other elements as may be appropriate. **Exhibit "G-2"** hereto sets out the time schedule for submittal of the Proposed Base Building Design Development Documents to Tenant, for Tenant's comments thereon to Landlord and Landlord's architect, and for the resubmittal of revised Proposed Base Building Design Development Documents by Landlord's architect to Tenant. In the event Tenant fails to provide any comment within the appropriate time period indicated on **Exhibit "G-2"**, the Proposed Base Building Design Development Documents so submitted shall be deemed to have been approved by Tenant. Any comments or suggested changes of Tenant shall be in writing and may be noted on the applicable drawings and plans provided they are legible and sufficiently detailed as warranted under the circumstances, including specific references and notations on applicable drawings and plans to highlight areas in which changes are requested. Except for (A) comments or suggested changes with respect to newly developed features of Proposed Base Building Design Development Documents (as opposed to refinements of features that existed in the previously approved set of Base Building Scope Documents or the Base Building Schematic Documents), and (B) comments or suggested changes to correct any aspect of the Proposed Base Building Design Development Documents that is inconsistent with the Base Building Scope Documents or the Base Building Schematic Documents, Tenant shall not withhold its approval of the Proposed Base Building Design Development Documents. If Tenant so advises Landlord's architect of such changes as permitted above in a timely manner in accordance with **Exhibit "G-2"** hereto, Landlord shall incorporate such changes into the Proposed Base Building Design Development Documents within the time period provided in **Exhibit "G-2"**. The final form of the Proposed Base Building Design Development Documents, as they shall have been developed in accordance with the procedures set forth in this Paragraph, are referred to in this Lease as the **"BASE BUILDING DESIGN DEVELOPMENT DOCUMENTS"**.

(iii)     Landlord's architect shall then prepare complete construction documents for the Base Building Work which shall be consistent with the final Base Building Design Development Documents, which shall consist of drawings and specifications setting forth in detail the requirements for the construction of the Base Building Work and which shall be prepared in two (2) phases, namely, **"50% Complete" Base Building Construction Documents and "100% Complete" Base Building Construction Documents**. Each of the proposed "50% Complete" Base Building Construction Documents and the proposed "100% Complete" Base Building Construction Documents shall be furnished to Tenant on the dates required therefor under the timetable described in **Exhibit "G-2"** and shall be subject to the review and approval of Tenant pursuant to the same procedure for Tenant's review and approval of the Proposed Base Building Design Development Documents described in Paragraph (B) above, except that instead of the Base Building Scope Documents and the Base Building Schematic Documents, the basis for making comments or suggesting changes to correct any aspect of the "50% Complete" Base Building Construction Documents and the "100% Complete" Base Building Construction Documents in terms of consistency shall be the Base Building Design Development Documents and the "50% Complete" Base Building Construction Documents, respectively. The final form of the "50% Complete" Base Building Construction Documents and the "100% Complete" Base Building Construction Documents, as they shall have been developed in accordance with the procedures set forth in this Paragraph, are referred to in this Lease as the **"FINAL BASE BUILDING CONSTRUCTION DOCUMENTS"**.

(iv)     Landlord and Tenant have agreed that Landlord's approved General Contractor will contract with H.T. Lyons, Inc., an affiliate of Tenant **("LYONS")**, on a design/build basis with respect to a portion of the Base Building Work consisting of the mechanical, electrical and fire protection and plumbing systems, including, but not limited to, preparing design drawings and related documents for such systems (the **"M&E DOCUMENTS"**) that are intended to be incorporated into the Base Building Schematic Documents, the Proposed Base Building Design Development Documents, the 50% Complete Base Building Construction Documents and the 100% Complete Base Building Construction Documents in accordance with the schedule and review by Landlord and Landlord's architect as described on **Exhibit "G-2"**. Any delays (x) resulting from Tenant's making or suggesting changes to any of the Base Building Schematic Documents, the Proposed Base Building Design Development Documents, the 50% Complete Base Building Construction Documents and the 100% Complete Base Building Construction Documents other than as permitted in Paragraphs (A) through (C) above or (y) resulting from the failure of Lyons to deliver the corresponding M&E Documents in a timely manner as required under this Paragraph (D) or to make any changes to the M&E Documents requested by Landlord's architect to make the M&E Documents compatible on a like level with corresponding design plans and drawings prepared by Landlord's architect (delays of the nature set forth in this clause (y) being referred to, individually and collectively, a **"LYONS DELAY"**) shall extend on a day-for-day basis all obligations of Landlord relating to the incorporation of such changes into, and completion of, the Base Building Schematic Documents, the Proposed Base Building Design Development Documents, the 50% Complete Base Building Construction Documents and the 100% Complete Base Building Construction Documents, and the completion and delivery of the Base Building Work; provided, however, that Landlord shall advise Tenant if Landlord believes that Tenant's suggested changes as described in clause (x) above are likely to cause delay or increase the cost of the Base Building Work (and the amount of such increase), whereupon Tenant shall have the right either

to approve the increased cost and the delay or to withdraw its request for such suggested changes.

2.       **Tenant Improvements.** The interior finish (**"TENANT IMPROVEMENTS"**) of the Premises shall be developed in accordance with the Final TI Construction Documents (as hereinafter defined) and with the procedure described below. Landlord shall contract with Landlord's General Contractor to perform the Tenant Improvements in accordance with the Final TI Construction Documents. Landlord and Tenant have approved Lyons to serve as a subcontractor under the General Contractor to perform a portion of the Tenant Improvements. All such work shall be performed in a good and workmanlike manner and in accordance with all local, state and federal laws, ordinances, building codes (including any variances lawfully granted) and other applicable requirements of duly constituted public authorities and in accordance with the terms of this Lease. Landlord shall be responsible for obtaining all necessary building permits and other governmental permits and approvals necessary for the construction of the Tenant Improvements. Tenant shall cooperate with Landlord, at Landlord's cost, in Landlord's efforts to obtain such permits and other approvals. The Final TI Construction Documents shall be developed in the following manner:

(a)       Landlord shall cause Landlord's architect to prepare, and forward to Tenant for Tenant's review, schematic design documents for the Tenant Improvements (the **"TI SCHEMATIC DOCUMENTS"**). **Exhibit "G-5"** hereto sets out the time schedule for submittal of the TI Schematic Documents to Tenant, for Tenant's comments thereon to Landlord and Landlord's architect, and for the resubmittal of revised TI Schematic Documents by Landlord's architect to Tenant. In the event Tenant fails to provide any comment within the appropriate time period indicated on **Exhibit "G-5"**, the TI Schematic Documents so submitted shall be deemed to have been approved by Tenant. Any comments or suggested changes of Tenant shall be in writing and may be noted on the applicable drawings and plans provided they are legible and sufficiently detailed as warranted under the circumstances, including specific references and notations on applicable drawings and plans to highlight areas in which changes are requested. If Tenant so advises Landlord's architect of such changes as permitted above in a timely manner in accordance with **Exhibit "G-5"** hereto, Landlord shall incorporate such changes into the TI Schematic Documents within the time period provided in **Exhibit "G-5"**.

(b)       Landlord shall cause Landlord's architect to prepare, and forward to Tenant for Tenant's review, design development documents for the Tenant Improvements which shall be consistent with the TI Scope Documents and the TI Schematic Documents (the **"PROPOSED TI DESIGN DEVELOPMENT DOCUMENTS"**), which shall consist of drawings and other documents to fix and describe the size and character of the Tenant Improvements as to architectural, structural, mechanical and electrical systems, materials, those items described in **Exhibit "G-5"** relating to Design Development, and such other elements as may be appropriate. **Exhibit "G-5"** hereto sets out the time schedule for submittal of the Proposed TI Design Development Documents to Tenant, for Tenant's comments thereon to Landlord and Landlord's architect, and for the resubmittal of revised Proposed TI Design Development Documents by Landlord's architect to Tenant. In the event Tenant fails to provide any comment within the appropriate time period indicated on **Exhibit "G-5"**, the Proposed TI Design Development Documents so submitted shall be deemed to have been approved by Tenant. Any comments or suggested changes of Tenant shall be in writing and may be noted on

the applicable drawings and plans provided they are legible and sufficiently detailed as warranted under the circumstances, including specific references and notations on applicable drawings and plans to highlight areas in which changes are requested. If Tenant so advises Landlord's architect of such changes as permitted above in a timely manner in accordance with **Exhibit "G-5"** hereto, Landlord shall incorporate such changes into the Proposed TI Design Development Documents within the time period provided in **Exhibit "G-5"**. The final form of the Proposed TI Design Development Documents, as they shall have been developed in accordance with the procedures set forth in this Paragraph, are referred to in this Lease as the **"TI DESIGN DEVELOPMENT DOCUMENTS"**.

(c)     Landlord's architect shall then prepare complete construction documents for the Tenant Improvements which shall be consistent with the final TI Design Development Documents, which shall consist of drawings and specifications setting forth in detail the requirements for the construction of the Tenant Improvements and which shall be prepared in two (2) phases, namely, **Pre-Final TI Construction Documents and Final TI Construction Documents**. Each of the proposed Pre-Final TI Construction Documents and the proposed Final TI Construction Documents shall be furnished to Tenant on the dates required therefor under the timetable described in **Exhibit "G-5"** and shall be subject to the review and approval of Tenant pursuant to such timetable. The final form of the Pre-Final TI Construction Documents and the Final TI Construction Documents, as they shall have been developed in accordance with the procedures set forth in this Paragraph, are referred to in this Lease as the **"FINAL TI CONSTRUCTION DOCUMENTS"**. The Final TI Construction Documents and the Final Base Building Construction Documents are sometimes referred to hereafter collectively as the **"FINAL CONSTRUCTION DOCUMENTS"**.

(d)     Landlord shall obtain a fixed price bid for the Tenant Improvements based upon the TI Schematic Documents, and Landlord agrees that it will require Landlord's General Contractor to obtain a minimum of three (3) competitive bids on all subcontractor work in excess of $50,000 (it being agreed that to the extent Lyons engages any subcontractors to perform any portion of its work, all such subcontractors shall be subject to the aforesaid competitive bidding requirements). The aforesaid bids shall be presented to Tenant together with Landlord's analysis comparing the pros and cons of each bid, and Landlord's recommendation as between the bidders. In the event Tenant fails to provide any comment within the appropriate time period indicated on **Exhibit "G-5"**, the pricing and subcontractor bids so submitted by Landlord as aforesaid shall be deemed to have been approved by Tenant. Landlord may (but is not obligated to) make recommendations for changes to the proposed TI Schematic Documents, the proposed TI Design Development Documents and to the Proposed TI Construction Documents, and Tenant may make changes to the same in each case to enable Landlord to obtain a "Tenant Improvement Price" (as hereinafter defined) within the Tenant Improvement Allowance. The final fixed price, when approved, or deemed approved, by Tenant in accordance with the timetable set forth in **Exhibit "G-5"**, shall be the **"TENANT IMPROVEMENT PRICE"**. Included within the Tenant Improvement Price shall be a construction management fee to Landlord of two and one-half percent (2.5%) of the total cost of the Tenant Improvement Work.

(e)     The provisions of Paragraph (1)(b)(iv) above with respect to Lyon's shall similarly apply to the Tenant Improvements to the extent applicable.

3.     **Change Orders/Field Adjustments.** Landlord shall have the right, from time to time after the approval of the Final Construction Documents, to make reasonable and non-material changes/field adjustments in and to the same in each instance, to the extent that the same shall be necessary or desirable in order to adjust to actual field conditions or to cause the Base Building Work or the Tenant Improvements to comply with any applicable requirements of public authorities and/or requirements of insurance bodies. All changes/field adjustments shall be noted on the applicable plans or documents that comprise the Final Construction Documents.

4.     **Punch List.** In conjunction with Substantial Completion for each Phase, Landlord and Landlord's architect, upon consultation with Tenant, shall generate a punch list of all asserted defects or incomplete work items, if any, in Landlord's construction work for such Phase (the **"PHASE PUNCH LIST"**). Landlord shall correct or complete, as applicable, all items on the Phase Punch List that constitute valid defects or incomplete work items, respectively, as described in Paragraph 5 below. In conjunction with Substantial Completion of the final Phase, Landlord and Landlord's architect, upon consultation with Tenant, shall generate a punch list of all asserted defects or incomplete work items, if any, in Landlord's construction work for such Phase and any other incomplete work items, if any, in Landlord's construction work through the date of Substantial Completion of the final Phase, including all previous Phases. Tenant may supplement such punch list for a period of sixty (60) days after the generation of such punch list with any additional asserted defects or incomplete work items in Landlord's construction work (the aforesaid punch list, as so supplemented, being referred to as the **"FINAL PUNCH LIST"**). Any and all such defects or incomplete work items not set forth in the Final Punch List shall be conclusively deemed to be waived by Tenant except as to the Latent Defects (as defined below).

5.     **Substantial Completion.** All construction comprising the Base Building Work and the Tenant Improvements for each Phase shall be commenced promptly in accordance with the construction schedule set forth in Final Construction Documents and shall be substantially completed and ready for use and occupancy by Tenant for such Phase on the Phase Target Turnover Date set forth on **Exhibit "G-6".** As used in this Lease, **"SUBSTANTIAL COMPLETION"** for each Phase of the Base Building Work and the Tenant Improvements shall mean the date that Landlord has delivered to Tenant (A) physical possession of, and access to, the Premises, (B) a copy of the Certificate of Occupancy relating to the work completed for such Phase of the Premises (or the applicable portion thereof being turned over to Tenant), whether permanent, temporary or otherwise, or other similar instrument issued by the applicable governmental authority, with only items set forth on the Phase Punch List (or the Final Punch List, as applicable) remaining to be completed, and (C) a certificate of Landlord's architect certifying: (i) that the Base Building Work and the Tenant Improvements relating to such Phase have been substantially completed substantially in accordance with the final plans and specifications relating thereto and all applicable Laws, and (ii) that such Phase of the Base Building Work and the Tenant improvements is capable of being occupied for the intended purposes thereof without any further work necessary for the completion of the same other than normal "punchlist" items which do not unreasonably interfere with the usual and customary intended use and occupancy of the Property and the Premises with respect to such Phase. Provided, however, that the time for Substantial Completion of each Phase of the Premises and each portion thereof shall be extended for additional periods of time equal to the time lost by a Lyons Delay, strikes, governmental restrictions and limitations, unavailability or delays in

obtaining materials (not resulting from Landlord's lack of diligence in ordering materials), war or other national emergency, acts of terrorism, accidents, floods, delays caused by Tenant, fire damage or other casualties, extraordinary weather conditions, or any cause similar or dissimilar to the foregoing beyond the reasonable control of Landlord or Landlord's contractors, subcontractors or suppliers (collectively "**EXCUSABLE DELAYS**"). If Landlord fails to achieve substantial completion of any Phase of the Premises by the applicable Phase Target Turnover Date, subject to extension on account of Excusable Delays, within ten (10) days following Substantial Completion of the Base Building Work and the Tenant Improvements, Landlord shall pay to Tenant as liquidated damages (and not as a penalty) those sums set forth on **Exhibit "G-6"** for each business day of delay in delivery of such Phase of the Premises beyond the applicable Phase Target Turnover Date. Such payment shall be made upon Substantial Completion of the applicable Phase of the Base Building Work and the Tenant Improvements, except that if Substantial Completion for such Phase has not occurred within thirty (30) days after the Phase Target Turnover Date relating to such Phase, subject to extension on account of Excusable Delays, Landlord shall commence payment of liquidated damages on the day after such thirtieth (30th) day and shall pay further installments thereof in 10-day increments until the achievement of Substantial Completion. Although Landlord and Tenant recognize that the damages which will be suffered by Tenant should Landlord fail to timely deliver the Premises and each Phase thereof as aforesaid will be difficult to determine with precision, Landlord and Tenant nevertheless agree that the liquidated damages to which Tenant is entitled hereunder are a reasonable forecast of the damages which will be suffered by Tenant by reason of such delay by Landlord. Additionally, if Landlord is able to deliver the first Phase of the Premises to Tenant before the Phase Target Turnover Date applicable thereto, within ten (10) days following Substantial Completion of the Base Building Work and the Tenant Improvements, Tenant shall pay to Landlord as an incentive bonus Fifteen Thousand Dollars ($15,000) per business day for the number of business days that elapse between the date of such early delivery and such Phase Target Turnover Date.

Within 60 days following the date of the generation of the Final Punch List, Landlord shall complete all items on all Phase Punch Lists previously generated and on the Final Punch List unless the nature of the defect or variance or incomplete work item listed therein is such that a longer period of time is required to repair or correct the same, in which case Landlord shall exercise due diligence in correcting such defect or variance or completing such incomplete work item at the earliest possible date and with a minimum of interference with the operation of Tenant. Any disagreement that may arise between Landlord and Tenant with respect to whether an item on the Phase Punch List constitutes a valid defect or incomplete work item shall be conclusively resolved by the decision of Landlord's architect. Tenant's occupancy of the Phase of the Premises then completed shall be conclusively deemed to constitute Tenant's acceptance of the same, as well as the Building shell and core (and the Common Areas following substantial completion of the final Phase), and thereupon Tenant shall be deemed to have acknowledged that the Phase of the Premises then completed and the Building shell and core (and the Common Areas following substantial completion of the final Phase) are in the condition required by this Lease, except as to any defects or incomplete work items set forth in the Phase Punch List, or as to any defects not discernible by a reasonable inspection (the "**LATENT DEFECTS**"); provided that: the foregoing shall not impair the obligations of Landlord to correct the conditions or complete incomplete work items identified on the Phase Punch List and any Latent Defects and to Maintain the Premises, the Building and the Common Areas as required pursuant to this

Lease, or the obligations of Landlord pursuant to the construction warranty set forth in Section 7 of this **Exhibit "G"**.

Within 90 days following the date of Substantial Completion of the final Phase, Landlord shall deliver to Tenant as-built drawings and specifications, operating manuals and third party warranties and guaranties required under the specifications for the Tenant Improvements. Landlord agrees to use diligent efforts to obtain a final Certificate or Certificates of Occupancy for the Premises (or each Phase to the extent required under applicable legal requirements), including without limitation, using diligent efforts to arrange for any required inspection of the Premises (or each Phase completed, as applicable) to be conducted as soon as reasonably practicable after the date Landlord has satisfied any conditions set forth on the temporary certificate(s) of occupancy issued for the Premises or Phase or portion thereof.

6.     **Payment for Tenant-Directed Change Orders.**     During the course of construction, Landlord shall keep a running account of the cost of all change orders and field adjustments initiated by Tenant, or initiated by Landlord for Tenant's benefit and approved by Tenant, with respect to the Tenant Improvements, noting the amount of any cost savings with respect thereto, which account shall be available to Tenant and its Project Manager on an open book basis. Within 15 days following substantial completion of the Tenant Improvements, Landlord shall deliver to Tenant a statement setting forth the Tenant Improvement Price (inclusive of all change orders and field adjustments, with any cost savings having been taken into account). To the extent the Tenant Improvement Price (inclusive of any such change orders and field adjustments), net of any reductions in the Tenant Improvement Price in accordance with this Section, is more than the Tenant Improvement Allowance, Landlord shall supply such documentation evidencing the excess as Tenant may reasonably require and at Tenant's option, Tenant shall pay such net excess to Landlord within 15 days following Landlord's submission to Tenant of such supporting documentation. Alternatively, if during the plan approval process for the Tenant Improvements and prior to substantial completion, the Tenant Improvement Price as determined in accordance with Section 2(d) above is greater than the Tenant Improvement Allowance, Tenant shall either deposit with Landlord the amount of such excess in cash or post a letter of credit with Landlord (in form and substance reasonably satisfactory to Landlord) in the amount of such agreed upon amount, which letter of credit shall be drawable by Landlord following substantial completion of the Tenant Improvements, in an amount equal to the net excess after taking into account any reductions in the Tenant Improvement Price pursuant to this Section. Landlord and Tenant agree that in the event that the Tenant Improvement Price, after taking into account any adjustments thereto in accordance with this Section, is less then the Tenant Improvement Allowance, for every $1.00 per rentable square foot in net savings in connection with the Tenant Improvement Work derived from Tenant-directed change orders and/or field adjustments, Minimum Annual Rent shall be adjusted by $0.11 per rentable square foot; provided, however, that Landlord shall hold such Tenant Improvement Allowance available to Tenant for a period of two (2) years following the Commencement Date so that if Tenant subsequently uses the available balance of the Tenant Improvement Allowance for future tenant improvements, there shall be a commensurate upward adjustment in Minimum Annual Rent. Any such adjustment in Minimum Annual Rent shall be confirmed and memorialized by Landlord and Tenant in a supplement to this Lease.

7.     **Construction Warranty.** Without limiting the effect of Section 7(d)(iii) of the Lease, Landlord covenants that it shall repair or replace at its expense defective materials or workmanship in the construction of the Base Building or the Tenant Improvements brought to its attention within one (1) year following substantial completion of the work in question, or within such longer period as may be provided by any warranty obtained by Landlord from its contractor or supplier (the **"CONSTRUCTION WARRANTY PERIOD"**). The foregoing shall be the sole and exclusive warranty relating to construction, and Tenant expressly WAIVES AND DISCLAIMS ALL OTHER WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.   TENANT FURTHER WAIVES ANY OTHER REMEDIES ARISING FROM ANY BREACH OF WARRANTIES RELATING TO CONSTRUCTION OF THE PREMISES, INCLUDING WITHOUT LIMITATION ANY CLAIMS FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. The foregoing shall not abrogate or impair the obligation of Landlord to Maintain the Building and the Common Areas in accordance with the terms of this Lease, or Tenant's remedies for any breach of such obligation by Landlord.

8.     **Approved Professionals and Contractors.** Landlord and Tenant hereby approve the design professionals listed on **Exhibit "G-3"** and approve the general contractors listed on **Exhibit "G-4"** as acceptable persons to be Landlord's General Contractor, in each case with respect to the Base Building Work and the Tenant Improvements. In the event Landlord desires to substitute any person(s) listed on the aforesaid Exhibits, Landlord shall send Tenant written notice thereof, accompanied with suitable backup information for Tenant to evaluate such persons, and requesting Tenant's approval, which approval shall not be unreasonably withheld. If Tenant fails to respond to Landlord's notice within five (5) business days following receipt of Landlord's notice and other information as aforesaid, Tenant shall be deemed to have approved Landlord's substitution.

9.     **Tenant's Self-Help Right.** It is expressly understood and agreed that in the event Landlord, for reasons other than Excusable Delays, shall not have substantially completed the Base Building Work and the Tenant Improvements in accordance with this **Exhibit "G"** and all subparts thereof, as certified by Landlord's Architect, and delivered the Premises to Tenant on or before the date which is 120 days after the final Phase Target Turnover Date (as extended on a day-for-day basis as a result of the occurrence of an Excusable Delay), and if Landlord had not have commenced curing such failure within 30 days and cured such failure within 60 days after Tenant has thereafter given written notice to Landlord of Tenant's intention to exercise self-help rights under this Section, Tenant shall have the right to complete or cause to be completed the Base Building Work and the Tenant Improvements in accordance with the Final Construction Documents, such completion to be certified by Landlord's Architect. All costs reasonably incurred by Tenant in doing so, with Interest thereon (accruing from the date such expense is paid by Tenant through the date Tenant is repaid, shall be promptly reimbursed by Landlord upon demand.

10.    **Re-Conveyance.** It is expressly understood and agreed that if construction of the Base Building Work, the Tenant Improvements and the Garage has not commenced by June 1, 2002 (as extended on a day for day basis as a result of the occurrence of an Excusable Delay), Tenant shall have the right to re-purchase the Land and the Garage Land from Landlord and upon Tenant's written notice to Landlord exercising such right, Landlord shall re-convey the

Land to Tenant or Tenant's designee and shall re-convey the Garage Land to PPL Electric Utilities Corp. or its designee. Such re-conveyance of the Land shall be at a purchase price equal to the purchase price paid by Landlord to Tenant for the Land pursuant to that certain Agreement of Sale entered into, or to be entered into, on or about the date hereof between Tenant, as seller, and Landlord, as buyer, and shall be free and clear of all liens, encumbrances and such other title matters other than those to which Landlord took subject at the time it acquired the Land from Tenant and utility easements entered into by Landlord in connection with the development of the Land and which benefit the Land. Such re-conveyance of the Garage Land shall be at a purchase price equal to the purchase price paid by Landlord to Tenant for the Garage Land pursuant to that certain Agreement of Sale entered into, or to be entered into, between PPL Electric Utilities Corp., as seller, and Landlord, as buyer, and shall be free and clear of all liens, encumbrances and such other title matters other than those to which Landlord took subject at the time it acquired the Garage Land from PPL Electric Utilities Corp. and utility easements entered into by Landlord in connection with the development of the Garage Land and which benefit the Garage Land.

11.     **Tenant's Representative.** Whenever in this **Exhibit "G"** Landlord is required to submit any documents to Tenant for Tenant's review or Tenant is given the authority to make comments or changes to any documents submitted by Landlord or approve changes requested by Landlord, "Tenant" shall mean Peter Cleff, Manager, Energy Operations & Services, Tenant's authorized representative and "Project Manager" for this purpose, and Landlord shall be entitled to rely on the actions of such person as being authorized by Tenant.

# EXHIBIT "G-1"

## BASE BUILDING SCOPE DOCUMENTS

# Exhibit C

News / Local News / Allentown

# How Five City Center is cashing in on Allentown's NIZ 

 

By **Matt Assad · Contact Reporter**
Of The Morning Call

**SHARE THIS**

An inside look at Allentown's NIZ and how one developer is turning it into gold.

DECEMBER 12, 2015, 6:29 PM

ALLENTOWN — With its sleek design and 19 floors reaching into the Allentown skyline, the proposed Innovation Tower of Five City Center will be the biggest new building downtown and the best example of how quickly the city is rebuilding its core.

It also shows how an enterprising developer can use the city's Neighborhood Improvement Zone to net tens of millions of dollars on a single project.

For its $5.3 million in seed money, the NIZ's largest developer stands to own one of the Lehigh Valley's most expensive office buildings, while netting $23.6 million in profits over the next 10 years, according to financial projections made by City Center Investment Corp. and obtained by The Morning Call.

Those projections — the first that the Allentown Neighborhood Improvement Zone Development Authority has provided on a new project — were submitted by City Center Lehigh Valley CEO J.B. Reilly in October, giving a glimpse into just how lucrative the city's one-of-a-kind tax district can be. They also show that without millions of dollars in NIZ subsidies, projects like Five City Center could not happen — at least not in Allentown. Making the whole deal come together is more than $40 million in NIZ tax revenues.

*Article continues below* ₒ

Reilly expects to take a building project that his projections show would have lost $12 million over 10 years — a loss that would have rendered the project virtually impossible to finance — and turn it into a healthy profit. That projected profit was enough to get the backing from a partnership of local banks, led by National Penn.

That influx of NIZ tax revenues is at the heart of Allentown's resurgence. NIZ-subsidized financial models, such as those behind the Innovation Tower, are credited with reversing a three-decade slide of Pennsylvania's third-largest city, enabling it to be a contributor rather than a drag on the state economy, contends Sen. Pat Browne, R-Lehigh, who wrote the NIZ law.

Some, including local developers who don't have any downtown properties, say the NIZ gives Reilly an unfair advantage.

A private developer shouldn't be the biggest winner in a plan funded with public money, said Stephen Herzenberg, executive director of the Keystone Research Center, a Harrisburg think tank that focuses on budget policy issues.

"We've got no quarrel with investing resources into revitalizing older cities and towns, but government is on a lot safer ground when it puts that money into schools, main street programs or property tax reduction," said Herzenberg, who reviewed the Five City Center financial model. "But when you put this much tax subsidy in the hands of one developer, it's going to raise questions. We'd prefer they be invested in projects that are unquestionably for the public good."

Reilly argues the NIZ has benefited the public good by strengthening the city and leveling an economic playing field that has allowed suburbs to lure tenants from downtowns for decades. And he acknowledged that if all goes as planned, Five City Center will one day enrich his bank account — but not any time soon.

"It could potentially be very profitable, but it's long-term," Reilly said. "We haven't taken a dime out of any of our projects and we don't expect to for 10 to 15 years. ... The risks are huge. If I didn't have a personal commitment to Allentown, I probably wouldn't do this."

"We all have risks," countered Don Frederick, a real estate broker and developer of an office building in South Whitehall Township, where there is no NIZ. "That's the nature of real estate development, but we don't all have tax dollars to cover those risks."

In February, Morgan Stanley, an anchor tenant in Frederick's Winchester Road building, will move to downtown Allentown, where the one-of-a-kind NIZ was established by the Legislature in 2009 to spur development. The initiative allows all state taxes created by new building projects in the NIZ to be harnessed by the developer — rather than being paid to the state — to pay for construction loans. The generous tax incentive has spurred $1 billion of new or proposed development, including the publicly owned PPL Center hockey arena and several privately owned office buildings, restaurants, a hotel, apartments and retail shops.

In essence, Frederick said, his tax dollars are helping his competitors in the NIZ to recruit tenants from him and other suburban developers with lower, tax-subsidized rents.

Most of the private development — more than $250 million has been spent so far — has been done by Reilly's City Center, and the more than $200 million Five City Center project would be the biggest yet. The project Reilly expects to break ground on next spring includes the 19-story Innovation Tower, a 15-story tower with 200 luxury apartments and a 1,000-space parking garage.

According to a detailed, 50-page ANIZDA financial model for the Innovation Tower, City Center's initial investment is to be $5.3 million, largely to acquire and prepare a block of Walnut Street, between Seventh and Eighth streets.

During construction, that equity and NIZ tax credits will fund more than $13 million in early costs, requiring the developer to tap a $99.3 million construction loan to cover the cost of the roughly $113 million building project.

In his 10-year projection, Reilly expects to get rental income from tenants totaling $56.4 million, while gathering another $41 million in NIZ taxes generated by those tenants. Through the first 10 years, those revenues would be enough for City Center to make annual debt payments of $6.3 million and cover real estate taxes, fees and some capital improvements, while garnering a "net cash flow" of $23.6 million.

The equity stake, which at $5.3 million is less than 5 percent of the total project, is well below what developers outside the NIZ must put in to get projects off the ground, Frederick said.

"We usually put 20 or even 30 percent into a project," Frederick said. "We'd all like for a project to come together with just 5 percent."

But there are drawbacks, Reilly said. To use those NIZ subsidies, City Center has to own the building, probably for the life of the 25-year loan, he noted.

"When you look at the numbers, there's clearly a great deal of money to be made, under the right circumstances," said Mike Stoudt, an Allentown accountant who has worked on several NIZ projects, including some that compete with City Center. "But this is no get-rich-quick scheme. The developer has to stay in for the long haul. He can't just flip it."

Stoudt noted that the net income or profit of Five City Center, while healthy, is not out of line from what most development projects generate. In fact, he said, it's required by the banks. To approve financing, he said, banks generally require a project to have annual revenues of at least 1.25 times the annual debt. The debt ratio on Five City Center over its first 10 years ranges from 1.34 to 1.50.

"Healthy, but not out of line," Stoudt said. "Developers routinely see that on a suburban project."

Also, if the Innovation Tower doesn't keep all 19 floors full, lease revenue goes down and the same is true if one of its tenants goes out of business during the life of the debt. NIZ tax revenues would

go down with it because those lost tenants won't be there to pay them.

It is for those reasons that City Center's loan covenants required by the banks forbid the developer from digging into the net income until much of the debt is paid off. It has to remain there to cushion the blow of tenant loss, Reilly said. It's also needed to pay fees that include federal taxes, he said.

In short, he argues, his best-case scenario is that in 10 to 20 years, Innovation Tower will be worth $75 million — a pretty good return on that initial equity stake. But the worst case is that if he can't keep the building full, he's stuck paying off a massive loan without the rents to cover it.

Banks are well aware of the potential for failure in the NIZ, where projects are scrutinized by banks and by ANIZDA.

"The NIZ is a unique animal, and every project is unique in how it uses tenant revenues to become viable," said David Lobach, CEO of Embassy Bank, which is among several banks helping to fund NIZ projects. "We're excited about the success and job growth downtown, and we're proud to be part of it, as long as the deals are structured properly."

Although the complexities of building downtown will drive the project's costs to $113 million, Reilly argues that the Innovation Tower's worth will be based on the lease revenues it can bring. Based on his projection to ANIZDA, that worth will be $65 million in Year 1 and $75 million in 2028.

City Center's projects are based on charging tenants $15 to $18 a square foot — 20 to 30 percent below market rate for Class A office space — to be in what would be one of the region's highest-profile office buildings. Reilly estimates that selling the building before 2027 would be done at a loss.

"We will be personally guaranteeing a $100 million loan," Reilly said, referring to him and his City Center partner, Joseph Topper. "I've been developing all of my life and I'm putting it all on the line for this."

NIZ also adds another potential pitfall, he said: time. Because it adds to City Center's debt, every new project pushes back the date when City Center could cash in on its investments.

"When we stop developing downtown, you'll know we're starting to think about taking something out, maybe 10 years down the road," said the 54-year-old Reilly. "I figure I have about a 50-50 chance of still being alive when that happens."

*massad@mcall.com*

*610-820-6691*

**NUMBERS BEHIND INNOVATION TOWER**

**Total cost:** $113 million

**Equity by developer:** $5.3 million

**Total tax subsidy over 10 years:** $41.1 million

**Developer net income over 10 years:** $23.5 million

**New workers downtown:** 1,200

*Sources: City Center Investment Corp., Allentown Neighborhood Improvement Zone Development Authority*

Copyright © 2015, The Morning Call

**This article is related to:** Commercial Real Estate

VIEW COMMENTS (17)

Content Continues Below

e

# Exhibit D

# Talen Energy to vacate PPL Plaza, move to Tower 6



The final beam is placed on the Tower 6 office building in downtown Allentown. Talen Energy Corp. said it plans to move workers next spring from The Plaza and PPL into the new, 12-story building. (CAMERON HART / THE MORNING CALL FILE PHOTO)

By **Anthony Salamone**
Of The Morning Call

AUGUST 16, 2017, 5:00 PM

**A**LLENTOWN — Talen Energy will vacate The Plaza at PPL Center in downtown Allentown early next year and move its employees into cheaper office space just blocks away on Hamilton Street, saving the company millions but leaving its landmark headquarters building mired in foreclosure and facing an uncertain future.

Talen spokesman Todd Martin, responding to a request by The Morning Call, said Tuesday that the energy company has made a "five-year commitment" to rent two floors of the soon-to-be-opened Tower 6 at Sixth and Hamilton streets.

The move will take effect in the second quarter of 2018, coinciding with the end of Talen's lease at PPL Plaza at 835 W. Hamilton St.

"We're pleased to be able to maintain our historic roots in downtown Allentown," Martin said. "We see this decision as beneficial to our business, our employees and the Greater Lehigh Valley, especially to others in the business community in downtown Allentown."

Tower 6, owned by City Center Investment Corp., is in the Neighborhood Improvement Zone, which offers tax incentives for developers who can, in turn, offer cheaper rents. PPL Plaza also is in the NIZ, but cannot draw upon its benefits because the incentives cover new construction and renovations.

Mayor Ed Pawlowski said he was pleased that Talen remains committed to downtown Allentown.

"The city has a lot to offer, and the benefits of locating in the NIZ are attractive," Pawlowski said. "I was always confident that proposals from developers in Allentown would be given very careful consideration."

What's not yet known is how many employees Talen plans to move into Tower 6. Martin did not respond to follow-up questions Wednesday. Jarrett Laubach, vice president of leasing of City Center Investment Corp., confirmed Wednesday that both parties have signed a lease, but said he was not permitted to comment further, citing a confidentiality agreement.

At one time, more than 500 people worked for Talen in PPL Plaza, and the company occupied nearly 90 percent of the building. It now occupies three floors, but that will be whittled down to one floor and fewer than 200 employees by Jan. 1, according to a Talen employee who asked to remain anonymous because he is not permitted to speak on behalf of the company.

According to an email sent to employees from Talen CEO Ralph Alexander on Tuesday and reviewed by The Morning Call, Talen's Allentown office will be one of two "center locations." The other is in a Houston suburb called The Woodlands. Both centers will be smaller than historic "Talen 1.0," wrote Alexander, who is based in Houston.

Pawlowski and other local leaders say that while the city might be losing jobs, it's also retaining a marquee corporate presence.

"It's certainly not the same number of employees at the time it was spun off from PPL," said Don Cunningham, president and CEO of the Lehigh Valley Economic Development Corp. "But the energy production market is changing so rapidly."

Talen was spun off from a PPL Corp. subsidiary in 2015 as a publicly held company, and then became private in late 2016 following its acquisition by private equity firm Riverstone Holdings. The company operates power plants and sells the energy they generate to utilities and other mostly commercial customers. It has been a tough industry in recent years, beset by stagnant demand, low energy prices and tight profit margins.

Talen owns power plants in seven states, including five in Pennsylvania, and had as many as 3,500 employees nationwide as of June 2015.

Local leaders said retaining businesses is as important as recruiting companies — even if it means fewer employees committed to the downtown and a company capitalizing on cheaper rent at the expense of another modern office building.

The ownership group of PPL Plaza has been heading for foreclosure on the 835 W. Hamilton St. building. The Plaza at 835 W. Hamilton St., which bought the property for $83.5 million in 2007, missed a $67.4 million balloon ···, locked in at an above-market rate when the building

**Support Quality Journalism**
Subscribe for only 99¢          START NOW ›

"PPL Plaza is a good property," Pawlowski said. "Once the legal issues are sorted out, I believe it will prosper again."

Alexander, in the email to employees, noted the move to Tower 6 will save Talen $7 million a year in building costs.

"Obviously, the costs savings help secure the entire company, and remaining in Pennsylvania is crucial given the scale of our operations in the Commonwealth," Alexander wrote.

The NIZ allows property owners to tap virtually all the state taxes created by their projects to fund their building debt for up to 30 years. Critics have said the NIZ has unfairly used big tax subsidies to lure tenants from other parts of the Lehigh Valley, and many of City Center's buildings are filled with tenants that moved to Allentown from elsewhere in the region.

In the case of Talen, its state tax payments are a critical component of revenues collected in the NIZ and help pay construction loans on the PPL Center arena at Seventh and Hamilton streets. Documents reviewed by The Morning Call show that Talen contributes $13.7 million a year in NIZ taxes, almost single-handedly providing enough money to pay a $15.3 million annual debt for the PPL Center arena, even before the zone's other 600 businesses chip in.

If Talen would have chosen to leave the NIZ, the public bonds sold by the arena authority would become less stable and more difficult to sell.

Sy Traub, chairman of the Allentown Neighborhood Improvement Zone District Authority, said officials won't know yet how Talen's move could affect its NIZ contribution. But he also said much of the NIZ revenue from Talen has come from state gross receipts tax on Talen's electric generating.

Tower 6, which is scheduled to be completed in May, will have one floor vacant following the Talen deal, according to City Center and Morning Call information. City Center was not alone in its attempts to lure Talen away from PPL Plaza. Other developers, most notably the developers of The Waterfront along the Lehigh River in Allentown, were linked to Talen.

Martin said Talen's decision to remain in Allentown came despite "other low-cost opportunities" that he declined to name.

On Wednesday, Zachary Jaindl, one of the principals of The Waterfront, congratulated City Center on keeping the company downtown.

"I actually applaud City Center ... and everything going on in the downtown," Jaindl said. "The long-term goal is to make sure we create an open and welcoming environment for Talen."

*Morning Call reporter Jon Harris contributed to this story.*

## TOWER 6 TENANTS SO FAR

Besides Talen Energy Corp., which is set to take two floors of the 12-story Tower 6 office building in downtown Allentown next year, other tenants planning to move in, with the number of floors they will occupy, are:

**Support Quality Journalism**
Subscribe for only 99¢          START NOW ›

- CAPTRUST Financial Advisors, 1
- I&I Software, 1
- Serfass Development Partners, 1

Tower 6 is also slated to host an unspecified number of retail businesses on the first floor.

Source: The Morning Call archives

asalamone@mcall.com

610-820-6694

Get the inside scoop on the Lehigh Valley's business scene on The Business Cycle, themorningcall.com/business. Like us on Facebook: facebook.com/LVBizCycle. Follow us on Twitter: @LVBizCycle.

Copyright © 2017, Lehigh Valley Business Cycle

This article is related to: Foreclosures, Real Estate, Ed Pawlowski

**Support Quality Journalism**
Subscribe for only 99¢          START NOW ›